JONATHAN D. SELBIN (Cal. Bar No. 170222)
jselbin@lchb.com
ANNIKA K. MARTIN (*to be admitted pro hac vice*)
akmartin@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ELIZABETH A. FEGAN (*to be admitted pro hac vice*)
beth@feganscott.com
FEGAN SCOTT, LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

LYNN A. ELLENBERGER (*to be admitted pro hac vice*)
lynn@feganscott.com
FEGAN SCOTT, LLC
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 515-1529
Facsimile: (412) 785-2400

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ERIN ALDRICH, LONDA BEVINS, AND JESSICA JOHNSON, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE BOARD OF GOVERNORS OF THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, and JOHN REMBAO, | |
| Defendants | |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION AND VENUE ......................................................................... 4

III.  INTRA-DISTRICT ASSIGNMENT ................................................................. 5

IV.   PARTIES ............................................................................................................ 5

    A.   Plaintiffs ................................................................................................... 5

    B.   Defendants ................................................................................................ 6

V.    FACTS ................................................................................................................ 8

    A.   Student-athletes are at risk for sexual exploitation by coaches............................ 8

    B.   By the 1990s, governing sports organization established prohibitions on coach-athlete relationships and sexual relations, recognizing the power disparities. ................................................................................................ 13

        1.   Sexual relationships are forbidden in analogous professional settings where a power disparity exists between the professional and his client. ..................................................................................... 13

        2.   In 1992, the United States Olympics Committee established the code of ethics, which prohibited coach-athlete sexual relationships as "exploitative."..................................................... 14

        3.   USA Hockey established a sexual abuse policy in 1993. ........................ 16

        4.   USA Swimming has prohibited sexual contact or advances toward an athlete by a person with authority over that athlete since 1998. .......... 18

        5.   The International Olympic Committee issued a consensus statement in 2007 on sexual abuse in sport. ............................................. 19

    C.   Despite the USOC's recognition in 1992 that all sexual contact between coaches and athletes should be prohibited, the NCAA took no action for 20 years. ....................................................................................................... 20

        1.   Under the NCAA Constitution, the NCAA has a duty to protect the physical and educational well-being of student-athletes........................ 20

        2.   The NCAA regulates coaches in a myriad of ways – except when it comes to sexual abuse of student-athletes................................................. 22

        3.   Despite its duty to protect student-athletes, the NCAA took no action to protect them from sexual abuse until 2012 – and fell short. ...... 23

    D.   Without NCAA controls, Coach John Rembao was permitted to move among schools without recrimination despite multiple schools' knowledge of his sexual abuse of student-athletes, including Plaintiffs. ............................... 33

        1.   Coach John Rembao groomed and sexually abused NCAA student-athlete Erin Aldrich at the University of Arizona and retaliated against her at the University of Texas-Austin........................................ 34

2.  Coach John Rembao groomed, sexually harassed and abused, and retaliated against student-athlete Jessica Johnson at the University of Texas-Austin. .......................................................................... 40

3.  Coach John Rembao groomed, sexually harassed and abused, and retaliated against student-athlete Londa Bevins at the University of Texas-Austin. ........................................................................... 48

E.  Plaintiffs and the Class were damaged. ................................................ 59

VI.  TOLLING OF THE STATUTE OF LIMITATIONS ............................................. 60

A.  The statute of limitations should be tolled by the discovery rule. ........................ 60

B.  The statutes of limitations should be tolled based on equitable estoppel, fraudulent concealment, and/or equitable tolling ................................................ 63

C.  Because Ms. Johnson and Ms. Bevins filed this lawsuit promptly after understanding their legal rights, their claims are timely. A new rule must be created to toll the statute of limitations favoring victims sexually abused by a person in a position of authority over them ...................................................... 65

VII.  CLASS ALLEGATIONS ............................................................................. 67

VIII.  CLAIMS AGAINST THE NCAA ON BEHALF OF THE NATIONWIDE CLASS...... 71

COUNT I GROSS NEGLIGENCE (PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA AND ITS BOARD OF GOVERNORS) .......... 71

COUNT II NEGLIGENCE (PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA AND ITS BOARD OF GOVERNORS) ...................... 76

COUNT III BREACH OF FIDUCIARY DUTY (PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA) ..................................... 81

COUNT IV NEGLIGENT MISREPRESENTATIONS AND OMISSIONS (PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST NCAA) ........... 83

COUNT V BREACH OF CONTRACT (PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST NCAA) ....................................... 84

COUNT VI BREACH OF IMPLIED CONTRACT  (PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST NCAA) ....................................... 88

COUNT VII BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES (PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA) ......................................................................... 89

IX.  CLAIMS AGAINST THE NCAA AND JOHN REMBAO ON BEHALF OF THE NCAA-REMBAO SUBCLASS ...................................................................... 93

COUNT VIII CIVIL BATTERY (PLAINTIFFS AND THE REMBAO SUBCLASS AGAINST THE NCAA AND JOHN REMBAO) ....................... 93

COUNT IX ASSAULT (PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS THE NCAA AND JOHN REMBAO)................................... 94

COUNT X FALSE IMPRISONMENT (PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND THE NCAA)........................... 95

COUNT XI INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND THE NCAA) ......................................................... 96

COUNT XII NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND THE NCAA) ............................................................... 98

COUNT XIII RATIFICATION (PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND NCAA) .......................................... 99

X.    PRAYER FOR RELIEF ............................................................ 100

XI.   DEMAND FOR TRIAL BY JURY ............................................ 101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Erin Aldrich, Jessica Johnson, and Londa Bevins, on behalf of themselves and all others similarly situated, by and through their attorneys, for their Complaint against the National Collegiate Athletic Association (NCAA), the Board of Governors of the NCAA, and John Rembao, allege as follows:

## I.   __INTRODUCTION__

1.    The NCAA admits that "[s]exual relationships between coaches and student-athletes have become a serious problem."[1]

2.    The NCAA acknowledges that any sexual contact between a coach and student-athlete is sexual abuse because the coach holds all the power and the student-athlete holds none:

> In the context of sports programs within institutions of higher learning, sexual abuse can occur regardless of the minor/adult status of the student-athlete, and regardless of the age difference between the perpetrator and victims. Whether the student-athlete is 17, 18, 19, 20, 21, or older, she or he is significantly less powerful than a head coach, assistant coach, athletics trainer, sport psychologist, athletics director, or other athletics department staff with supervisory control or authority over student-athletes. It is this power differential that makes such relationships inherently unequal, and when relationships are unequal, the concept of "mutual consent" becomes problematic.
>
> Because of this power differential, any amorous or sexual relationship between coaches and student-athletes constitutes sexual abuse. In other words, the dynamics of the coach-athlete relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent.[2]

3.    Despite this, the NCAA does not categorically prohibit such behavior. "That lack of institutional boundary-setting has allowed coaches with bad boundaries to continue taking advantage of young, vulnerable student-athletes."[3]

4.    The NCAA had and has a duty to protect the health and safety of student-athletes, and has promulgated rules that require it to "adopt legislation to enhance member institutions'

---

[1] Deborah L. Brake, J.D. and Mariah Burton Nelson, MPH, CAE, "Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel," at 4 (NCAA 2010) ("Staying in Bounds"),  available at https://www.ncaa.org/sites/default/files/Staying+in+Bounds+Final.pdf (last accessed 2/12/20).

[2] "Staying in Bounds," at 5-6 (emphasis supplied).

[3] *Id*. at 6.

compliance with applicable gender-equity laws."[4]

5.    According to the NCAA:

> One of the NCAA's principles of conduct for intercollegiate athletics focuses on gender equity.  The office of inclusion is committed to supporting the membership as it strives to comply with federal and state laws regarding gender equity, to adopting legislation that augments gender equity and to establishing an environment that is free of gender bias.[5]

6.    Gender equity includes the right to be free from sexual violence, sexual abuse, and sexual harassment. When students suffer sexual abuse and harassment, they are deprived of equal access to education.

7.    Despite its duty to promulgate legislation to augment gender equity and protect the health and safety of its student-athletes, the NCAA has failed to implement or enforce rules prohibiting sexual abuse, harassment, or relations between NCAA coaches and student-athletes.

8.    NCAA student-athletes – chasing aspirations that may include Olympic participation or a professional career, mandated to meet certain standards both athletically and academically, and typically experiencing living away from home for the first time – include some of the most vulnerable individuals (regardless of gender) in our society.

9.    Student-athletes arrive at college with the expectation that they will become the best athlete they possibly can be under the supervision of educated, skilled, and fully vetted athletics department personnel looking out for their best interests. The student-athletes trust and believe in these individuals because they are taught to do so from a young age, and accord their coaches and trainers deference, respect, and unquestionable loyalty.

10.    This trust – coupled with the NCAA's failure to implement and enforce rules prohibiting sexual relations and abuse by athletic department personnel of student-athletes and failure to impose significant sanctions that would incentivize schools to report abuse and deter perpetrators – has created a national epidemic perpetuating a cycle of sexual abuse, similar to that

---

[4] *See* 2.3.2 NCAA Legislation (adopted 1/11/94), available at https://web3.ncaa.org/lsdbi/bylaw?bylawId=2461&division=1&adopted=0 (last accessed 2/12/20).

[5] https://www.ncaa.org/about/resources/inclusion/gender-equity-and-title-ix (last accessed 2/13/20).

1    seen in the Catholic Church.

2        11.     Rather than create a system that requires member institutions to report coaches

3    who are perpetrators to the NCAA, the NCAA has created a system that permits the perpetrators

4    to move unchecked among schools, prioritizing the protection of athletic revenue, alumni

5    donations, and tuition that schools receive at the expense of student-athletes.

6        12.     Student-athletes who are sexually abused by their coaches are "'likely to adapt to

7    the victim role, … repeating it in other relationships, each time losing more of her self-respect

8    and enthusiasm for life.' Too afraid of the authority figures to become angry, she instead suffers

9    from depression, fear, anxiety, shame, and overwhelming guilt."[6] A victim of a coach's abuse

10   may quit the team, give up her scholarship, or transfer schools, losing valuable time and

11   engagement in her education and social development. She may engage in self-harm, self-medicate

12   with drugs and alcohol, and self-destruct through eating disorders, cutting, burning, or attempting

13   suicide.

14       13.     By this lawsuit, Plaintiffs come forward and seek to hold the NCAA accountable

15   in two ways:  changes to its policies and practices to ensure that it fulfills its obligation to protect

16   student-athletes from sexual abuse by athletic department personnel now and in the future, and

17   compensation for those who have already been subjected to sexual abuse as a result of the

18   NCAA's failure to do so previously.

19       14.     First, Plaintiffs seek injunctive and equitable relief requiring the NCAA to

20   implement and enforce rules and bylaws that are considered consensus best practices.  That

21   includes, *inter alia*: prohibiting sexual harassment and/or sexual abuse of student-athletes by

22   athletics department personnel; prohibiting any romantic or sexual relationships between athletics

23   department personnel and student-athletes; prohibiting grooming and other sexually-exploitative

24   behavior by athletics department personnel of student-athletes; requiring NCAA member

25   institutions to immediately report any allegations of sexual relationships, harassment, or abuse of

26   a student-athletes by athletics department personnel; maintaining all reports in a centralized

---

[6] "Staying in Bounds," at 8 (*quoting* Peter Rutter, Sex in the Forbidden Zone: When Men in Power – Therapists, Doctors, Clergy, Teachers, and Others – Betray Women's Trust (Los Angeles: Jeremy Tarcher, Inc., 1986)).

CLASS ACTION COMPLAINT              - 3 -

1  repository so that all complaints about sexual relationships, harassment, or abuse of a student-
2  athlete by athletics department personnel can be tracked by the NCAA and its member
3  institutions; requiring that all reports of sexual relationships, harassment, or abuse of a student-
4  athlete by athletics department personnel be independently investigated; implementing public
5  sanctions on member institutions and athletics department personnel where allegations of sexual
6  relationships, harassment, or abuse of a student-athlete by athletics department personnel are
7  substantiated; banning athletics department personnel from working or volunteering for any
8  member institution where allegations of sexual relationships, harassment, or abuse of a student-
9  athlete by such athletics department personnel are substantiated; mandating training of athletics
10  department personnel regarding grooming, sexual relationships with student-athletes, sexual
11  abuse and harassment, the prohibition thereof, and reporting obligations; mandating training of
12  athletics department personnel and student-athletes to recognize the signs of grooming and sexual
13  abuse and harassment by athletics department personnel, and to provide confidential avenues to
14  report the abuse; and providing a safe environment for NCAA student-athletes free from sexual
15  abuse and harassment.

16      15.    Second, Plaintiffs seek compensation for those NCAA student-athletes who were
17  subjected to sexual abuse as a result of the NCAA's failures to employ such consensus best
18  practices.

19      16.    Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and/or (c)(4), Plaintiffs bring this
20  class action for negligence, breach of fiduciary duty, and breach of contract against the NCAA,
21  for negligence against the NCAA Board of Governors, and for battery, assault, false
22  imprisonment, and intentional and negligent infliction of emotional distress against John Rembao.
23  Plaintiffs also seek to hold the NCAA vicariously liable for Rembao's state tort law violations,
24  and for ratification of Rembao's actions.

25  **II.    JURISDICTION AND VENUE**

26
27      17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
28  1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) there are

CLASS ACTION COMPLAINT          - 4 -

at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; (c) at least one Plaintiff is a citizen of a different state than at least one Defendant; and (d) members of the class, including Plaintiffs, are citizens of a state and at least one of the Defendants is a citizen or subject of a foreign state.

18.     This Court has personal jurisdiction over John Rembao because he resides in this District.

19.     This Court has personal jurisdiction over the NCAA as an unincorporated association which has members that reside in the State of California and in this District, including the University of California at Santa Cruz.  For this same reason, this Court has personal jurisdiction over the Board of Governors of NCAA.

20.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(1) because the NCAA resides in every district in which its members reside, including this District, and all defendants are residents of the State in which the district is located.

### III.    INTRA-DISTRICT ASSIGNMENT

21.     Assignment in the San Jose Division is appropriate because Defendant John Rembao resides in Santa Cruz county in this division, as does Defendant NCAA, an unincorporated association whose member University of California-Santa Cruz resides in this District.

### IV.    PARTIES

#### A.      Plaintiffs

22.     Plaintiff Erin Aldrich is a citizen and resident of Cardiff, California and citizen of the United States.  As a freshman during the 1996-97 school year, Ms. Aldrich was a member of the University of Arizona volleyball team and track and field team, where she competed in the high jump. Ms. Aldrich transferred to the University of Texas at Austin, where she also competed in the high jump as a member of the track and field team from 1997 to 2000. She was coached at both universities by John Rembao, who sexually abused her at the University of Arizona and harassed her at the University of Texas. As a result of the abuse and the NCAA and its Board of

Governors' breach of their duties as alleged herein, Ms. Aldrich has been damaged.

23.     Plaintiff Jessica Johnson is a citizen and resident of Grapevine, Texas and citizen of the United States. As a freshman during the 1999-2000 school year, Ms. Johnson was a high jump competitor for the University of Texas track and field team. At the University of Texas, she was coached and sexually harassed and abused by John Rembao. As a result, she gave up her scholarship and transferred to the University of Arkansas. As a result of the abuse and the NCAA and its Board of Governors' breach of their duties as alleged herein, Ms. Johnson has been damaged.

24.     Plaintiff Londa Bevins is a citizen and resident of Boulder, Colorado and citizen of the United States. As a freshman during the 1999-2000 school year, Ms. Bevins was a cross-country, indoor track, and outdoor track competitor at the University of Texas where she was coached and sexually harassed and abused by John Rembao. As a result, Ms. Bevins gave up her scholarship and transferred to the University of Arkansas. As a result of the abuse and the NCAA and its Board of Governors' breach of their duties as alleged herein, Ms. Bevins has been damaged.

**B.     Defendants**

25.     Defendant National Collegiate Athletic Association (NCAA) is an unincorporated association that acts as the governing body of college sports. Its principal office is located in Indianapolis, Indiana. According to its 2018 IRS Form 990, the most recent one publicly available, its gross receipts were $1,222,405,932 and net assets were $425,995,451.

26.     Defendant NCAA Board of Governors is the highest governance body in the NCAA and is composed of institutional chief executive officers that oversee association-wide issues. The Board is charged with ensuring that each division of the NCAA "operates consistently with the basic purposes, fundamental policies and general principles of the Association."[7] The Board is currently comprised of the following voting members: Philip DiStefano, Chancellor University of Colorado at Boulder; Randy Woodson, Chancellor North Carolina State University; Burns Hargis, President Oklahoma State University; Denise Trauth, President Texas State

---

[7] http://www.ncaa.org/governance/committees/ncaa-board-governors (last visited 3/1/20).

University; Eli Capilouto, President University of Kentucky; Michael V. Drake, President The Ohio State University; Renu Khator, President University of Houston; Satish Tripathi, President the State University of New York at Buffalo; David Wilson, President Morgan State University; Ronald K. Machtley, President Bryant University; James J. Maher, President Niagara University; John DeGioia, President Georgetown University; Sandra Jordan, President University of South Carolina at Aiken; Tori Murden McClure, President Spalding University; Vivek Murthy, 19th Surgeon General of the United States; Denis McDonough, The Markle Foundation; Ken Chenault, General Catalyst; Mary Sue Coleman, President Association of American Universities; and Grant Hill, Atlanta Hawks. NCAA President, Mark Emmert, is permitted to vote in the case of a tie among the voting members present and voting. Hereinafter, unless otherwise specified, NCAA and its Board of Governors are collectively referred to as NCAA.

27.     Defendant John Rembao is an individual residing in Santa Cruz, California. Rembao was the Women's and Men's Assistant Track and Field Coach at the University of Arizona from 1994 to 1997.  From 1997 to 2001, he was the head Women's Cross-Country Coach and coach of the high jumpers in Women's Track and Field.

28.     Rembao worked at several other NCAA schools throughout his career.

29.     From 1984 to 1994, Rembao worked at Cal Poly,[8] including as the Women's Assistant Track and Field Coach (1984-1994), Men's Assistant Track and Field Coach (1989-1994), and Men's Head Cross-Country Coach (1992-1994).

30.     At Cal Poly, Rembao met student-athlete Sue McNeal, "while she was icing her shins in the ice whirlpool in the training room."[9]  Rembao began dating McNeal, who was a three-time NCAA All-American in the high jump, while she was still a student and member of the track and field team. Rembao coached her in the high jump while she trained for the Olympics.[10] Rembao eventually married Ms. McNeal.

---

[8] https://calbears.com/sports/track-and-field/roster/coaches/john-rembao/498 (last visited 12/23/19); https://www.santacruztrackclub.com/john-rembao.html (last visited 12/23/19).
[9] http://www.crosscountryexpress.com/2016/02/catching-up-with-santa-cruz-high-school.html (last visited 12/23/19).
[10] https://www.gopoly.com/insideathletics/hof/Rembao_Sue?view=bio (last visited 12/23/19).

31.     From 2001 to 2005, Rembao worked at Southern Methodist University (SMU) as its Women's and Men's Head Cross-Country Coach and Assistant Track and Field Coach.

32.     From 2005 to 2007, Rembao worked at Stanford as the Men's and Women's Assistant Track and Field Coach.

33.     In September 2007, Rembao began at the University of California at Berkley as its Director of Operations and Assistant Track and Field Coach.  While at University of California at Berkley, Rembao was responsible for "[c]ounsel[ing] and guid[ing] student-athletes on academic, personal, and athletic issues."  Rembao remains on the University of California at Berkeley's website today, presumably still employed by that university.[11]

34.     Rembao has held other positions connected to track and field while he was employed by NCAA member institutions.  He served as the USA Track and Field's Women's High Jump Development Coordinator for 10 years, from 1996 through 2006.

35.     Rembao also held multiple Olympic training positions. From 1995 through 1999 and from 2001 through 2004, Rembao was an Olympic Training Center Clinician. In 1997, Rembao was part of the Team USA World Championship Indoor Staff in Paris, France, and in 2001, Team USA World Championship Staff in Edmonton, Alberta, Canada.[12]

## V.     FACTS

### A.     Student-athletes are at risk for sexual exploitation by coaches.

36.     All college students are encouraged to engage in self-exploration in order to develop a clear sense of self, commitment, and direction. Emerging adults are engaged in a variety of developmental tasks such as identity formation, becoming personally competent, developing interpersonal relationships, and planning for the future.[13]

37.     Student-athletes must balance a unique set of circumstances, such as balancing athletic and academic endeavors, social activities with the isolation of athletic pursuits, athletic

---

[11] https://calbears.com/sports/track-and-field/roster/coaches/john-rembao/498 (last visited 2/13/20).

[12] https://www.santacruztrackclub.com/john-rembao.html (last visited 12/23/19).

[13] E.M. Heird  & J. Steinfeldt, "An interpersonal psychotherapy approach to Counseling student-athletes: Clinical implications of athletic identity," Journal of College Counseling, 16, pp. 143-157 (2013).

CLASS ACTION COMPLAINT                    - 8 -

1  success or shortcomings with maintenance of mental equilibrium, physical health and injuries

2  with the need to keep playing, the demands of various relationships, and reconciling the

3  termination of an athletic career with setting goals for the future.[14]

4       38.    As such, the degree to which one exclusively identifies with the athletic role, also

5  known as athletic identity, can have a variety of implications. Specifically, over-identification

6  with the athletic role has been tied to harmful outcomes, such as decreased college success and

7  lower rates of completion.[15]

8       39.    The NCAA has explained that self-identity is important for NCAA student-athletes

9  because "NCAA research has shown academic outcomes (grades, graduation and eventual

10  graduate degree attainment) are strongly related to identity as a student while in college, even

11  after taking prior academic performance into account."[16]

12       40.    When other college students might be testing their emerging identity in school-

13  based and friendship networks, the college athlete is spending significant time separated from

14  these networks while they train and compete.

15       41.    Student-athletes often spend hours a day with their coaches on the practice field, in

16  the training room, and in meetings.  Researchers suggest that "the culture of sport, specifically the

17  power invested in the coach, facilitates an environment conducive to, and tolerant of, sexual

18  exploitation."[17]

19       42.    One author explained that a student-athlete's susceptibility to the influence of her

20  coach is even greater for athletes close to the upper echelon of their sport:

21  _____

22  [14] J.G. Gayles, "Engaging student athletes," Student Engagement in Higher Education: Theoretical Perspectives and Approaches for Diverse Populations (2nd ed.), pp. 209-221 (2015).

23  [15] P.C. Harris, "The sports participation effect on educational attainment of Black males," Education and Urban Society (2014); Comeaux, E., "Rethinking academic reform and encouraging organizational innovation: Implications for stakeholder management in college

24  sports," Innovative Higher Education, 38, 281-293 (2013); Kelly, D. D. & Dixon, M. A.,

25  "Successfully navigating life transitions among African American male student-athletes: A review and examination of constellation mentoring as a promising strategy, Journal of Sport Management, 28, 498-514 (2014).

26  [16] http://www.ncaa.org/about/resources/research/do-ncaa-student-athletes-view-themselves-students-or-athletes (last visited 12/23/19).

27  [17] Joy D. Bringer, Celia H. Brackenridge, and Lynn H. Johnston, "Defining appropriateness in

28  coach-athlete sexual relationships: The voice of coaches," The Journal of Sexual Aggression 8(2) (2002), at 83.

CLASS ACTION COMPLAINT     - 9 -

> Athletes are more susceptible to the grooming process which precedes actual sexual abuse when they have most at stake in terms of their sporting careers, that is when they have reached a high standard of performance but are just below the elite level. We call this the 'stage of imminent achievement' (SIA) (see Fig. 1). This stage might include athletes on national squads who have not yet been selected for the national/ international honours, those who occupy rankings just outside the top echelon for their sport and those for whom junior or age phase representative honours have been achieved. For these athletes, the personal costs of dropping out of their sport might be deemed to be higher than for others. The novice athlete can drop out without loss of face, can leave to find another coach or another sport without loss of reputation and has invested least, in terms of time, effort, money and family sacrifices. The top athlete, on the other hand, has a proven record, has already attained some of the rewards of success, and may be less dependent upon his or her coach for continued achievement at that level. In other words, they may have less to prove.

> \*              \*              \*

> The elite young athlete treads a fine line between success and failure. Physical injuries or illness can occur at any time, destroying years of training. Psychological damage can be caused by the withdrawal of the coach's attention of interest. In short, the young athlete often needs the attention of the coach in order to maintain form and the chance to succeed. In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete.[18]

43. A coach with sexual motives is able to groom and gain his athlete's compliance because of the power differential between a coach and the student-athlete, which makes consent even between adults impossible. From a very young age, young athletes are taught to look up to and respect their coaches, to view them as upstanding adults who serve in the roles that can include mentor, trainer, counselor, and sometimes even surrogate parent, and to accord them unquestioning authority.

44. Moreover, "[t]he style of coaching that is most conducive to forming coach-athlete sexual relationships is more closely associated with male coaches: authoritarian, requiring unquestioning submission to the coach's authority, and exercising near total control over athletes'

---

[18]Celia Brackenridge, "Playing safe: Assessing the risk of sexual abuse to elite child athletes," International Review for the Sociology of Sport: Special Issue on Youth Sport (1997) at 13, available at https://pdfs.semanticscholar.org/a1fe/585a19259091d9598e0f5ac63523e0ba0211.pdf?_ga=2.242843141.625218843.1581428881-2058641848.1581428881 (last visited 2/11/20)

lives."[19]  Commentators have noted that having a male coach with an authoritarian coaching style is a high risk factor for coach-athlete sexual abuse.[20]

45.     In 2012, the NCAA acknowledged the coach's ability to wield tremendous emotional control and power over their student-athletes:

> In the most tangible terms, the student-athlete depends on the coach for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college education or not. In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life. For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.[21]

46.     Nancy Hogshead-Makar, a 1984 Olympic gold medalist in swimming and the CEO of the non-profit Champion Women which provides legal advocacy for girls and women in sport, has explained that the coach holds all the power in a relationship with the athlete, stating: "There is no balance of power, there's power one way, which is the coach has all the power and the athlete does not…. [The coach] has her scholarship, her ability to continue her education."[22]

47.     This power imbalance is especially prevalent at the highest level of intercollegiate athletics:

> coaches have power over athletes' lives far exceeding the mechanics of practicing and competing in a sport. A coach's power over athletes can extend to virtually all aspects of the athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is rarely questioned. [23]

48.     "The athlete's dependence on the coach makes it enormously difficult for the

---

[19] Deborah L. Brake, JD, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," 22 MARQUETTE SPORTS L. REV. at 403 (Jan 1, 2012) (citation omitted).

[20] *Id.* & n.35 (citations omitted).

[21] "Staying in Bounds," at 15 (citations omitted).

[22] J. Barr & N. Noren, "Track & Fear," *ESPN, Outside the Lines,* found at http://www.espn.com/espn/feature/story/_/id/18900659/university-arizona-coach-threatened-one-athletes-blackmail-violence-death-school-stopped-him (last visited 1/20/20) (quoting Ms. Hogshead-Makar).

[23] Brake, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," at 405 (footnotes omitted).

1    athlete to control the boundaries of the relationship or speak up to a coach who oversteps."[24]   It is

2    this dependence and power differential created by the coach-athlete relationship which enables

3    predators who work with student-athletes (like Jerry Sandusky, Larry Nassar, and John Rembao)

4    to thrive.

5            49.     Historically, the NCAA and other sporting organizations looked the other way

6    when coaches became sexually involved with their athletes. Karen Morrison, the NCAA director

7    of gender inclusion, explained: "'I think there is some hesitancy to prescribe what people consider

8    to be the personal lives of their coaches,' Morrison said. 'A lot of times there's a fallback to,

9    'Well, they're consenting adults.'"[25]

10           50.     The fact that college athletes are over the age of 18 does not indicate that any

11   sexual relationship or sexual activity is consensual, however. According to many experts, the

12   implicit power in the coach-athlete relationship negates consent.[26] "The distinctive features of the

13   coach-athlete relationship should call into question whether it is possible for an athlete to freely

14   consent to a sexual relationship with the coach."[27]

15           51.     By the 1990s, multiple studies challenged organizations that denied the existence

16   of sexual abuse in sport.[28]

17           52.     A 1996 study of retired and Olympic athletes reported that 21.8% of the

18   respondents had sexual intercourse with persons in positions of authority, "which, by whatever

19   standard, is a startling figure."[29]

20   _____

21   [24] *Id.* at 406.

22   [25] Allis Grasgreen, "Out-of-Bounds Relationships," Inside Higher Ed. (May 1, 2012), available at https://www.insidehighered.com/news/2012/05/01/ncaa-asks-colleges-prohibit-romantic-relationships-between-athletes-coaches  (quoting Karen Morrison).

23   [26] *See, e.g.,* Brake, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," at 399.

24   [27] Staying in Bounds, at 16.

25   [28] Brackenridge, at 9 (citing studies in the United States, including Pike-Masteralexis, L., "Sexual harassment and athletics: Legal and policy implications for athletic departments,  Journal of Sport and Social Issues, 19 (2) May:141-156 (1995); Volkwein, K., "Sexual harassment in sport - perceptions and experiences of female student-athletes, (paper presented at the Pre-Olympic Scientific Congress, Dallas, USA, July 11-14) (1996)).

26   

27   [29] Brackenridge, at 10 (*citing* Kirby and Greaves, "Foul play: Sexual harassment and abuse in sport," (paper presented to the Pre-Olympic Scientific Congress, Dallas, USA, July 11-14) (1996)).

28

53.    In 1997, a scholar noted that it is "increasingly clear that these issues [of sexual relations between coaches and athletes] constitute a problem which demands responses from sport organisations at the level of both policy and practice."[30]

54.    A 1998 study reported that 20% of responding athletes in the United States experienced behavior from a coach that was characterized as noninstructional and potentially intimate.[31] This is the precise behavior that transforms a personal relationship into a sexual one.[32]

55.    The results "speak to the intensity of the coach-athlete bond, and the difficulty of setting boundaries in the relationship."[33] This also explains why, when confronted with sexual abuse, athletes do not recognize harassing or abusive behavior when they experience it.[34]

56.    Although late and without taking action to protect its student-athletes, in 2010, the NCAA itself acknowledged: "Sexual relationships between coaches and student-athletes have become a serious problem."[35]

**B.    By the 1990s, governing sports organization established prohibitions on coach-athlete relationships and sexual relations, recognizing the power disparities.**

**1.    Sexual relationships are forbidden in analogous professional settings where a power disparity exists between the professional and his client.**

57.    It is widely understood and accepted that, in many professional settings involving asymmetrical relationships, sexual relationships are forbidden as a matter of professional ethics. The prohibition on sex applies, regardless of facial consent, because professional ethics recognize the inability by the vulnerable party in the professional relationship to refuse sexual advances without fear of professional consequence.

58.    Examples include:

a.    lawyers are forbidden from entering into sexual relationships with clients;

---

[30] Brackenridge, at 10 (emphasis added).

[31] Brake, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," at 405 (footnotes omitted) at 400-401 (*citing* Volkwein, Karin A.E., *et al.,* "Sexual Harassment in Sport: Perceptions and Experiences of American Female Student-Athletes," 32 INT'L REV. FOR SOC. SPORT 283, 284 (1997) (referring to an invitation to diner alone or having a pet name).

[32] Brake, at 401 (*citing* Voklwein, "Sexual Harassment in Sport").

[33] *Id.* at 400.

[34] *Id*.

[35] Staying in Bounds, at 4.

CLASS ACTION COMPLAINT            - 13 -

b.     doctors and therapists are forbidden from having sex with their patients;

c.     judges are forbidden from entering into any kind of relationship with a party or lawyer appearing before them that would create an actual or perceived conflict of interest, including any kind of sexual relationship; and

d.     clergy may not use their position in the church to enter into a sexual relationship with a parishioner.

59.     In a 2012 publication by the NCAA, two experts explained that these same rules should apply to coaches:

> All of these examples involve relationships that are too fraught with power imbalances for consent to be meaningfully and reliably given. While being a coach is, in many respects, different from other professions, it shares the defining features that make consent to enter into a sexual relationship inherently problematic. At the core of the coach-athlete relationship is a duty of care and an imbalance of power. In many respects, the relationship of dependence is even more acute here than it is in these other settings due to the breadth of control that the coach has over the life and education of the student-athlete.[36]

60.     Thus, many sports organizations have adopted similar rules to prohibit coaches from engaging in sexual relationships with athletes, and to protect the safety and preserve the well-being of the athlete.

**2.     In 1992, the United States Olympics Committee established the code of ethics, which prohibited coach-athlete sexual relationships as "exploitative."**

61.     In 1992, the United States Olympics Committee developed a Coaching Ethics Code to establish "some minimum standards for coaches in the United States."[37]  The USOC intended that the code of ethics apply not just to coaches of Olympic athletes, but to all coaches "to review, adopt and support."[38]

62.     The USOC's Coaching Ethics Code includes Ethical Standard 1.08, which is entitled "Sexual Harassment" and both defines and prohibits sexual harassment by coaches as

---

[36] Staying in Bounds, at 26.

[37] Brigadier General Malham Wakin (Ret.), USOC Ethics Oversight Committee, "Coaching Code of Ethics" (Dec. 1992), available at https://ethics.iit.edu/ecodes/node/3942 (last accessed 2/3/20).

[38] "Coaching Code of Ethics," *Commentary*.

CLASS ACTION COMPLAINT     - 14 -

follows:

> (a) Coaches do not engage in sexual harassment. Sexual harassment is sexual solicitation, physical advances, or verbal or nonverbal conduct that is sexual in nature, and that either:

> > (1) is unwelcome, is offensive, or creates a hostile environment, and the coach knows or is told this;

> > (2) is sufficiently severe or intense to be abusive to a reasonable person in the context. Sexual harassment can consist of a single intense or severe act or of multiple persistent or pervasive acts.

> (b) Coaches accord sexual-harassment complaints and respondents dignity and respect. Coaches do not participate in denying an athlete the right to participate based upon their having made, or their being the subject of, sexual harassment charges.[39]

63.    Ethical Standard 1.14 is entitled "Exploitative Relationships" and recognizes that because of the power differential, any relationship between a coach and athlete would likely impair judgment and become exploitative:

> (a) Coaches do not exploit athletes or other participants over whom they have supervisory, evaluative, or other authority.

> (b) Coaches do not engage in sexual/romantic relationships with athletes or other participants over whom the coach has evaluative, direct, or indirect authority, because such relationships are likely to impair judgment or be exploitative.[40]

64.    Ethical Standard 3.04 is titled "Sexual Intimacies with Current Athletes" and uncategorically prohibits any sexual intimacies between coach and athlete: "Coaches do not engage in sexual intimacies with current athletes."[41]

65.    Ethical Standard 3.05, called "Coaching Former Sexual Partners," does not permit an individual to coach athletes with whom they have engaged in sexual intimacies: "Coaches do not coach athletes with whom they have engaged in sexual intimacies."[42]

66.    Ethical Standard 3.06 is titled "Sexual Intimacies with Former Athletes," and sets out very specific guidelines if there is to be an intimate relationship between a coach and athlete,

---

[39] *Id.,* Standard 1.08.
[40] *Id.,* Standard 1.14.
[41] *Id.,* Standard 3.04.
[42] *Id.,* Standard 3.05.

CLASS ACTION COMPLAINT                 - 15 -

including that there be a two year period after termination of the coaching relationship and that the mental status of the athlete be considered:

> (a) Coaches should not engage in sexual intimacies with a former athlete for at least two years after cessation or termination of professional services.

> (b) Because sexual intimacies with a former athlete are so frequently harmful to the athlete, and because such intimacies undermine public confidence in the coaching profession and thereby deter the public's use of needed services, coaches do not engage in sexual intimacies with former athletes even after a two-year interval except in the most unusual circumstances. The coach who engages in such activity after the two years following cessation or termination of the coach-athlete relationship bears the burden of demonstrating that there has been no exploitation, in light of all relevant factors, including:

>> (1) the amount of time that has passed since the coach-athlete relationship terminated,

>> (2) the circumstances of termination,

>> (3) the athlete's personal history,

>> (4) the athlete's current mental status,

>> (5) the likelihood of adverse impact on the athlete and others, and

>> (6) any statements or actions made by the coach during the course of the athlete-coach relationship suggesting or inviting the possibility of a post-termination sexual or romantic relationship with the athlete or coach.[43]

67.     In 2013, the United States Olympic Committee required all of its National Governing Bodies to put in place "minimum standards" for athlete protection by December 31 of that year.

### 3.    USA Hockey established a sexual abuse policy in 1993.

68.     USA Hockey first established a Sexual Abuse Policy, Physical Abuse Policy, and Background Screening Policy in 1993.[44]

---

(i) [43] *Id.,* Standard 3.06.

[44] Letter dated March 21, 2018 from USA Hockey regarding "USA Hockey Response to House Committee on Energy and Commerce Letter of March 7, 2018," available at https://republicans-energycommerce.house.gov/wp-content/uploads/2018/12/U.S.A.-Hockey.pdf (last accessed 2/3/20).

69.     USA Hockey's 1993 Sexual Abuse Policy provided that, upon proof of a violation, the perpetrator would be permanently banned or suspended from USA Hockey programs.

70.     To help guide USA Hockey programs and administrators of USA Hockey, Affiliates, and local programs, USA Hockey also published "Abuse and Screening Policies: Guidelines for Administrators" as early as 1997.

71.     USA Hockey established the USA Hockey SafeSport Program upon adoption by its Board of Directors in June 2012. This followed a mandate by USA Hockey's then President to immediately create a comprehensive athlete safety policy to protect USA Hockey members from abuse or misconduct. The SafeSport Program Handbook incorporated:

    a.    USA Hockey's previous Sexual Abuse, Physical Abuse, Hazing, Background Screening and Locker Room Supervision policies;

    b.    new policies addressing Emotional Abuse, Bullying, Threats and Harassment, Electronic Communications, Travel and Billeting;

    c.    the already existing procedures for taking disciplinary action for violations of any of those policies;

    d.    new education and training requirements for SafeSport Training of coaches, officials and other employees and volunteers in USA Hockey programs;

    e.    a Reporting Policy making it mandatory to report all allegations of sexual abuse to both USA Hockey and the appropriate law enforcement authorities; and

    f.    a means of monitoring the programs in USA Hockey, its affiliates and local programs.

72.     Upon USA Hockey's receipt of any report that contains allegations or suspicions of sexual abuse, a report is made to the U.S. Center for Safe Sport (USCSS), and any allegations of sexual or physical abuse of a child are reported to law enforcement. In those cases, USA Hockey directs its affiliates to promptly issue a "summary suspension" prohibiting the person from participating in any USA Hockey programs until the allegation has been investigated by the

CLASS ACTION COMPLAINT        - 17 -

appropriate agency. Summary suspensions are issued so that USA Hockey and its affiliates can take swift action in the event that the USCSS is delayed in issuing its own interim suspension.

73.    Importantly, USA Hockey's mandatory reporting policy applies to all members of USA Hockey and all employees and volunteers of USA Hockey and its member programs.

### 4.    USA Swimming has prohibited sexual contact or advances toward an athlete by a person with authority over that athlete since 1998.

74.    In 1998, USA Swimming adopted a code of conduct that provided for discipline in cases of "sexual contact or advances directed toward an athlete by a person who, in the context of swimming, was in a position of authority over that athlete."[45]

75.    Specifically, Rule 304.3 of USA Swimming's code of conduct prohibited the following: "Conviction of, imposition of a deferred sentence for, or any plea of guilty or no contest at any time, past or present, or the existence of any pending charges, for…(iii) any crime involving sexual misconduct"; "Any sexual contact or advance directed towards an athlete by a coach, official, trainer or other person who, in the context of swimming, is in a position of authority over that athlete…."; and "Physical abuse of an athlete by any person who, in the context of swimming, is in a position of authority over that athlete."[46]

76.    In 2002, the prohibition against sexual advances was modified to include "other inappropriate sexually oriented behavior or action." Specifically, Article 304.3.5 prohibited: "Any sexual contact or advance or other inappropriate sexually oriented behavior or action directed towards an athlete by a coach, official, trainer, or other person who, in the context of swimming, is in a position of authority over that athlete."[47]

77.    Effective September 2008, this rule was amended to include language prohibiting sexual harassment and sexual misconduct by any "other adult" participating "in any capacity." Clarified in 2009, the amended Article 304.3.5 prohibited "Any sexual conduct, advance or other

---

[45] "When the Athlete is a Child: An Assessment of USA Swimming's Safe Sport Program," at 9 (Jan. 27, 2014), found at https://www.usaswimming.org/docs/default-source/safe-sportdocuments/safe-sport-basics/2014-vieth-report.pdf (quoting USA Swimming Code of Conduct 1998) (last visited February 13, 2020).

[46] *Id.* (*quoting* USA Swimming Code of Conduct, § 304.3 (1998 ed.)).

[46] *Id.* (*quoting* § 304.3 (2002 ed.))

inappropriate sexually oriented behavior or action directed towards an athlete by (i) a coach member or other non-athlete member, or (ii) any other adult participating in any capacity whatsoever in the affairs or activities of USA Swimming (whether such adult is a member or not)…."[48]

78.     In 2010 (effective 2011), USA Swimming added an "Athlete Protection Policy" and "Sexual Misconduct Reporting Requirement" to its rulebook. These changes prohibited coaches from performing rubdowns or massages, banned the use of audio or visual recording devices in changing areas, expanded the list of those who were mandated to undergo a background check, and developed some policies for travel. The changes required reports of sexual misconduct and prohibited retaliation for reporting.[49]

79.     In 2013, USA Swimming's House of Delegates expanded the definition of prohibited sexual contact to include contact "at any time past or present" directed toward an athlete or any child.[50]

80.     USA Swimming also prohibited "romantic or sexual relationships" between coaches and athletes involving any "imbalance of power."[51]

### 5.      The International Olympic Committee issued a consensus statement in 2007 on sexual abuse in sport.

81.     In 2007, the International Olympic Committee issued a "Consensus Statement" on "Sexual Harassment and Abuse In Sport."[52]

82.     The statement warned that power differences between athletes and authority figures in sport create the risk of exploitative sexual relationships.[53] It urged all sport

---

[49] *Id.* (*quoting* 304.3.5 (2009 ed.)).
[50] *Id.* at 13.
[51] *Id.*
[52] Press Release, "IOC Adopts Consensus Statement on "Sexual harassment & Abuse in Sport,'" (Feb. 8, 2007), available at https://stillmed.olympic.org/Documents/THE%20IOC/OFFICIAL%20SHA%20Statement.pdf.
[53] "Consensus Statement Sexual Harassment and Abuse in Sport, p. 3 of 8, found at https://stillmed.olympic.org/media/Document%20Library/OlympicOrg/News/20070802-IOC-adopts-Consensus-Statement-on-sexual-harassment-and-abuse-in-sport/EN-Sexual-Harassment-Abuse-In-Sportt-report-1125.pdf#_ga=2.230927129.742348209.1581616095-498578813.1581616095 (last accessed 2/13/20).

CLASS ACTION COMPLAINT                          - 19 -

organizations to develop policies to protect athletes from sexual abuse and harassment.

83.     It defined sexual abuse broadly to include a sexual relationship in which consent is not or cannot be given, and recognized the dangers sport presents for "manipulation and entrapment" of the athlete.[54]

84.     The statement highlighted the power difference between authority figures and athletes, and urged coaches and other authority figures to "stay… within the boundaries of a professional relationship with the athlete."[55]

**C.      Despite the USOC's recognition in 1992 that all sexual contact between coaches and athletes should be prohibited, the NCAA took no action for 20 years.**

**1.      Under the NCAA Constitution, the NCAA has a duty to protect the physical and educational well-being of student-athletes.**

85.     The NCAA is comprised of 1,098 colleges and universities and 102 athletic conferences.[56]  The NCAA schools are divided into Division I, Division II and Division III. Division I institutions are the most visible collegiate athletic programs.

86.     Each division within the NCAA is governed by rules applicable to all NCAA institutions, as well as rules unique to that division.  The Division I Manual sets forth the Constitution, Operating Bylaws, and Administrative Bylaws for that division (at times referred to collectively as "Manual").

87.     The NCAA Constitution clearly defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and the participating student-athletes. The NCAA Constitution states in pertinent part:

> **1.2 Purposes.**  The purposes of this Association are:
>
> (a)  To initiate, stimulate and improve intercollegiate athletics programs for student athletes….;
>
> (b) To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;….

---

[54] *Id.*

[55] *Id.* at 4 of 8.

[56] http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last visited 2/3/20).

CLASS ACTION COMPLAINT                                    - 20 -

1                                        *        *        *

2          (h)  To legislate, through bylaws or by resolutions of a Convention,
           upon any subject of general concern to the members related to the
3          administration of intercollegiate athletics;….

4    NCAA Const., Art.1, § 1.2(a), (b) & (h).

5          88.    Article 2.2 of the NCAA Constitution specifically provides for the well-being of

6    the NCAA's student-athletes, including in the areas of health and safety and student-athlete/coach

7    relationships:

8          **2.2 The Principle of Student-Athlete Well-Being.** Intercollegiate
           athletics programs shall be conducted in a manner designed to
9          protect and enhance the physical and educational wellbeing of
           student-athletes.  (Revised: 11/21/05)
10                    *        *        *

11         **2.2.3 Health and Safety.** It is the responsibility of each member
           institution to protect the health of, and provide a safe environment
12         for, each of its participating student-athletes. (Adopted: 1/10/95)
           **2.2.4 Student-Athlete/Coach Relationship.**  It is the responsibility
13         of each member institution to establish and maintain an
           environment that fosters positive relationship between the student-
14         athlete and coach. (Adopted: 1/10/95)

15

16   NCAA Const., Art. 2, § 2.2, 2.2.3 & 2.2.3.

17         89.    Moreover, when it comes to gender equity, which includes sexual abuse and

18   harassment, the NCAA has expressly undertaken the duty to adopt rules to ensure member

19   institutions' compliance with gender equity laws. Article 2.3 of the NCAA Constitution provides

20   in pertinent part:

21         2.3.2 NCAA Legislation. [*] The Association should not adopt
           legislation that would prevent member institutions from complying
22         with applicable gender-equity laws, and should adopt legislation to
           enhance member institutions' compliance with applicable gender-
23         equity laws. (Adopted: 1/11/94)

24

25   NCAA Const., Art. 2 § 2.3.2.[57]

26         90.    In addition to its Constitution, the NCAA has consistently recognized and publicly

27   proclaimed its duty to provide a safe environment for student-athletes. The NCAA's website

28   ────────────────────────
     [57] Available at https://web3.ncaa.org/lsdbi/bylaw?bylawId=2461&division=1&adopted=0 (last
     accessed February 12, 2020).

     CLASS ACTION COMPLAINT                    - 21 -

states that it was founded in 1906 "to keep college athletes safe." "We are working hard to protect them physically and mentally, on the field and off."[58]

91.     The NCAA maintains, "Sexual assault and interpersonal violence on campus are important issues that impact the well-being of students and the campus community. The NCAA is committed to supporting and working with campuses to develop collaborative programming, resources, tool kits and best practices to create and maintain a safe campus environment."[59]

### 2.     The NCAA regulates coaches in a myriad of ways – except when it comes to sexual abuse of student-athletes.

92.     The NCAA has expressly regulated the conduct of coaches in a myriad of ways.

93.     Article 10 of the NCAA Bylaws is entitled "Ethical Conduct," and applies to coaches of intercollegiate athletics, among others. It provides a detailed list of unethical conduct.[60] That unethical conduct includes, among other things, sports wagering, providing banned substances, providing a prospective or current student-athlete with an improper inducement or extra benefit, and facilitating a meeting between a student-athlete and an agent.[61] Institutional members such as coaches who violate this provision are subject to disciplinary or corrective action.[62]

94.     Article 11 of the NCAA Bylaws, titled "Conduct and Employment of Athletics Personnel," further explains the responsibilities and obligations of coaches and other athletics personnel.  The section regulates coaching bonuses and other compensation, education requirements and compensation restrictions for certain types of coaching personnel, responsibility for violations of NCAA regulations, marketing to sports agents, the use of the NCAA name, the use of tobacco, required contractual provisions, recruiting, scouting, and limitations on the number and duties of coaching and other staff members.[63]  Again, coaches and other athletic personnel are subject to disciplinary or corrective action for violating these Bylaws.[64]

---

[58] http://www.ncaa.org/health-and-safety (last visited 2/3/20).
[59] *Id.*
[60] NCAA Bylaws, Art. 10.
[61] NCAA Bylaws, Art. 10, § 10.1-10.3.
[62] *Id.,* § 10.4.
[63] NCAA Bylaws, Art. 11, § 11.1.
[64] *Id.,* §11.1.1.

CLASS ACTION COMPLAINT          - 22 -

95.     Yet, the Bylaws are utterly silent on limitations on coaches (or athletics department personnel) as to sexual relationships with student-athletes or the sexual harassment or abuse of student-athletes; internal or external reporting of coaches who engage in sexual relationships with student-athletes or the sexual harassment or abuse of student-athletes; the necessity for an independent investigation of coaches who engage in sexual relationships with student-athletes or the sexual harassment or abuse of student-athletes; a centralized repository for complaints so that complaints about a coach can be tracked between and among schools; and mandatory training of coaches relating to inappropriate relationships with student-athletes and/or sexual harassment or abuse of student-athletes.[65]

**3.    Despite its duty to protect student-athletes, the NCAA took no action to protect them from sexual abuse until 2012 – and fell short.**

96.     Despite the USOC's adoption of a coaching code of ethics in 1992, which defined sexual harassment and categorically prohibited any sexual relationship between coach and athlete during the coaching relationship, the NCAA took no action for 20 years and then fell short.

97.     During that time, multiple reports of inappropriate sexual conduct by athletics department personnel emerged. A sampling of non-exhaustive reports follows.

98.     In 1993, University of Florida women's swim coach Mitch Ivey, then 44, was fired after ESPN reported that he had been sexually involved with his athletes – some under the legal age for consent – and verbally abused others to the point of constituting sexual harassment.

99.     In 1998, a lawsuit was filed against University of North Carolina soccer coach Anbson Dorrance by two players who accused Dorrance of inappropriate behavior that included uninvited sexual comments and retaliation. As one court opinion characterized the allegations, Dorrance regularly "bombarded players with crude questions and comments about their sexual activities and made comments about players' bodies that portrayed them as sexual objects. In addition, Dorrance expressed (once within earshot of [plaintiff Melissa] Jennings) his sexual fantasies about certain players, and he made, in plain view, inappropriate advances to another."

---

[65] In fact, the word "sex" appears but once in the NCAA's 451-page Constitution and Bylaw, in its nondiscrimination statement when it references sexual orientation (NCAA Constitution, Art. 2, § 2.6).

100.    One of the players settled in 2004.  The second, Melissa Jennings, settled for $385,000 in 2006 with an admission by the coach that he had "participated with members of the UNC-Chapel Hill women's soccer team in group discussions of those team members' sexual activities or relationships with men."[66]

101.    Also in 1998, a lawsuit was filed against Jesse Dwire, the women's tennis coach at Syracuse University, alleging that Dwire massaged, fondled, and propositioned two scholarship tennis players, and that Dwire and the university retaliated against the players after they pursued a complaint through the school's grievance system.

102.    According to one report: "William Dealy, the lawyer for [the plaintiffs], said Syracuse officials, aware that the National Collegiate Athletic Association has no policy on sexual harassment, had ignored complaints about Dwire's sexual improprieties for years."[67]

103.    In 2002, Penn State became aware Jerry Sandusky had committed sexual acts on a young boy in a shower. In all, Sandusky abused ten young football players over a 15-year period of time.  Despite the knowledge of Penn State officials, they did nothing about it for years.

104.    In 2007, Boston College women's ice hockey coach Tom Mutch stepped down amid allegations of improper behavior with one of his players.

105.    Also in 2007, Louisiana State basketball coach Pokey Chatman resigned before the NCAA tournament amid allegations of sexual relationships with players.

106.    In 2008, Florida Gulf Coast University fired its head volleyball coach for showing "an interest in an amorous relationship" with a student team manager.

107.    In 2011, a former University of South Carolina women's soccer player sued the university, alleging she received unwanted sexual advances by the assistant coach – and that her academic advisor admitted that the coach had sexually harassed other students. She also alleged that the university failed to renew her scholarship in retaliation for her complaint.

108.    In June 2012, Sandusky was convicted on 45 counts of relating to the abuse, and

---

[66] Doug Lederman, "North Carolina and Coach Settlement Sexual Harassment Suit," Inside Higher Ed (Jan. 15, 2008), available at https://www.insidehighered.com/news/2008/01/15/north-carolina-and-coach-settle-sexual-harassment-suit (last accessed 2/12/20).
[67] *Id.*

1  was sentenced to 30 to 60 years in prison.  Several top Penn State University officials, including

2  its president and athletic director, were sentenced to prison for their roles in covering up the

3  crimes.

4        109.  On July 23, 2012, in response to public pressure, the NCAA finally imposed

5  punishment on Penn State's because of its "conspiracy of silence" relating to Jerry Sandusky's

6  sexual abuse of minor boys.  The penalty included a $60,000,000 fine, which equates to one

7  year's gross revenue that the university's football program brings, to endow a fund to support

8  programs to assist victims of sexual abuse; a ban on Penn State's participation in post-season

9  football games for four years; a reduction in the number of football scholarships from 25 to 15 per

10  year for four years; and vacating all of the teams wins from 1998 (when university officials first

11  heard that Sandusky might be sexually abusing young boys) to 2011.[68]

12        110.  The NCAA announced that its punishment of Penn State was intended to "driv[e]

13  cultural change," because of the "tragic damage that has been done to the victims or their

14  families." In announcing the punishment, NCAA President Mark Emmert stated:

> This case involves tragic and tragically unnecessary circumstances.
> One of the grave dangers stemming from our love of sports is that
> the sports themselves can become too big to fail and indeed too big
> to even challenge.  The result can be an erosion of academic values
> that are replaced by the value of hero worship and winning at all
> costs.  All involved in intercollegiate athletics must be watchful that
> programs and individuals do not overwhelm the values of higher
> education.  In the Penn State case, the results were perverse and
> unconscionable.  No price the NCAA can levy will repair the
> grievous damage inflicted by Jerry Sandusky on his victims.
> However, we can make clear that the culture, actions and inactions
> that allowed them to be victimized will not be tolerated in collegiate
> athletics.[69]

      111.  Yet some of these penalties were later rescinded because the NCAA had allegedly

strong-armed Penn State into accepting the punishments.[70]

---

[68] https://www.npr.org/sections/thetwo-way/2012/07/23/157222533/penn-state-fined-60m-banned-from-bowls-wins-from-1998-on-vacated (last visited 1/2/20).

[69] https://www.youtube.com/watch?v=MGItBWWTN0k (last visited 1/2/20).

[70] https://www.nytimes.com/2018/01/24/sports/ncaa-investigation-michigan-state.html (last visited 1/2/20).

CLASS ACTION COMPLAINT      - 25 -

112.    At the same time the NCAA sanctioned Penn State, the NCAA finally publicly acknowledged the epidemic of inappropriate relationships between coaches and student-athletes.

113.    In May 2012, the NCAA distributed a new publication entitled "Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel," to all of its member institutions, recommending that athletic departments create policies that "unambiguously and effectively" prohibit relationships between coaches and student-athletes.[71]

114.    At the time the NCAA published the guidelines, Erin Buzvis, a law professor at Western New England University, commented that it was suggested, not required:

> The NCAA is offering this as a resource, not a mandate, and in that sense **there is no consequence for a school that ignores the issue**. Nevertheless, I think this is the appropriate first step,' Buzvis said. 'I believe that culture, not policy, is going to drive change on this issue. A tactic of providing resources and encouragement to change expectations within individual athletic departments will more effectively foster this change of culture, where a mandate is more likely to evoke backlash.[72]

115.    The NCAA publication confirmed what researchers have been saying for decades and what Plaintiffs and the Class know all too well: "Sexual relationships between coaches and student-athletes **have become a serious problem**. NCAA member institutions must unambiguously and effectively prohibit such relationships to ensure that sport programs offer a safe and empowering experience for all student-athletes."[73]

116.    The NCAA acknowledged that the power differential between coaches and student-athletes allows student-athletes to be exploited:

> In the context of sports programs within institutions of higher learning, sexual abuse can occur regardless of the minor/adult status of the student-athlete, and regardless of the age difference between the perpetrator and victims. Whether the student-athlete is 17, 18,

---

[71] https://www.ncaa.org/sites/default/files/Staying+in+Bounds+Final.pdf (last visited 2/7/20).

[72] Allie Grasgreen, "Out-of-Bounds Relationships," (May 1, 2012), found at https://www.insidehighered.com/news/2012/05/01/ncaa-asks-colleges-prohibit-romantic-relationships-between-athletes-coaches (last visited 2/7/20) (*quoting* Erin Buzvis).

[73] "Staying in Bounds," at 4 (emphasis added).

19, 20, 21, or older, she or he is significantly less powerful than a head coach, assistant coach, athletics trainer, sport psychologist, athletics director, or other athletics department staff with supervisory control or authority over student-athletes. It is this power differential that makes such relationships inherently unequal, and when relationships are unequal, the concept of "mutual consent" becomes problematic.

Because of this power differential, any amorous or sexual relationship between coaches and student-athletes constitutes sexual abuse. In other words, the dynamics of the coach-athlete relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent.[74]

117.    According to the NCAA's publication, "Historically, most universities have not definitively prohibited such behavior. That lack of institutional boundary-setting has allowed coaches with bad boundaries to continue taking advantage of young, vulnerable student-athletes."[75]

118.    Thus, the NCAA defined sexual abuse as including, but not limited to:

conduct that is sexual harassment (as where the athlete did not welcome a sexual relationship with the coach). Sexual abuse includes amorous or sexual relationships between a coach or other supervisory staff and student-athletes, even when these relationships are perceived by both parties to be consensual. Amorous or sexual relationships can be defined as any relationship that includes sexual touching, talking, or flirting; engaging in any form of sex; or otherwise developing a private, personal relationship that goes beyond the context of a staff and student professional relationship.

Unlike sexual harassment, which is demonstrably unwelcome, sexual abuse often involves a slow seduction (or "grooming") whereby one person gradually prepares another to accept "special" attention, and then proceeds with sexual activity. The term sexual abuse is often used in reference to sexual activity between an adult and a minor, but adults can also sexually abuse other adults in contexts where one adult holds power over another.[76]

---

[74] "Staying in Bounds," at 5-6.
[75] *Id.* at 6.
[76] *Id.* at 6.

CLASS ACTION COMPLAINT                          - 27 -

119.    Also, the publication recommended a "model policy" which was based on the NCAA's duty to protect student-athletes, stating:

> The model policy is a natural extension of the purpose of the NCAA: to protect student-athletes. In the early 1900s, college football players were being injured and even killed as a result of the sport's popular offense, called "the flying wedge." A public outcry put pressure on universities to abolish or reform football. President Theodore Roosevelt urged college athletics leaders to work together to protect young people from dangerous and exploitive practices. This resulted in the formation of the NCAA in 1906. Since then, the NCAA has enacted many bylaws to curb harmful practices and to promote the educational mission of athletics, including instituting minimum educational standards for recruits, ensuring the academic progress of student-athletes, and instituting maximum practice and competitive limits. Today, the NCAA's stated purpose is to "govern competition in a fair, safe, equitable and sportsmanlike manner, and to integrate intercollegiate athletics into higher education so that the educational experience of the student-athlete is paramount."

> This model policy and supporting best practice recommendations are fully in accord with the NCAA's stated purpose. This resource is designed to ensure that student-athletes are safe from sexual advances by coaches or other athletics department employees, and that sexual or romantic relationships do not distract student-athletes or their teams from the educational experience.[77]

120.    At the time, NCAA's Karen Morrison, Director of Gender Inclusion, stated that "[These relationships] had been going on forever," yet "Staying in Bounds" was the first time NCAA had made a statement on the topic.[78]

121.    Morrison, however, added, "'I think there is some hesitancy to prescribe what people consider to be the personal lives of their coaches,' Morrison said. 'A lot of times there's fallback to, 'Well, they're consenting adults.'"[79]

122.    The hesitancy expressed by the NCAA has kept the NCAA from adopting minimum standards for coaches. Nevertheless, "Staying in Bounds," provides that sexual or romantic relationships between a student-athlete and coach or other athletics staff with

---

[77] *Id.* at 4.
[78] Grassgreen, "Out-of-Bounds Relationships," (*quoting* NCAA's Karen Morrison).
[79] *Id.*

CLASS ACTION COMPLAINT                              - 28 -

supervisory responsibility over the student-athlete constitutes sexual abuse even where the student-athlete claims consent.[80]

123.    The NCAA thereafter began to take a seemingly more visible stance on the topic of sexual assault prevention, yet at its core were policies and pronouncements without teeth.  On its website, the NCAA states that the "NCAA's Sports Science Institute **promotes health and safety** through research and training on…sexual assault prevention…."[81]

124.    The NCAA's website further states that: "Sexual assault and interpersonal violence on campus are important issues that impact the well-being of students and the campus community. The NCAA is committed to supporting and working with campuses to develop programming, resources, tool kits and best practices to create and maintain a safe environment."[82]

125.    To that end, in 2014, the NCAA Executive Committee issued a Statement on Sexual Violence Prevention and Complaint Resolution:[83]

**NCAA Executive Committee Statement on Sexual Violence Prevention and Complaint Resolution**

At the August 6, 2014, meeting of the Executive Committee of the National Collegiate Athletic Association (NCAA), the following resolution was proposed and unanimously approved by the Executive Committee.

WHEREAS NCAA Constitution Article 4.1.2 charges the NCAA Executive Committee with identifying core issues that affect the Association as a whole and with overseeing Association-wide issues and ensuring that each division operates consistent with the basic purposes, fundamental policies and general principles of the Association;

WHEREAS the Executive Committee regularly takes action to preserve and enhance student-athlete health, safety and well-being and promote nondiscriminatory and effective learning and competitive environments;

WHEREAS NCAA Constitution Article 2.2.3 requires each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes;

WHEREAS the U.S. Department of Education Office for Civil Rights has issued guidance related to sexual harassment, bullying and violence against all students under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq, which applies to all educational activities, including athletics programs, of higher education institutions receiving federal financial assistance and which states that sexual harassment includes rape, sexual assault, sexual battery, sexual coercion and gender-based harassment.

Now, Therefore, Be It Resolved, that the Executive Committee recognizes the importance of addressing the abhorrent societal issue of sexual violence, especially when it occurs on our campuses. The Executive Committee acknowledges that it is our members' collective responsibility to maintain campuses as safe places to learn, live, work and play. The Executive Committee expects NCAA members to ensure that the values and principles articulated in the Constitution to protect the health and safety of student-athletes, operate fairly and ethically, and further to assure that student-athletes are neither advantaged nor disadvantaged by special treatment and that institutions' athletics departments must:

- Comply with campus authorities and ensure that all athletics staff, coaches, administrators and student-athletes maintain a hostile-free environment for all student-athletes regardless of gender or sexual orientation; know and follow campus protocol for reporting incidents of sexual violence; report immediately any suspected sexual violence to appropriate campus offices for investigation and adjudication;

- Educate all student-athletes, coaches and staff about sexual violence prevention, intervention and response;

- Assure compliance with all federal and applicable state regulations related to sexual violence prevention and response; and

- Cooperate with but not manage, direct, control or interfere with college or university investigations into allegations of sexual violence ensuring that investigations involving student-athletes and athletics department staff are managed in the same manner as all other students and staff on campus.

---

[80] "Staying in Bounds," at 4-5.

[81] http://www.ncaa.org/about/resources/media-center/ncaa-101/how-we-support-college-athletes (last visited 1/5/20).

[82] http://www.ncaa.org/health-and-safety (last visited 2/7/20).

[83] "Addressing Sexual Assault and Interpersonal Violence, Preamble, http://www.ncaa.org/sites/default/files/Sexual-Violence-Prevention.pdf (last visited 2/7/20).

1

2    126.    To further that Statement, in 2014, the NCAA's Sport Science Institute published a

3    document entitled "Addressing Sexual Assault and Interpersonal Violence: Athletics' Role in

4    Support of Healthy and Safe Campuses."[84]

5    127.    The NCAA's guidance addressing sexual abuse on campus fails, however, to

6    recognize the potential for abuse by coaches, instead primarily recognizing coaches as those to

7    whom a student-athlete might turn to report abuse by others.[85]

8    128.    This is so even though the NCAA acknowledges that: "Athletics has long accepted

9    that **coaches and particularly head coaches** and the coach who works most closely with a given

10    student-athlete **have a very strong if not the strongest influence on a student-athlete during**

11    **his or her college years**."[86]

12    129.    Despite the NCAA's recognition of the importance of the coach/student-athlete

13    relationship, the NCAA nevertheless puts coaches on the same footing as trainers and teammates:

14    "Certainly coaches are important; so too are teammates, other student-athletes, athletic trainers,

15    academic support personnel, mental health professionals, strength and conditioning coaches,

16    administrators and other staff in athletics."[87]

17    130.    The fact that the NCAA's guidelines have no force is demonstrated by the recent

18    scandal involving Michigan State and Larry Nassar.  Under the guise of medical treatment, the

19    long-time USA Gymnastics national team doctor and physician at Michigan State University

20    sexually abused hundreds of athletes under his care. Over 350 athletes, including Olympic

21    champions Simone Biles, Gabby Douglas, Aly Raisman, and McKayla Maroney, publicly

22    accused Nassar of sexually abusing them. After numerous emotional testimonies from victims,

23

24

25

26    [84] Found at http://www.ncaa.org/sites/default/files/Sexual-Violence-Prevention.pdf (last visited 2/7/20).

27    [85] See, e.g. *id.* at 9.

28    [86] *Id.* at 19 (emphasis in original).
      [87] *Id.*

1    the disgraced physician was sentenced up to 175 years in prison on sexual assault charges.[88]

2         131.    Complaints were reportedly made to Michigan State University about Larry

3    Nassar as far back as 1988, but Michigan State did not take any appropriate action, and instead,

4    chose to protect its reputation (and endowments) to the detriment of the victims, thereby allowing

5    Nassar to thrive unchecked at the expense of his victims for decades.

6         132.    At least 14 individuals at Michigan State, including its President Lou Anna Simon,

7    athletic trainers, and assistant coaches, had known about complaints regarding Nassar, yet

8    allowed the abuse to continue unabated for 20 years.[89]

9         133.    Like with Penn State, it was only **after** Nassar was convicted and sentenced that

10   the NCAA announced an investigation into Michigan State's handling of the allegations against

11   Nassar in January 2018.  The goal of the investigation was to determine if Michigan State

12   violated any NCAA rules.[90]

13        134.    In August 2018, the NCAA dropped its investigation of Michigan State, finding

14   that Michigan State had not violated any of the NCAA's bylaws.  The NCAA stated that despite

15   the allegations of abuse (and apparently despite Nassar's convictions), the NCAA had "not

16   substantiated violations of N.C.A.A. legislation."[91]

17        135.    While the NCAA freely metes out punishments for student-athletes for poor

18   academic performance and disciplines athletes for profiting off their own likeness, the NCAA's

19   Constitution and Bylaw simply do not contain any penalties for sexual, violent, or criminal

20   conduct by coaches or personnel in the athletics programs, despite the USOC's recognition that

21   there should be minimum standards.

22        136.    The NCAA's Board of Governors has been keenly aware of the issue for years.

---

[88] In February 2019, Nassar was sentenced to 40-175 years after pleading guilty to seven counts of criminal sexual misconduct in Ingham County, Michigan.  Two weeks later, he was sentenced to 40-125 years for pleading guilty to three counts of criminal sexual conduct in Eaton County, Michigan.

[89] https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/ (last visited 1/2/20).

[90]  https://www.cnn.com/2018/01/24/us/ncaa-msu-nassar-investigation/index.html (last visited 1/2/20).

[91] https://www.nytimes.com/2018/08/30/sports/ncaa-michigan-state-nassar.html (last visited 1/2/20).

1   Yet it has ignored previous calls by eight United States senators and its own study commission to

2   fix the problem.

3       137.    In fact, in 2018, the NCAA Board of Governors disbanded the NCAA study group

4   called the Commission to Combat Campus Sexual Violence, promising only to continue to

5   "monitor and track on sexual violence issues."[92]

6       138.    The *USA Today* recently reported on the "Predator Pipeline," showing how

7   sexually violent student-athletes (not unlike coaches) are allowed to migrate from one NCAA

8   school to another and yet remain eligible to play:

> if a school suspends, dismisses or expels athletes for sexual
> misconduct, NCAA rules provide avenues for them to return to the
> field on a new team within a year and sometimes immediately;
> players routinely exploit the NCAA's own loopholes to circumvent
> penalties; a handful of the NCAA's Division I conferences have
> adopted their own policies ban athletes with past behavioral
> problems, but definitions of culpability vary, and most rely on the
> honor system, not record checks, to verify recruits.[93]

15       139.    According to Brenda Tracy, a survivor and advocate who was gang-raped by

16   college football players in 1998 at the University of Texas at San Antonio, "Despite receiving

17   over $130 billion in federal subsidies, the NCAA continues to willfully ignore the problem of

18   violent athletes."[94]

19       140.    In the wake of the *USA Today* investigatory report, the NCAA has indicated a

20   willingness to "modernize" its rules and promised that, at its January 2020 meeting, "the Board of

21   Governors will review and examine NCAA policies regarding those accused and/or convicted of

22   sexual assault…."[95]

[92] *See* https://www.usatoday.com/story/sports/college/2020/01/16/ncaa-predator-pipeline-focus-congressional-bill-athletes-sexual-assault/4492088002/ (last visited 1/20/20).

[93] https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-looks-other-way-athletes-punished-sex-offenses-play/4360460002/ (last visited 1/20/20).

[94] *See* https://www.usatoday.com/story/sports/college/2020/01/16/ncaa-predator-pipeline-focus-congressional-bill-athletes-sexual-assault/4492088002/ (last visited 2/20/20) (Tracy recognizes that "[p]redators hunt where they're safe and thrive in cultures that enable them." https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-looks-other-way-athletes-punished-sex-offenses-play/4360460002/ (last visited 2/20/20).

[95] *Id.*, https://www.usatoday.com/story/sports/college/2020/01/16/ncaa-predator-pipeline-focus-congressional-bill-athletes-sexual-assault/4492088002/ (last visited 2/20/20).

CLASS ACTION COMPLAINT       - 32 -

141.    The NCAA is not without enforcement ability.  It employs a nearly 60-member enforcement staff to investigate potential violations of amateurism and academic eligibility rules.[96]  But the enforcement staff has been criticized for placing too much emphasis on minor infractions, such as having noncoaching staff members perform coaching duties and impermissibly producing personalized recruiting videos,[97] and insufficient attention on serious misconduct such as sexual violence.

142.    The irony was well stated by Brenda Tracy:  "Getting bad grades and accepting money is an NCAA violation.  You know what's not an NCAA violation?  Rape."[98]

143.    And while the focus in the media at the moment is on the sexually violent student-athletes whom the NCAA fails to punish, coaches, trainers, and other athletics department personnel who commit the same or similar acts continue to enjoy perhaps even greater immunity as they migrate from one NCAA institution to another for entire careers.[99]

**D.    Without NCAA controls, Coach John Rembao was permitted to move among schools without recrimination despite multiple schools' knowledge of his sexual abuse of student-athletes, including Plaintiffs.**

144.    John Rembao is just the latest predator in the NCAA who has been publicly outed by several of his victims.  Without NCAA rules requiring member institutions to report predators like Rembao to the NCAA, Rembao moved among NCAA schools, preying on female track and field student-athletes.  Rembao's unfettered sexual and emotional abuse physically and emotionally damaged multiple student-athletes, including Plaintiffs.

145.    Yet even today, Rembao is heralded as an icon in track and field.  In a biography

---

[96] https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-looks-other-way-athletes-punished-sex-offenses-play/4360460002/ (last accessed 2/13/20).

[97] http://www.ncaa.org/about/resources/media-center/news/pittsburgh-men-s-basketball-and-football-programs-commit-violations (last accessed 2/21/20).  *See also* "NCAA announces violations against Pitt football, basketball," found at https://triblive.com/sports/ncaa-announces-violations-against-pitt-football-basketball/ ("Serious employment restrictions were also placed on Stallings, who is no longer coaching, and former director of basketball operations Dan Cage that would make it difficult for them to return to collegiate athletics") (last accessed 2/21/20).

[98] https://settheexpectation.org/the-tracy-rule (last accessed 2/13/20).

[99] *See* Joan Ryan, "Little Girls in Pretty Boxes, the Making and Breaking of Elite Gymnasts and Figure Skaters," Introduction to 2018 Edition at 7 ("In other words, they let a sexual predator [Nassar] walk away with his reputation intact").

on the University of California at Berkeley website, Rembao is lauded as a skilled, winning coach who has coached at the University of California, Cal Poly, Arizona, Texas, SMU, and Stanford for 26 years.[100]

**1.**   **Coach John Rembao groomed and sexually abused NCAA student-athlete Erin Aldrich at the University of Arizona and retaliated against her at the University of Texas-Austin.**

146.   While watching the 1984 Olympics on television when she was six years old, Plaintiff Erin Aldrich told her parents she was going to be an Olympian.

147.   In junior high school, she was first exposed to track and field, and fell in love with the sport.  Because of her height and athleticism, she was immediately successful in the high jump event and was also successful at volleyball.

148.   By high school, Ms. Aldrich was receiving invitations to Junior Elite Development Camps in Colorado Springs, which she attended each summer accompanied by her female high school coach.  There, she met Coach John Rembao, who began running the camps her sophomore or junior year of high school.

149.   Coach Rembao was known as the high jump guru – and Ms. Aldrich was excited to train with him.

150.   Coach Rembao began regularly calling Ms. Aldrich while she was in high school, frequently talking to her on the phone sometimes up to two hours a night.  They would talk about her dreams, aspirations, training, and life in general.  At the time, Coach Rembao coached at University of Arizona, so they would also discuss her college plans.

151.   Coach Rembao also began regularly sending Ms. Aldrich and her parents gifts, such as University of Arizona gear and fresh tortillas made by his mother.

152.   By her senior year, Ms. Aldrich had committed to Arizona on a volleyball scholarship with a plan to also train for the high jump.  At that time, Coach Rembao started directing his nightly phone calls to more personal topics and conversations that had nothing to do with sports.

---

[100] https://calbears.com/sports/track-and-field/roster/coaches/john-rembao/498 (last visited 12/23/19).

153.     He commented on Ms. Aldrich's senior pictures, telling her which one was his favorite and why.  In the picture, Ms. Aldrich was wearing a black dress and jean jacket:



154.     Commenting on the picture, Coach Rembao told her that he loved the muscle that showed on the side of her leg, calling it "super sexy."

155.     Coach Rembao asked about Ms. Aldrich's dating life.  He knew she didn't date in high school because she was so focused on making an Olympic team.  Coach Rembao supported her laser focus on training.

156.     While Ms. Aldrich was going to attend Arizona on a volleyball scholarship, Coach Rembao told her that he planned to oversee all of her workouts and help to manage her nutrition and physique.

157.     By June 1996, the summer after Ms. Aldrich's senior year, Coach Rembao regularly attended competitions with Ms. Aldrich.  For example, below is a picture of Coach Rembao and Ms. Aldrich together at the 1996 United States Olympic Trials for track and field held at Centennial Olympic Stadium in Atlanta, Georgia from June 14-23, 1996.  She did not

make the Olympic Team.  By this time, Coach Rembao had effectively groomed and gained Ms. Aldrich's trust.



158.    Ms. Aldrich gained a spot to compete for Team USA for USA Track and Field at the World Junior Championships in Sydney, Australia.  Because Ms. Aldrich's high school coach was unable to attend, her parents paid for Coach Rembao to accompany her to the August 20-25, 1996 event.

159.    On the plane ride to Australia, Ms. Aldrich was sitting in a middle seat and Coach Rembao was sitting in the aisle seat.  On the overnight flight, he covered Ms. Aldrich with a blanket and proceeded to fondle her under the blanket.

160.    Ms. Aldrich trusted Coach Rembao implicitly.  She had never had any sexual experiences before but he had groomed her to a place where she submitted.

161.    Coach Rembao penetrated Ms. Aldrich with his fingers, and joked with her that they were now members of the "mile high club."  He also told her he was going to divorce his wife and move with Ms. Aldrich to Australia.

162.    Because of Ms. Aldrich's repressed memories of the events, this incident may or may not have been the first time that Rembao sexually assaulted her.  During Ms. Aldrich's

freshman year at Arizona, Coach Rembao acted as though she was his girlfriend even while he was married.  He would even have Ms. Aldrich over to his house once a week, where his wife would cook them dinner.

163.   Coach Rembao would give Ms. Aldrich massages in his home; Ms. Aldrich would not know where his wife would disappear to.

164.   Coach Rembao would perform oral sex on Ms. Aldrich in his office, at his house, in the car, and on road trips for competitions and camps.

165.   Coach Rembao kept Ms. Aldrich on a strict nutritional plan. He emphasized calorie-counting and having her thin so much that it became an obsession for him, as well as an obsession for Ms. Aldrich to be in the shape he wanted her to be.  Coach Rembao made Ms. Aldrich feel that he knew where every fat cell was on her body; he would tell her she could always be leaner.  He required that she write down everything she ate.  His criticisms traumatized Ms. Aldrich, causing her to be in starvation mode a lot.

166.   Based on the amount of time and attention that Coach Rembao would give Ms. Aldrich, Arizona coaches of both the volleyball and track and field teams knew or should have known that Coach Rembao was acting inappropriately with her.

167.   In fact, Coach Rembao would come watch Ms. Aldrich's volleyball practices under the guise of counting how many times she jumped during practice so that he could monitor her training for the high jump and help her "recover."

168.   Coach Rembao's actions were caught in the fall of Ms. Aldrich's freshman year (1996) by her roommate, a fellow volleyball teammate.

169.   Coach Rembao was in Ms. Aldrich's dorm room, when Ms. Aldrich's roommate came home. They were not expecting her roommate to come home. When the door handle jiggled, he quickly jumped into the closest closet – which was her roommate's closet.

170.   Ms. Aldrich's roommate opened the door to her closet and discovered Coach Rembao hiding.

171.   On information and belief, Ms. Aldrich's roommate reported the incident to the University of Arizona.

172.     In May 1997, Arizona's Athletic Director pulled Ms. Aldrich into a conference room with her parents. He told her that Coach Rembao was leaving Arizona and going to the University of Texas at Austin.  The Athletic Director asked that Ms. Aldrich stay at Arizona and play her sophomore year of volleyball.  He told her that, if she was unhappy, Arizona would then release her with full eligibility.

173.     In 1997, the summer between her freshman and sophomore year, Ms. Aldrich qualified for the World Championship team. With Coach Rembao, Ms. Aldrich traveled between multiple European cities to attend track meets in preparation for the championships.

174.     At one stop at a training camp between meets, Coach Rembao came to Ms. Aldrich's room and told her he needed to take her upstairs. He told her that he suspected that his wife had herpes, and that he needed to check her.

175.     Rembao took Ms. Aldrich to a vacant room in the hotel, laid her on the bed, and began to probe and physically inspect her vaginal area.

176.     Ms. Aldrich was scared, ashamed, and concerned that Coach Rembao thought she would have herpes.

177.     Ms. Aldrich stayed at Arizona to play her sophomore year of volleyball in the fall of 1997. With Coach Rembao gone, she started dating boys on the track team, her own age, for the first time ever.

178.     After her volleyball season ended in December 1997, Ms. Aldrich transferred to the University of Texas. She started at Texas in January 1998.

179.     There, Coach Rembao continued to attempt to engage Ms. Aldrich in sexual relations.

180.     Coach Rembao would sit down next to her on the bench during weight training, and say "Je t'aime," *i.e.,* "I love you" in French.  Ms. Aldrich, however, would say thank you and walk away. He would tell her he missed her, but Ms. Aldrich maintained her distance. Eventually, Coach Rembao stopped trying and the retaliation began.

181.     Coach Rembao continued to heavily monitor her calorie intake in such a way that she began to lose her energy and ability to train at her full potential. If she didn't jump well, he

1   made her feel unqualified, insignificant, and a loser.

2       182.    By 1999, Ms. Aldrich was beaten down by Coach Rembao.  She was mentally,

3   emotionally, and physically depleted.  She started performing very poorly in the high jump.

4   Coach Rembao was livid, constantly berating her.  He retaliated against her for putting distance

5   between them and not engaging in a sexual relationship.

6       183.    While at a track meet in Disney World for spring break, Coach Rembao was

7   particularly critical of Ms. Aldrich.  She called her parents out of desperation, and her dad jumped

8   on the next plane to support her.  He showed up at the hotel that evening and comforted her.  The

9   next day, she jumped a personal record, which she now believes was the result of realizing she

10   had loving support.

11       184.    Ms. Aldrich made the Olympic team the following year in 2000.  Under such a

12   microscope for food and with the constant criticism from Coach Rembao, Ms. Aldrich was on

13   fumes by the time she got to the Olympics.  She gained 15 pounds between the Olympic trials and

14   the Olympics, because she could not sustain the caloric restrictions Coach Rembao had imposed

15   on her.  She was emotionally, mentally, and physically exhausted, and did not perform well.

16       185.    Ms. Aldrich did not recognize she had been sexually abused by Coach Rembao

17   until the end of March or early April 2019, when she watched *Leaving Neverland*, the

18   documentary about the young boys who were sexually abused by Michael Jackson under the

19   guise of love.

20       186.    The realization of her abuse manifested itself in physical injury.  Shortly after

21   watching *Leaving Neverland,* with the pressure and stress of the past triggered and realized, Ms.

22   Aldrich was hospitalized with sepsis from bacterial pneumonia for eight days.  Her body had shut

23   down, and during those eight days, she believed that she was going to die with the secret of the

24   events that had occurred.

25       187.    Rembao's sexual abuse has had a devastating effect on Ms. Aldrich's life.  She has

26   experienced extreme distress, depression, and anxiety.  She feels guilt and shame.  Feelings of

27   self-doubt overshadow her relationships and cause her to question the validity of her feelings.

28   She has sought and continues to seek counseling and psychiatric care.  She also believes that

CLASS ACTION COMPLAINT       - 39 -

Rembao's training demands and dietary restrictions caused lifelong issues with her hypothalmus, leading to fertility issues.

### 2.  Coach John Rembao groomed, sexually harassed and abused, and retaliated against student-athlete Jessica Johnson at the University of Texas-Austin.

188.  When Jessica Johnson was nine, she started competing in track and field.  At competitions, she would pick the events in which she knew she could win a medal.  By age 11, she was competing in the high jump.  By middle school, she was regularly winning every event in which she competed.

189.  During her freshman year of high school, she won the high jump event at the Texas state track meet.  Her success caught the attention of multiple colleges and Olympic trainers.

190.  After her freshman year of track, Ms. Johnson was invited to the Olympic Training Center of Chula Vista in San Diego, California. There, in 1996 when she was 15 years old, Ms. Johnson met John Rembao, who was a coach and clinician at the center from 1995-1999 (and again from 2001-2004).



191.  As Ms. Johnson flourished in the high jump (and in volleyball), her parents hired

her a private coach who was recommended by Rembao.  Rembao took a keen interest in Ms. Johnson and her track career, regularly providing advice to her and her parents.

192.    Over winter break her sophomore year of high school, Ms. Johnson was invited to attend a track camp at the University of Arizona where Rembao was then coaching.  Rembao invited Ms. Johnson to stay at his house.  During the break, Rembao and his wife Sue regularly took Ms. Johnson on outings.

193.    Between Ms. Johnson's sophomore and junior year, Rembao left Arizona and began coaching at the University of Texas-Austin.

194.    By her junior year, Rembao regularly called, emailed (from his University of Texas email address: jrembao@mail.utexas.edu), and wrote letters to Ms. Johnson, and the topics of conversation became more and more personal. Examples follow.

195.    On October 16, 1997, Rembao mailed Ms. Johnson a handwritten letter on official UT letterhead, noting on the envelope: "ONLY OPEN IF YOU ARE MISS AMERICA! (AT LEAST IN THE FUTURE!).



196.    In the letter, Rembao laments that he doesn't "miss Arizona all that much," but

that "I miss Erin from time to time, but she is creating her own life in Arizona." He tells Ms. Johnson: "There aren't too many young ladies who have to offer your wit, charm, athletisism[sic], and Miss America looks!"

197.    In a December 16, 1997 email exchange, Ms. Johnson and Rembao talked about her dating life. Rembao stated: "How old are you? You have lots of time to find a boy, husband, whatever….. *** So, are you saying I'm going to get old to you sometime? Thanks a lot!"

198.    On December 17, 1997, Rembao sent Ms. Johnson an email, stating:

> …when I tell you things, I expect them to stay between me and you,
> or I just won't tell you things anymore. Trust is important to me.
> Loyalty too. And I will return it the way I receive it.
>
> *                    *                    *
>
> Sometimes you can be so wierd[sic] and I love it! Good luck on
> your English and Spanish exams. You multilingual, long legged,
> Miss America looking, sincere, young, gorgeous looking young
> lady (I guess that was covered under Miss America looking), high
> jump/heptathlete STUD-ette!

199.    On December 31, 1997, Rembao emailed Ms. Johnson: "…I appreciate your friendship and the conversations that we have. We could be really, really good friends." He also said: "That will be your nickname, "Princess". You look like one anyways! I like it better than Miss America because it still describes beauty and is less obnoxious."

200.    On January 13, 1998, Rembao emailed Ms. Johnson, stating: "I meant what I said. You are special, and are becoming more so the better I get to know you." After telling him she got a speeding ticket that day, he wrote back: "Was your first time special? Like your first kiss, boyfriend……."

201.    Throughout this time, Ms. Johnson was excelling at track and field and in volleyball. By January 1998, the University of Texas had told Ms. Johnson they were interested in offering her a volleyball scholarship based on her test results at the Olympic training center. However, Ms. Johnson's first love was track and field, and Rembao reassured her and her parents that she could play both sports.

202.     During Ms. Johnson's senior year, she suffered from mononucleosis and dropped from first in state to second.  She gained some weight that she wanted to drop to be more successful in the high jump.  During this time, Rembao continued to be supportive of and personal with Ms. Johnson.

203.     Based on Rembao's grooming and the fact that the University of Texas-Austin had won the national championships in track and field, Ms. Johnson committed to attending Texas.



204.     Ms. Johnson started at Texas as a freshman in the fall of 1999.

205.     Before the semester started, Rembao invited Ms. Johnson to dinner at his home with his wife.  During dinner, they discussed her work-outs, and she explained that she had been lifting heavy weights which caused her legs to be sore.

206.     After dinner, Rembao told Ms. Johnson to go into the living room and lay down on the floor so he could work on her legs.

207.     Thinking she was safe because Rembao's wife was home, Ms. Johnson went into the living room and laid down face down.  Rembao's wife disappeared.

208.     Rembao came into the living room, sat down and pushed Ms. Johnson's running shorts and the built-in underwear inside the shorts up so that her buttocks were fully exposed.  He massaged her inner thighs and buttocks, which made Ms. Johnson extremely uncomfortable.

CLASS ACTION COMPLAINT                                    - 43 -

Distressed, she frantically tried to figure out how to escape without offending her new coach.  As soon as he stopped, she excused herself and left.

209.    In another incident at his home, she complained of a stomachache and Rembao proceeded to rub her stomach under her shirt with his wife present.

210.    On another occasion that fall, he invited her and another athlete to his house, and they watched the movie "American Pie."  During the sexual parts and when sexual comments were made, Rembao would watch Ms. Johnson to gauge her reaction.  Uncomfortable, Ms. Johnson avoided Rembao's gaze.

211.    Ms. Johnson lived in an all-girls' dormitory with the track and cross-country team. From the beginning of freshman year, Rembao would call Ms. Johnson's dorm room most nights, trying to keep track of her whereabouts.

212.    In fact, Ms. Johnson did go on one date, which Rembao discovered when he called her room and talked to her roommate when she was not there.  For the next week, Rembao refused to speak with Ms. Johnson or give her workouts.  Rembao told her he was "jealous," and ostracized her from the team.  In fear of the punishment, Ms. Johnson did not go out on another date.

213.    Rembao started controlling what Ms. Johnson ate, requiring her to keep detailed food diaries, telling her to eat a sardine if she got hungry, and telling her he knew where every ounce of fat was on her body.  Rembao would make Ms. Johnson weigh in weekly in front of other athletic teams and shame her if he didn't like the numbers.  He would say things like, "I've never seen so much subcutaneous fat on the side of your leg," for everyone to hear.

214.    He would sometimes call Ms. Johnson into his office, under the guise of official meetings, but instead use the time as an excuse to give her uncomfortably-long hugs.  At other times and in other places away from the track, he would give her long and intimate back rubs.  He would cup her face and rub his thumbs on her cheeks and jaw.  Ms. Johnson would try to find excuses to get away from him.

215.    Rembao regularly commented on Ms. Johnson's looks and his feelings for her, including that she had a sexy haircut, her legs were good-looking, her butt was getting smaller,

she was beautiful, he was jealous of her boyfriends, he had feelings for her that he didn't understand, and that their conversations should remain confidential.

216.    On January 21, 2000, Rembao called and told Ms. Johnson to meet him in his office. Ms. Johnson told him she had just finished a workout and needed to go back to her dorm room to shower.  Rembao insisted that she come to his office first.

217.    When Ms. Johnson arrived in Rembao's office, he shut the door.  He walked toward her and she put both hands up to maintain her personal space.  Rembao pushed forward, grabbed her in a full hug, and licked her neck.  He told her she tasted "salty."  She was horrified.

218.    Ms. Johnson thought she was to blame for Rembao's actions.  She didn't know how to get him to stop.  She avoided him when she could, but he controlled her eating, her athletic career, and her scholarship.  She was dependent on Rembao for her workouts and training, so she could not afford to offend him.

219.    On February 19, 2000, while at the Oklahoma Invitational, Rembao told Ms. Johnson that he needed to talk to her and to come to his hotel room.  He told her to sit on the bed, and she had a sick feeling.  She complied, and he pushed her backwards so that she was laying down, and told her to relax.  He reached under her shirt, and she felt his hand slipping underneath the waistband of her shorts.  Ms. Johnson panicked and feigned sleep.  She then got up and left the room.

220.    Rembao's comments and actions caused Ms. Johnson severe physical and emotional distress.  She became increasingly depressed, had a hard time getting out of bed, developed an eating disorder (alternating between starving herself and bingeing), and developed panic attacks.  She went to the University of Texas student health center, which prescribed her an anti-depressant and sleeping pills.  She could not effectively compete due to her mental and physical state.

221.    During her indoor track season, Ms. Johnson suffered an ankle injury and could not participate in the spring outdoor season.  She was relieved that it happened so that she could avoid Rembao.

222.    About this time, Ms. Johnson ran into a teammate, Londa Bevins, who was crying.

As they began talking, they realized that Rembao was abusing both of them and others on the team.  They concluded that they needed to transfer.  Ultimately, nine freshmen from the track and field and cross-country teams quit that year.  Ms. Johnson was both horrified and relieved that she was not alone.

223.  Shortly thereafter, Ms. Johnson told her parents she needed to leave Texas. Severely depressed and anxious, she told them she had to transfer to a new school.

224.  When her parents saw the severely depressed state she was in, they encouraged her to withdraw from school.  However, she was determined to finish the semester.

225.  She submitted her resignation to Rembao on March 5, 2000.

226.  On Saturday, March 20, 2000, she awoke to a distressing sight.  Rembao was in her dorm room, pulling back the blankets to look at her injured foot.

227.  Ms. Johnson was in bed in her dorm room, sleeping in a nightgown without a bra. Her injured ankle was propped up on a pillow.  The dormitory required a key to access the building and her room, so she did not expect anyone to be in or have access to her room (other than her roommate).

228.  When she awoke, she saw Rembao next to her bed.  She was not only surprised, but immediately felt freaked out.  Rembao began to examine her foot, telling her that he missed her.  He began kissing her ankle.  He hugged her and rubbed her back.  She became extremely upset and felt violated.

229.  Thereafter, Ms. Johnson took steps so that she wouldn't have to encounter Rembao.  However, on June 15, 2000, her last day at Texas, she went to get her car in the parking garage to go home. As she began backing out of the stall, she saw a four-door sedan blocking her car in.

230.  She looked in her sideview mirror and saw Rembao standing there.  He told her that he was not going to let her go until she got out and gave him a hug.  She was trapped.  She could not move her car without doing as he demanded.

231.  She got out of the car, and he gave her a full-body hug.  He told her "I just want you to know I don't hold hard feelings against you."  She said whatever she needed to say to

1   escape.

2      232.    When she came home that summer, Ms. Johnson was severely depressed, a shell

3   of her former self.  She experienced a sadness that was deep and painful.  She began cutting her

4   wrists and attempting to hide the cuts with a bandanna (her mom discovered the cutting).  The

5   physical pain of the cutting, repeated over and over, with just enough pressure to break the skin to

6   cause bleeding, would overwhelm her emotional pain and would provide a measure of

7   momentary relief.

8      233.    She was ashamed and felt dirty.  She found that she couldn't look people in the

9   eyes.  That summer she would lie in her bed and cry and hurt herself.  She went to counseling and

10   was on anti-depressants and anti-anxiety medication.

11     234.    Ms. Johnson did not return to Texas; she transferred to the University of Arkansas

12   and joined the track and field team.  That summer however, she submitted a formal complaint to

13   the University of Texas-Austin.

14     235.    During the course of Texas' investigation, Rembao admitted to the majority of the

15   conduct about which Ms. Johnson complained.  Nonetheless, Texas attacked Ms. Johnson, found

16   that Rembao's conduct did not constitute sexual misconduct, and led Ms. Johnson to believe she

17   could not sue and/or did not have a claim against Texas or Rembao.

18     236.    Ms. Johnson was only offered a 50% scholarship to be a member of the Arkansas

19   track team.  She chose the University of Arkansas because she felt it was a safe place for her,

20   because a friend told her she would not be abused by the coaching staff.

21     237.    When Ms. Johnson arrived at Arkansas and one of her new coaches heard what

22   had happened, he did not act surprised but instead acknowledged that Rembao had a reputation

23   with female student-athletes.

24     238.    In the Spring of 2003, while competing for Arkansas, Ms. Johnson attended an

25   indoor track meet in Oklahoma.  At the high jump area, Ms. Johnson had bent down to put her

26   things away in her bag.  She saw a hand extended to give her a handshake and grabbed it before

27   she looked up.  When she looked up, she froze.  It was Rembao, who was then coaching at

28   Southern Methodist University.

239.    She pulled away, grabbed her things, and ran to her parents.  Her heart was pounding as she replayed the abuse in her head.

240.    Ms. Johnson's parents spoke with SMU, which agreed that Rembao was not permitted any further contact with Ms. Johnson.  During the conversation, the school acknowledged that coaches hire their buddies and there was no vetting or checks and balances among schools to track wrongdoing.

241.    In June 2003, Ms. Johnson attended the NCAA championships in Sacramento California.  While lined up to compete, she saw Rembao speaking with her coach.  Rembao proceeded to film her while she competed.

242.    Ms. Johnson felt sick and violated, because Rembao would not leave her alone.

243.    Rembao subsequently sent her a binder containing an analysis of her jumps under the guise of Olympic training development.

244.    As a result of Rembao's abuse, Ms. Johnson forfeited a full scholarship at the University of Texas; as a result, she was required to pay one-half of tuition at the University of Arkansas her sophomore year, as well as during a fifth year of college, prior to the 2004 Olympic Trials, due to missing out on her first outdoor season because of injury.

245.    Rembao's abuse of Ms. Johnson has had a profound and traumatic effect on her life and her relationships.  Ms. Johnson has continued to seek psychiatric and counseling treatment for depression and anxiety.  She has struggled with eating disorders.  She regularly has nightmares about Rembao's sexual misconduct.

### 3.    Coach John Rembao groomed, sexually harassed and abused, and retaliated against student-athlete Londa Bevins at the University of Texas-Austin.

246.    Londa Bevins grew up in a Dallas, Texas suburb and attended Mesquite High School.  Running was the most important thing during her high school days.  She lived it, breathed it, ate it, and slept it.  Success in running came very easily to Ms. Bevins, who was 5' 6" and weighed 120 pounds.

247.    As a sophomore in high school, Ms. Bevins came in second in the mile at the 5A state meet in Austin, Texas in 1997.  The next year, Ms. Bevins came in seventh in the 1500m at

the USA Track and Field Championships/Junior Championships at Southern Illinois University, where she competed against some college athletes. Coach John Rembao from the University of Texas, the head cross-country coach, began calling Ms. Bevins's home to recruit her for the cross-country and track and field teams at University of Texas at Austin.

248.    In July 1998, prior to her senior year in high school, Ms. Bevins orally committed to attend University of Texas at Austin. She visited Texas in October 1998, and her first college visit was her last. She told her parents, who were supportive of her running career, that UT-Austin was the place for her. She was excited to join the University of Texas women's track team, which won the NCAA Division I championships in 1988 and 1989 in both indoor and outdoor track.

249.    Ms. Bevins formalized her commitment to UT-Austin in November 1998, when she signed a contract to attend in exchange for a full scholarship as a three-sport athlete: cross-country, indoor track, and outdoor track. Below is a photograph of the day she signed her contract to attend University of Texas at Austin:



250.    A week later, Ms. Bevins participated in a state cross-country track meet where she was slated to win or place second in the 5A Division. Instead, she tripped and was gashed in the leg with other runners' spikes and developed complications from her injury. She did not run

for ten weeks.

251.   During that time she regularly received telephone calls from Coach Rembao, who would offer words of encouragement such as, "You don't have to impress me – I already know what you can do."

252.   After Ms. Bevins' injuries healed, she redoubled her training, knowing that her injury had put her behind the other competitors.

253.   During that time, Coach Rembao would continue to telephone Ms. Bevins once a week. Some of those telephone calls lasted over an hour. He began to ask her personal questions about the boys she liked and the high school events she attended.  He also complimented her appearance, saying that she was "pretty."  Several times he would call to say he was having a bad day, and that just talking to Ms. Bevins cheered him up.  This made her feel special.

254.   Ms. Bevins's intense training paid off, and in she won the mile in the 5A state track meet in May 1999, prior to her high school graduation.

255.   Through Coach John Rembao, Ms. Bevins was invited to attend the United States Olympic Committee's high altitude training camp in Dallas and Utah the summer prior to her freshman year of college.  She was thrilled to be among college students and excited to share a dorm room with a UT-Austin star athlete.

256.   A few times Ms. Bevins stayed out late. When Rembao learned of these incidents, he telephoned Ms. Bevins and told her she had lost his trust, making her feel miserable.

257.   Ms. Bevins started at the University of Texas in the fall of 1999.

258.   Immediately, Coach John Rembao's psychological abuse began to take hold and his sexual abuse of Ms. Bevins began.

259.   One day he made her feel accomplished and talented, and the next he would make her feel like a despicable failure, so that she began to mistrust her own feelings.  He wielded immense power over her:  not only was he an adult and male, but he was her track coach who held Ms. Bevins' scholarship in his hands.  Rembao was keenly aware of the power differential, and he used it to his benefit.

260.   The psychological abuse began in August 1999 at the University of Texas's first

CLASS ACTION COMPLAINT                          - 50 -

official cross-country practice.  There, Rembao began bullying Ms. Bevins, saying, "You wasted your summer."  He said words to the effect of, "Just tell me and I can send you to any school you want," suggesting that she was unqualified for the University of Texas team and that he did not want her on the team.

261.   He repeatedly threatened to take away her scholarship, suggesting that she was not qualified.  Another of his oft-repeated phrases was, "Stop wasting our time and yours," again suggesting that she was not qualified for the teams.

262.   In the fall of 1999, Ms. Bevins participated in a Big 12 Conference cross-country meet at Texas A&M.  After the meet, Rembao gathered the team around him and picked out those who performed well and those who performed poorly.  Ms. Bevins had had a bad race and he told her, in front of her teammates and within earshot of the Texas A&M cross-country team, that she did a crappy job and that she should just save everyone the trouble and give her scholarship back.  This was one of the most mortifying and humiliating experiences that Ms. Bevins suffered up to that point in her life because she had always prided herself on hard work and diligence.  She began sobbing and cried during the two-hour bus ride back to Austin.

263.   Ms. Bevins' parents attended that cross-country meet, and Rembao told them certain things that Ms. Bevins was supposedly doing wrong that made her perform poorly.  Her parents were so concerned, because again, she had always worked and trained hard, that they drove from College Station to Austin, and sat with Ms. Bevins in the lobby of her dormitory and questioned her behavior.  She just cried.  She was giving track her all during two, exhausting workouts a day, and yet Rembao's bullying and the words he used had reduced her to thinking that she was fat and lazy.  She did not tell her parents about Rembao's behavior because she had always been taught to be respectful, and he had by that time skillfully manipulated her into thinking that there was indeed something wrong with her.

264.   In early 1999, someone complained to University of Texas officials about Rembao telling his track and field athletes that they were fat.  Rembao then grilled Ms. Bevins as to whether she had told anyone what they talked about.

265.   Rembao would often yell at Ms. Bevins in front of others and say cruel, hurtful

things. One day he came in the weight room, menacingly approached her and said, "Come with me." He took her into the weight trainer's lounge and closed the door and put his face close to hers and screamed at her for ignoring another teammate. He said that he did not like her attitude and was not going to take her to the next track meet, making her cry. Rembao told Ms. Bevins that another teammate had told him that Ms. Bevins did not say hello. Ms. Bevins was dazed because of the intensity of his rage and because she was utterly unaware of this supposed encounter with her teammate.

266. All during this time, Rembao would claim that Ms. Bevins' poor performance warranted meetings in his office. The meetings, however, were a ruse for sexual assaults. Ms. Bevins would sit in a stationary chair backed against the wall of Rembao's office, and Rembao would sit in a desk chair on wheels. The door was always closed; sometimes it was locked. She was trapped and felt paralyzed.

267. Rembao would cunningly use a carrot and stick, criticizing Ms. Bevins's drive, skill, and performance, and always threatening her scholarship, but at the same time seemingly offering care and concern for her track career and well-being.

268. Rembao would move his chair with his legs spread apart to where Ms. Bevins was sitting. Rembao would wrap his arms around her in an embrace that would last for minutes at a time. He would hold his body against hers and rub his erection on her.

269. At times he would touch her hair. He kissed her head, hair and neck. He would tell her she had nice legs, while touching and rubbing them inappropriately.

270. He would rub her shoulders and ask, "Tell me what's going on?" or "What can I do?" He would tell her that he liked her so very much, and that she was special.

271. Rembao would tell Ms. Bevins that she was one of his favorite people, and she believed him. She believed everything he said because he was an adult and he was her coach, people whom she was taught to respect. Rembao would often tell Ms. Bevins that if she didn't want to be great, he would start treating her the way he treated her teammates who weren't as fast or who were injured. He hardly spoke to those girls at all.

272. These office meetings spanned nearly the entire academic year that Ms. Bevins

CLASS ACTION COMPLAINT                                   - 52 -

attended UT-Austin.  They were all variations on the same theme.  Ms. Bevins felt alone, trapped, threatened, and scared. In the picture shown below, Ms. Bevins cut her hair shorter her freshman year in the hopes that Rembao would stop touching her platinum blonde hair:



273.    Rembao took every opportunity to seclude and isolate Ms. Bevins, to make her feel that she was doing something wrong so that she began to doubt her own feelings and judgment about events.  He did that so he had complete power and control over her.  To this day, Londa Bevins cannot be in a closed office with a male without suffering from a panic attack.

274.    Prior to the winter break in 1999, Ms. Bevins was not feeling well.  She was mandated to run six miles, but only ran four. When Rembao heard, he ordered Ms. Bevins to stay at school a week longer during the Christmas break as punishment because he did not "trust" her. Jessica Johnson was also punished in the same way.  Rembao arranged for them to stay at Erin Aldrich's apartment. During that time, Rembao and his wife Sue invited Ms. Bevins and Ms. Johnson over for dinner.

275.    When Ms. Bevins finally went home, Rembao telephoned her almost every single day under the guise of seeing if she did her workout.  He would say things like, "Do you miss me?" and she would nervously laugh, and he would say "Oh, I see how it is.  You don't miss me

1    at all."

2         276.    In January 2000, Ms. Bevins was required to take the Texas Academic Skills

3    Program (TASP) test, administered at Southwest Texas State in San Marcos, Texas.  Ms. Bevins

4    had arranged for a ride with a friend, but Rembao insisted on driving her.

5         277.    During that 30-minute car ride, Rembao put his hand on her thigh, moving it all

6    the way up, trying to reach and touch her labia and vagina.  He told her that she had nice legs and

7    hamstrings, that they were "really sexy."  He also told her that if she was younger, he would

8    "definitely date" someone like her.  Ms. Bevins squirmed away from his hand.  She was too

9    afraid to tell him to stop.  Ms. Bevins shook the entire time she took the test, dreading the car ride

10   back.

11        278.    Early in 2000, Ms. Bevins competed in the Big 12 Indoor Track and Field

12   Championships in Iowa.  That indoor track and field season was the first time that she had ever

13   competed on an indoor track.

14        279.    At some point between the preliminaries and the finals, Rembao asked Ms. Bevins

15   to come to his hotel room under the guise of discussing the finals.  While there Rembao told Ms.

16   Bevins that she looked stressed and he began to rub her shoulders, and he asked her to sit on the

17   bed in front of him.  He managed to move her back towards him so that her body touched his

18   erection.  Ms. Bevins was scared, ashamed and disgusted, and told him that she was tired and left

19   his room.

20        280.    To her surprise because she had never run on an indoor track, she ran two personal

21   bests times in the 1000m, coming in fifth place, and set a school record in the distance medley

22   relay, with the relay team coming in second.  Despite these personal and team successes, the

23   coaches made it feel like a funeral.  At a team meeting at the conclusion of the meet, Ms. Bevins

24   was reduced to tears.

25        281.    Jessica Johnson attempted to console Ms. Bevins afterwards, telling her that she

26   knew what it felt like to be yelled at, screamed at, told she was fat or not good enough, and what

27   it was like to cry a lot.  Ms. Bevins asked Ms. Johnson why she wasn't crying and Ms. Johnson

28   said, "I don't have any tears left."

CLASS ACTION COMPLAINT                      - 54 -

282.     That evening, after returning to the hotel from dinner, Rembao pointed to certain girls walking down the hall and said, "You, you, you, and you," and directed those girls to his hotel room.  He said to those remaining girls, including Ms. Bevins, "The rest of you can go to your rooms."  After that meeting, one of the girls who was selected to go to Rembao's hotel room confided in Ms. Bevins that Rembao had told them to stay away from Londa Bevins because "she will be a bad influence on you."  Ms. Bevins, who had always prided herself on hard work, was humiliated.

283.     By the Spring of 2000, Ms. Bevins could not sleep.  For nights at a time, she would lay in bed, crying, wishing that she was not at University of Texas at Austin and did not have to go to practice.  She could not face Rembao, and she dreaded track practice.  She did not want to be near the track, which was near Rembao's office.

284.     In high school, running was the most important thing in Ms. Bevins's life, and she enjoyed it so much.  Now the thing she loved so much was making her dreadfully sad and hopeless.  She contemplated taking a bunch of pills because she could not deal with the situation any longer.

285.     She was also exhausted from other girls on her team coming to her dorm room at night and crying about how unhappy they also were.  Ms. Bevins had no answers, and could not help herself, let alone her teammates.

286.     In or around March 2000, Ms. Bevins and Ms. Johnson admitted to each other that they were both victims of Rembao's sexual and mental abuse.  They both discussed that they needed to get out of there, to leave UT-Austin because of his conduct.

287.     Attending track practice began to provoke anxiety attacks in Ms. Bevins.  She would be relatively fine during the day, and when she would walk from class to the track, the closer she got her stomach would turn into a knot, she would get nervous, and her legs would start to shake.

288.     One day in or around April, during warm-ups, she just started sobbing.  She could not stop and she could not breathe.  She started shaking and thought that she was going to throw up.  She did not know why she was crying because no one had said anything to her that particular

day.  She went into the bathroom and sat on the floor and just cried.  Two teammates attended her
and tried to talk her into going back to practice.  She eventually did, and was determined to
complete the workout, but continued to cry.

289.     Ms. Bevins walked to the starting line and turned and saw Rembao and she started
crying harder.  He looked at her and said, "Get that look out of your eyes.  I don't like that.  I
know that look."  She responded, "I don't know if I can do this.  I'm crying and shaking and I
can't breathe, and I don't know what's wrong with me."  Rembao responded, "Then leave.  You
are a distraction to the other girls.  Just get your stuff and leave."

290.     And so she did.  She took the bus and went straight to Jessica Johnson's dorm
room and Ms. Johnson attempted to console Ms. Bevins.  To distract her, Ms. Johnson took Ms.
Bevins to a movie.  After the movie Ms. Bevins telephoned her roommate to tell her where she
was.

291.     Her roommate said that Coach John Rembao had called a number of times, and
that Ms. Bevins must call him.  She did not want to telephone him but did.  He told Ms. Bevins
that he wanted to meet with her the next day.

292.     The next day, Rembao told Ms. Bevins to quit running.  She tried to talk to him
about why she was so upset, why she was having anxiety attacks, but he did not want to listen to
her.  He encouraged her to call her parents and tell them that she wanted to quit track.  He would
only get her scholarship money back if she quit.

293.     The stress made Ms. Bevin physically sick a few days later. Although sick, she
was relieved for the physical excuse of missing track practice.

294.     Around April 2000, Ms. Bevins quit the Texas track team, ending her high school
dream and terminating her scholarship.  Her parents came to Austin to help Ms. Bevins approach
Rembao to have him sign a required paper "releasing" her so that she could transfer to another
school yet still participate in track.  This was an NCAA requirement – that the victim of the abuse
had to ask her abuser for "permission" to compete in track at another institution.

295.     During the Summer of 2000, Ms. Bevins attended counseling and was diagnosed
with depression and anxiety and was prescribed anti-depressant medication.  If she did not take

1   the medication, she would lay in bed and cry, but if she did take the medication, she would feel

2   physically awful and unable to train.

3        296.    That summer she contacted the University of Arkansas and made plans to transfer

4   in the fall of 2000.

5        297.    Ms. Bevins received only a 50% scholarship to be a member of the Arkansas track

6   team in exchange for attending.  The transition to a new school and a new track program was very

7   difficult for Ms. Bevins.  She was very depressed and angry at giving up her full scholarship at

8   the university of her choice, all because of Rembao's abuse.  At one point she attempted suicide.

9        298.    After the first year at the University of Arkansas, Ms. Bevins lost her 50%

10   scholarship due to lack of performance.

11        299.    Jessica Johnson had filed a formal complaint with UT-Austin regarding Coach

12   John Rembao.  Ms. Johnson identified Ms. Bevins as a witness who could support Ms. Johnson's

13   allegations.

14        300.    While Ms. Bevins was at the University of Arkansas, a lawyer for UT-Austin

15   summarily interviewed Ms. Bevins.

16        301.    During the interview Ms. Bevins had a hard time explaining the abuse she suffered

17   because she was still traumatized and could barely talk about it.  During the interview, the

18   attorney asked if she was certain that the events happened and asked her if she was sure,

19   attempting to cast doubt what she said.  He led her to believe that she did not have a claim, and

20   that Rembao's conduct was not wrong or abusive.  The interview re-traumatized her.

21        302.    Even though Ms. Bevins left UT-Austin to get away from Rembao, she

22   nevertheless could not because the University of Arkansas was in the same NCAA Region as

23   SMU, where Rembao was then coaching.  As a result, she had to run every cross-country, indoor

24   track, and outdoor track regional and national meets for the next three years in front of John

25   Rembao.  As she looped the track in her events, she had to see Rembao, who was on the sidelines,

26   again and again. At times he said things to her.  One time she distinctly heard him call her a

27   "bitch."

28        303.    During her junior year Ms. Bevins qualified for the 2003 NCAA DI Outdoor Track

CLASS ACTION COMPLAINT                     - 57 -

and Field Championships in Sacramento, California, where she ran a personal best in preliminaries in the 1500m.  Rembao came up to Ms. Bevins during the meet and said words to the effect that he had helped her achieve that result.  Not only was seeing him deeply distressing to Ms. Bevins, but Rembao arrogantly claiming Ms. Bevins's success, when in fact he was the cause of her emotional and psychological problems, was profoundly disturbing.

304.    During her senior year, Ms. Bevins qualified for the NCAA DI Outdoor Track and Field Championships, which to Ms. Bevins's distress, was by chance held at the University of Texas at Austin.  She became physically sick to her stomach.  She was so distraught from being at that venue where she was abused that she pinned her bib number upside down, and another competitor pointed that out to her at the starting line.  As a result, she had a terrible race and placed seventh overall.

305.    Ms. Bevins qualified to run in the 1500m at the 2004 USA Outdoor Track and Field Championships held in Sacramento, California, which is a qualifying meet for the United States Olympic Team.  This was Ms. Bevins very last track meet.  Again, Ms. Bevins saw Rembao at that event, causing her additional distress and trauma.



306.    Ms. Bevins was forced to transfer schools, to start in new athletic and academic programs, and all the while manage depression and anxiety due to Rembao's abuse.  Rembao not only physically and emotionally harmed Ms. Bevins but caused her to lose opportunities as a track and field runner.  She does not believe that she ever performed to the best of her abilities.

College athletes have a mere four years to perform in their sports, and no more.  Coaches like Rembao, however, have entire careers.

307.    Due to Rembao's abuse, Ms. Bevins forfeited a full scholarship at the University of Texas; as a result, she was required to pay one-half of tuition at the University of Arkansas her sophomore year and her full tuition her junior year.

308.    The sexual and emotional assaults that Rembao inflicted on Ms. Bevins at the University of Texas affected her athletic performance her entire college career, and her personal life to this day.  Even today, Ms. Bevins suffers anxiety and panic attack under certain circumstances, such as being in a confined space with a man.  Her work and interpersonal relationships have suffered.  She has a mistrust of people and has a hard time communicating her feelings.  Ms. Bevins also has difficulty in establishing and maintaining intimate relationships, and she gets angry easily.

**E.      Plaintiffs and the Class were damaged.**

309.    In cases of delayed reporting of physical, emotional or sexual student-athlete abuse, the focus becomes on not the adult, predator coaches or the institutions that harbored them for entire careers, but on the victims' delay in reporting. Why did the innumerable young, innocent, and impressionable boys and girls who were their prey wait so long to come forward?

310.    The answer is simple:  the victims have been trapped in a system created from the top down by organizations such as the NCAA and their member institutions of higher learning which have placed a higher value on continuing their respective revenue streams by maintaining secrecy of this epidemic of abuse, rather than protecting the innumerable young lives over which the predators have trod.

311.    Also asked is how could assaults like this have gone on for years and years?  Joan Ryan, author of "Little Girls in Pretty Boxes, the Making and Breaking of Elite Gymnasts and Figure Skaters," offered an explanation relevant to any sport and not limited to gymnastics:

> Elite gymnastics systematically strips away a girl's connection to her own body and mind as she is groomed from a young age to distrust what her body and mind are telling her. When she's in too much pain to train, her coach says she's lazy. When she's hungry, he says she's fat and eats *too* much. When she's too exhausted for

one more high-risk vault, she's a loser. She comes to understand that her own feelings and perceptions not only are unreliable, they don't matter. Her pain is dismissed. Her hunger is dismissed. Her exhaustion is dismissed. To fit into elite gymnastics' reality, a gymnast has to deny her own. She becomes an expert at withstanding all manner of insult to her body. She doesn't complain or make waves. She is the perfect target for a sexual predator like Larry Nassar.[101]

312. As such, the sexual, physical and mental abuse that many young student-athletes, such as the Plaintiffs in this case, have suffered is accompanied by self-doubt, shame, blame, and guilt, and only after years of reflection, meditation, counseling, medication, and psychotherapy are these individuals able to see the events for what they were:  sexual, physical, and emotional abuse and exploitation.  All the while many of these young lives are plagued with eating disorders, alcoholism, drug use and abuse, self-harm, emotional disorders, intimacy issues, and many to this day are simply broken individuals.

313. Sexual abuse in athletes results in long-term posttraumatic symptomology, with core symptoms including re-experiencing, avoidance, and hyperarousal.  Furthermore, disclosing or recounting the experience of sexual abuse can be traumatic and lead to a "double-trauma," which can cause an aftermath involving intense ruptures in day-to-day life.[102]

314. Sex abuse also leads to depression, phobias, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, sexual disorders, and suicidal ideation and attempts.[103]

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   The statute of limitations should be tolled by the discovery rule.

315. After she left the University of Arizona, Ms. Aldrich repressed the majority of her memories of Rembao's sexual contact with her.

316. The Arizona Supreme Court has explained repressed memories as follows:

---

[101] Joan Ryan, "Little Girls in Pretty Boxes, the Making and Breaking of Elite Gymnasts and Figure Skaters," Introduction to 2018 Edition at 3-4 (emphasis original).

[102] Helen Owton & Andrew C. Sparkes (2017), Sexual abuse and the grooming process in sport: Learning from Bella's story, Sport Education and Society, 22:6, 732-743, at 733, available at https://doi.org/10.1080/13573322.2015.1063484.

[103] Ingunn Bjørnseth & Attila Szabo (2018) Sexual Violence Against Children in Sports and Exercise: A Systematic Literature Review, Journal of Child Sexual Abuse, 27:4, 365-385, at 365

CLASS ACTION COMPLAINT                          - 60 -

> In laymen's terms, memory repression is the involuntary blocking of memory so that the memory remains stored but inaccessible to the conscious mind. Repression is a psychological defense mechanism that protects the individual from being confronted with the memory of an event that is too traumatic to cope with. A documented example is the woman known as the "Central Park Jogger," who was incapable of recalling the brutal attack and repeated rape she suffered just one year earlier. Physiological research conducted on the functioning of memory demonstrates the brain's biological capacity to retain memories yet prevent conscious access to them. See Cynthia Grant Bowman & Elizabeth Mertz, A Dangerous Direction: Legal Intervention in Sexual Abuse Survivor Therapy, 109 HARV. L. REV. 549, 600-04 (1996). The memory is not lost but remains dormant and inaccessible. The individual functions with no conscious awareness of the traumatic event. Researchers and clinicians attest that the inaccessible memory may nonetheless adversely impact the individual's psychological well-being and is frequently manifested by substance abuse, severe depression, suicidal tendencies, and sexual and social dysfunctions. See Judith Herman & Emily Schatzow, Recovery and Verification of Memories of Childhood Sexual Trauma, 4 PSYCHOANALYTIC PSYCHOL. 1, 2 (1987).

*Doe v. Roe*, 955 P.2d 951, 957 (Ariz. 1998).

317.    In late March or early April of 2019, Ms. Aldrich watched the HBO documentary called *Leaving Neverland,* which was about two boys, now men, who were sexually abused by Michael Jackson as children. These men had previously denied any sexual abuse during Jackson's criminal trial, but admitted in the documentary that it took years to recognize that Jackson did in fact abuse them.

318.    While watching the documentary, Ms. Aldrich experienced strong flashback memories of Rembao's sexual abuse of her. It was the first time Ms. Aldrich realized she had been sexually abused.

319.    Ms. Aldrich's realization is consistent with experts' recognition that an athlete "might not recognise the events as sexual abuse for several years after the event."[104]

320.    "Research on the biology of memory verifies the brain's capacity to retrieve

---

[104] Helen Owton & Andrew C. Sparkes (2017), Sexual abuse and the grooming process in sport: Learning from Bella's story, Sport Education and Society, 22:6, 732-743, at n.1, available at https://doi.org/10.1080/13573322.2015.1063484.

1   previously inaccessible memory in response to stimuli. These stimuli, commonly referred to as

2   triggers, include sensory experiences, therapy, and spontaneous recall." *Doe*, 955 P.2d at 957.

3        321.    In Ms. Aldrich's case, the documentary *Leaving Neverland* was the trigger leading

4   to her recall and (partially) understand the sexual abuse.

5        322.    Upon realizing the abuse, Ms. Aldrich developed feelings of panic, remorse,

6   distress, shame, and guilt.  She sought counseling, but is still unable to recall whether she ever

7   was forced to engage in any sexual acts, other than Rembao taking advantage of her (by

8   penetrating her with his fingers and performing oral sex on her).

9        323.    The realization of the abuse also manifested itself in physical injury.  Shortly after

10   watching *Leaving Neverland,* with the pressure and stress of the past triggered and realized, Ms.

11   Aldrich was hospitalized with sepsis from bacterial pneumonia for eight days.  Her body had

12   literally shut down.  For eight long days, she feared she was going to die with the secret of

13   Rembao's abuse.

14        324.    To this day and despite counseling, she continues to experience feelings of guilt,

15   shame, self-doubt, depression, and anxiety.

16        325.    Ms. Aldrich's statute of limitations was tolled until the end of March or early April

17   2019, when she viewed that HBO documentary.

18        326.    Since watching the documentary and recovering her memories of abuse, Ms.

19   Aldrich has exercised due diligence to investigate and discover the nature and extent of her

20   injuries.

21        327.    Several months after watching the documentary, in October of 2019, Ms. Aldrich

22   telephoned Ms. Johnson. After not having heard from Ms. Aldrich in 20 years, Ms. Johnson

23   intuitively knew the subject of the telephone call: "Is this about our coach?" Ms. Aldrich shared

24   the facts of her interactions with Rembao, and Ms. Johnson confirmed that she, too, was sexually

25   abused and harassed by Rembao.

26        328.    The statute of limitations should also be tolled based on these facts where Ms.

27   Aldrich was not able to comprehend her legal rights until the fall of 2019.  Statutes of limitations

28   should be tolled where:

CLASS ACTION COMPLAINT        - 62 -

Plaintiff repressed memories of abuse (one cannot understand legal rights with respect to a wrong of which the person was unaware); she was in denial that any abuse took place, was unable to accept that the events had occurred, and was unable to articulate them; she experienced feelings of complicity with her abuser (evidencing, perhaps, that she did not understand that a wrong had occurred); and she experienced feelings of responsibility and guilt for the abuse (same)…. Moreover, in the present case consultation with an attorney, the single factor evidencing an ability to understand legal rights in both *Allen* and *Florez*, occurred within two years of the filing date.

*Doe*, 955 P.2d at 967.  Because Ms. Aldrich filed this lawsuit within two years of understanding her legal rights, Ms. Aldrich's claims are timely.

**B.     The statutes of limitations should be tolled based on equitable estoppel, fraudulent concealment, and/or equitable tolling.**

329.    Jessica Johnson complained to the University of Texas at Austin of Rembao's abuse on June 16, 2000, and, at the university's direction, was required to file a formal complaint in writing, which she did on August 9, 2000.  In connection with its investigation of her complaint, UT-Austin interviewed 23 witnesses and reviewed over 200 documents.

330.    On November 21, 2000, the university issued its Final Report on Complaint of Sexual Harassment by Jessica Johnson ("UT-Austin Report")

331.    The UT-Austin Report is an unmitigated whitewash where the university goes to great lengths to minimize Rembao's unquestionably inappropriate conduct in order to exonerate itself, finding that Rembao did not violate University of Texas at Austin's Sexual Misconduct or Sexual Harassment Policies.  UT-Austin Report at 11.[105]

332.    The UT-Austin Report is utterly dismissive of Ms. Johnson's facially plausible allegations, many of which were corroborated, making untenable excuses for what was nothing more than sexual abuse she suffered at Rembao's hands.  For example, Ms. Johnson complained

---

[105] Two such "whitewash" investigations with hauntingly parallel facts were recently reported in, "Internal Investigations Won't Stop Abusive Coaches" (Feb. 26, 2020), available at https://www.outsideonline.com/2409753/alberto-salazar-dave-scott-thomas-coaching-abuse#close (last visited 2/28/20) ("both coaches benefitted from being ensconced in a large institution – the University of Guelph [in Canada] and Nike – that said it would look into the issue, despite having little incentive to expose the wrongdoings of its more prominent employees").

1    that Rembao gave her a massage at his house on her upper thighs and gluteus.  Rembao did not

2    deny this and admitted giving Ms. Johnson three massages, including two "stomach massages."

3    Although such massages were not authorized by the Women's Athletic Department, the

4    university absurdly concluded that such touching was done by Rembao in his role as a coach.  *Id.*

5    at 6.

6         333.    The same is true of the "chair hugs," to which Rembao subjected his athletes.  The

7    UT-Austin Report states that "virtually every athlete interviewed expressed at least initial

8    discomfort with the 'bear hugs' and 'chair hugs' Mr. Rembao engages in," yet concluded that

9    hugging student-athletes in such a way does not violate the university's Sexual Harassment and

10   Sexual Misconduct policy.  *Id.* at 7.

11        334.    The University of Texas at Austin exonerated Rembao from sexual harassment and

12   sexual abuse and, predictably, laid the blame for the events at Ms. Johnson's feet.  The

13   investigative process showed no care or concern for Ms. Johnson's or Ms. Bevins's well-being.

14   The University of Texas failed to have a trauma-informed trained professional interview them

15   who would have immediately recognized and identified their allegations, which included doubt,

16   self-blame, minimization, and uncertainty, as classic ones of survivors of sexual abuse.  The UT-

17   Austin Report was designed to protect the school's reputation and cause Ms. Johnson and Ms.

18   Bevins to believe they did not have any legal rights.

19        335.    The manner in which the University of Texas at Austin conducted its investigation

20   of Rembao, and its exoneration of him for sexual harassment and assault, effectively tolled the

21   statutes of limitations for the claims alleged by Plaintiffs herein based on the doctrines of

22   equitable estoppel, fraudulent concealment, and/or equitable tolling.

23        336.    University of Texas at Austin's exoneration of Rembao from sexual harassment

24   and sexual abuse was fraudulent in a number of ways.  First, Texas's exoneration of Rembao **in**

25   **the face of the UT-Austin Report's factual findings**, cannot be reconciled.  There is only one

26   conclusion based on UT-Austin's own documented factual findings, and that is that by any

27   standard and under any guidelines, Rembao sexually harassed and abused both Ms. Johnson and

28   Ms. Bevins.

CLASS ACTION COMPLAINT                        - 64 -

337.    Second, the University of Texas's characterizations of Ms. Johnson and Ms. Bevins, and the information they provided, was intentionally designed to detract from Rembao's serial predation, to divert from any question that there may have been other victims, and to shame and embarrass the complainants, further bolstering the fraudulent, result-oriented conclusion while at the same time undermining the credibility of Ms. Johnson and Ms. Bevins.

338.    The University of Texas at Austin undertook this fraudulent conduct in order to silence Ms. Johnson and Ms. Bevins, to ensure, among other things, that they would not make their experiences public by complaining in other fora or otherwise filing suit.  When the UT-Austin Report was issued on November 21, 2000, UT-Austin unequivocally told Ms. Johnson and Ms. Bevins that their allegations were not believable and that they did not have a claim.  With such a conclusion, University of Texas at Austin also implicitly told them their complaints were isolated and that there were no other victims.

339.    As set out above, in October 2019, Jessica Johnson received a telephone call from Erin Aldrich.

340.    It was at that point that Ms. Johnson was informed that in addition to Londa Bevins, there were indeed other victims of Rembao's abuse.  Because of the university's acts and omissions, Jessica Johnson's statute of limitations was tolled from November 21, 2000, the date of the UT-Austin Report, until October 2019.

341.    In October 2019, Ms. Johnson telephoned Ms. Bevins to advise her of the call from Erin Aldrich. Because of University of Texas at Austin's acts and omissions, Ms. Bevins's statute of limitations was also tolled from November 21, 2000 until October 2019.

C.      **Because Ms. Johnson and Ms. Bevins filed this lawsuit promptly after understanding their legal rights, their claims are timely. A new rule must be created to toll the statute of limitations favoring victims sexually abused by a person in a position of authority over them.**

342.    Statutes of limitations are not intended to shield wrongdoers, yet this is precisely the state of the law today in nearly every jurisdiction regarding sexual abuse claims.  Recently, there has been some progress made in changed limitations periods regarding the sexual abuse of minors, but the law still imposes an artificial cutoff after an individual celebrates their eighteenth

birthday. Such statutory changes are for the legislature, but the judiciary has crafted certain exceptions to toll statutes of limitations, like those mentioned above.

343.   Plaintiffs contend that courts – and this Court in particular –  should create an exception called the victimization exception to toll limitations periods for victims of sexual abuse in instances where the abuser is in a recognized position of power over their victims, like an NCAA coach over a student-athlete. The limitations period should be tolled until the victim can identify the conduct for what it was:  sexual abuse.

344.   Such an exception is essential because sexual abuse is not an event with a discrete begin and end date – a factor which is imperative for the application of all existing statutes of limitations and the existing exceptions.  Instead, sexual abuse is a course of conduct that may begin innocently at first and may extend over time.  During much, or sometimes even all, of that time, the victim does not realize that the predator's conduct is unlawful, or even inappropriate. With some victims, the abnormal events become normalized; with others, the events are suppressed because of shame, fear, or manipulation.  Not only are the events themselves viewed through the victim's distorted lens, but the victim is not emotionally capable of understanding their victimization and taking meaningful action for their own protection.  With some victims, memories are not always completely repressed so as to fall within the discovery rule, but they are unclear, unfocused, and uncertain about the nature of the acts and conduct inflicted upon them.

345.   For these reasons and in such circumstances, the "discovery rule" regarding tolling is wholly inadequate, therefore requiring a judicially created exception predicated on equitable considerations.

346.   Equitable concepts benefitting victims are not new in the law. For example, the marital privilege affords a spouse the ability to bar his spouse from testifying against him in civil or criminal proceedings.  This privilege arises from medieval jurisprudence where the wife had no separate legal existence.  The common law then crafted an equitable and, indeed, humanitarian exception where the defendant committed an offense against the witness-spouse.  This common law exception was designed to afford the victimized witness-spouse the opportunity to testify over the defendant's objection.  It has since been extended in situations where the defendant also

1    commits offenses against their children. This common law exception to the marital privilege

2    shows that the law valuing protecting victims over wrongdoers.

3        347.   Plaintiffs contend that this equitable theory must be judicially created and applied

4    where a victim is sexually abused by a person in a recognized position of authority, and the

5    limitations period remains tolled until the victim is able to comprehend that the conduct was

6    sexual abuse.  To hold otherwise would allow sexual predators and the organizations that

7    protected them to escape liability from suit by the victims, who, because of the nature of sexual

8    abuse, oftentimes for years cannot immediately and timely (so as to comply with inflexible

9    limitations periods) identify the conduct for what it is.

10   **VII.   CLASS ALLEGATIONS**

11
12       348.   Plaintiffs bring this action on behalf of the following "Nationwide Class" pursuant

13   to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4): "All student-

14   athletes who participated in NCAA sports at NCAA member institutions from 1992 to the

15   present."

16       349.   Plaintiffs also bring this action on behalf of the following "NCAA-Rembao Class"

17   pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4): "All

18   student-athletes at NCAA member institutions who were coached by John Rembao."

19       350.   Plaintiffs reserve the right to modify or amend the class definitions, including the

20   addition of one or more subclasses, after having the opportunity to conduct discovery.

21       351.   Excluded from the Classes are Defendants and any of their affiliates, parents,

22   subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all

23   persons who make a timely election to be excluded from the class; governmental entities; and all

24   judges assigned to hear any aspect of this litigation, including their immediate family members.

25       352.   Numerosity:  The NCAA reports that there are more than 460,000 NCAA student-

26   athletes competing in 24 sports every year.[106]  As such, the members of the Classes are so

27   numerous that joinder is impractical.

28   ─────────────────
     [106] http://www.ncaa.org/student-athletes (last visited 2/11/20).

353.   Typicality:  Plaintiffs' claims are typical of the claims of each class member in that Plaintiffs, like all class members, were NCAA student-athletes.  Plaintiffs and the class members were injured through NCAA's failure to protect them, and Plaintiffs are advancing the same legal theories on behalf of themselves and the Classes.

354.   Adequacy:  Plaintiffs will fairly and adequately protect the interest of the Class. Plaintiffs' interests and the interests of all other members of the Class are identical, and Plaintiffs are cognizant of their duty and responsibility to the Class.  Accordingly, Plaintiffs can fairly and adequately represent the interests of the Class.  Moreover, Plaintiffs' counsel are competent and experienced in litigating class actions, including litigation of this kind.  Plaintiffs and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

355.   Commonality and Predominance:  There are numerous questions of law and fact common to the Classes, and these common questions predominate over any issues affecting only individual class members.  Questions common to the class include:

a.   Whether the NCAA and its Board of Governors had a duty to implement and enforce rules and bylaws to, *inter alia*:

- prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

- prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

- prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

- require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

- maintain all reports in a centralized repository so that all complaints about sexual relationships, harassment, or abuse of a student-athlete by

1    athletics department personnel can be tracked by the NCAA and its

2    member institutions;

3    • require that all reports of sexual relationships, harassment, or abuse of a

4    student-athlete by athletics department personnel be independently

5    investigated;

6    • implement public sanctions on member institutions and athletics

7    department personnel where allegations of sexual relationships,

8    harassment, or abuse of a student-athlete by athletics department

9    personnel are substantiated;

10   • ban athletics department personnel from working or volunteering for

11   any member institution where allegations of sexual relationships,

12   harassment, or abuse of a student-athlete by such athletics department

13   personnel are substantiated;

14   • mandate training of athletics department personnel regarding grooming,

15   sexual relationships with student-athletes, sexual abuse and harassment,

16   the prohibition thereof, and reporting obligations.

17   • mandate training of athletics department personnel and student-athletes

18   to recognize the signs of grooming and sexual abuse and harassment by

19   athletics department personnel, and to provide confidential avenues to

20   report the abuse;

21   • protect Plaintiffs and members of the Classes from such abuse and

22   other known and/or foreseeable risks; and

23   • provide a safe environment for NCAA student-athletes free from sexual

24   abuse and/or sexual harassment:

25   b.   Whether the NCAA and its Board of Governors breached the foregoing

26   duties;

27   c.   Whether the NCAA and the student-athletes entered into a contract

28   requiring the NCAA to abide by, implement and enforce rules concerning

1   gender equity, including with respect to the prohibition of sexual

2   relationships between coaches and student-athletes, and the sexual abuse

3   and harassment of student-athletes;

4   d.   Whether the NCAA breached the foregoing express or implied contract;

5   e.   Whether John Rembao battered, assaulted, and falsely imprisoned

6   Plaintiffs and the subclass;

7   f.   Whether John Rembao intentionally or negligently inflicted emotional

8   distress on Plaintiffs and members of the NCAA-Rembao Subclass;

9   g.   Whether the NCAA should be held vicariously liable for Rembao's tortious

10   conduct;

11   h.   Whether the NCAA ratified Rembao's tortious conduct; and

12   i.   The scope of the injunctive relief and damages to which the Plaintiffs and

13   members of the Classes are entitled.

14   356.   Superiority:  A class action is superior to any other available means for the fair and

15   efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered

16   in the management of this class action.  The purpose of a class action is to permit litigation

17   against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify

18   individual litigation.  Individual litigation by each class member would also strain the court

19   system, create the potential for inconsistent or contradictory judgments, and increase the delay

20   and expense to all parties and the court system.  Moreover, the highly sensitive and traumatic

21   nature of the facts involved here makes a class action superior, because in circumstances like

22   these, there will be some victims who are emotionally ready and able to come forward and bring

23   suit on behalf of the many others who may not be able or ready to come forward to bring suit on

24   their own. In sum, the class action presents far fewer management difficulties and provides the

25   benefits of a single adjudication, economies of scale, and comprehensive supervision by a single

26   court.

27   357.   Equitable Relief:  Class certification is also appropriate under Rule 23(b)(2)

28   because Defendants have acted and refused to act on grounds generally applicable to the Classes

as a whole, such that final injunctive relief is appropriate with respect to the Classes as a whole. Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent such conduct in the future as mentioned above.

358.    This action is also properly maintainable under Rule 23(c)(4) in that particular issues common to the class, as set out supra, are most appropriately and efficiently resolved via class action, and would advance the disposition of this matter and the parties' interests therein.

**VIII.    CLAIMS AGAINST THE NCAA ON BEHALF OF THE NATIONWIDE CLASS**

**COUNT I**
**GROSS NEGLIGENCE**
**(PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA AND ITS BOARD OF GOVERNORS)**

359.    Plaintiffs incorporate by references all prior paragraphs as if set forth in full herein.

360.    At all relevant times, the NCAA and its Board of Governors owed a duty to Plaintiffs and the Class to implement and enforce rules and bylaws to, *inter alia*:

a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.    require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athletes by athletics department personnel;

e.    maintain all reports in a centralized repository so that all complaints about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel can be tracked by the NCAA and its member institutions;

f.    require that all reports of sexual relationships, harassment, or abuse of a

1        student-athlete by athletics department personnel be independently

2        investigated;

3    g.   implement public sanctions on member institutions and athletics

4        department personnel where allegations of sexual relationships,

5        harassment, or abuse of a student-athlete by athletics department personnel

6        are substantiated;

7    h.   ban athletics department personnel from working or volunteering for any

8        member institution where allegations of sexual relationships, harassment,

9        or abuse of a student-athlete by such athletics department personnel are

10        substantiated;

11    i.   mandate training of athletics department personnel regarding grooming,

12        sexual relationships with student-athletes, sexual abuse and harassment, the

13        prohibition thereof, and reporting obligations.

14    j.   mandate training of athletics department personnel and student-athletes to

15        recognize the signs of grooming and sexual abuse and harassment by

16        athletics department personnel, and to provide confidential avenues to

17        report the abuse;

18    k.   protect Plaintiffs and members of the Classes from such abuse and other

19        foreseeable risks; and

20    l.   provide a safe environment for NCAA student-athletes free from sexual

21        abuse and harassment.

22  2.    The NCAA and its Board of Governors' duty arose from the following:

23    m.   The NCAA's Constitution and Bylaws, which, among other things,

24        establish a duty to protect the health and well-being of NCAA student-

25        athletes, including in the areas of health and safety and in gender equity,

26        which includes student-athlete/coach relationships;

27    n.   The NCAA's website, which establishes a duty to exercise reasonable care

28        concerning the health and well-being of its student-athletes in connection

CLASS ACTION COMPLAINT                      - 72 -

1    with its sports;

2    o.    The NCAA's positioning of itself as the exclusive authority in

3          intercollegiate athletics to preserve its goal of preserving amateurism; and

4    p.    The Board of Governors being charged with ensuring that each NCAA

5          Division operates consistently with the basic purposes, fundamental

6          policies, and general principles of the NCAA.

7    361.    The NCAA acted recklessly and indifferently in its position as the regulatory body

8    for college athletics among its members institutions and its student-athletes, including Plaintiffs

9    and the Class, and the NCAA Board of Governors acted recklessly and indifferently in its role of

10   ensuring that each NCAA Division operates consistently with the purposes, policies, and

11   principles of the NCAA.

12   362.    The NCAA and its Board of Governors knew or should have known that its

13   actions or inactions in the area of gender equity with respect to sexual relationships, abuse, and

14   harassment by athletics department personnel of student-athletes created an unreasonable risk of

15   harm to Plaintiffs and the Class, such that the risk was so great that it was highly probable that the

16   harm would result.

17   363.    The NCAA's Board of Governors has been aware of the issue for years, and has

18   ignored previous calls by eight United States senators and its own study commission to fix the

19   problem.  In fact, the NCAA Board of Governors disbanded the NCAA study group called the

20   Commission to Combat Campus Sexual Violence in 2018, promising only to continue to

21   "monitor and track on sexual violence issues."

22   364.    The NCAA and its Board of Governors knew or should have known that the power

23   differential between coaches, trainers and other athletics department personnel on the one hand,

24   and student-athletes on the other hand, so favors the athletics department personnel that student-

25   athletes cannot effectively protect themselves from inappropriate conduct. Moreover, this

26   disparity of power negates any purported consent by the student-athlete when confronted by

27   inappropriate conduct.

28   365.    The NCAA and its Board of Governors thus owed its student-athletes a duty to

CLASS ACTION COMPLAINT                    - 73 -

protect them from the foreseeable risk of coaches or trainers who take advantage of the power differential for improper purposes.

366.    The NCAA and its Board of Governors knew or should have known that college athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims, and so owed its student-athletes a duty to protect them from the foreseeable risk of such coaches or trainers.

367.    The NCAA and its Board of Governors knew or should have known of an extremely high incidence of marriages between coaches or trainers and student-athletes/former student-athletes to indicate the existence of improper relationships between coaches and trainers and student-athletes, and so owed its student-athletes a duty to protect them from the foreseeable risk of such improper relationships.

368.    Plaintiffs had a reasonable expectation that the NCAA and its Board of Governors would require its member institutions to employ (and the member institutions would employ) skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would carry out said coaching and training without sexual harassment, sexual, physical, and psychological abuse, and molestation.

369.    Plaintiffs also had a reasonable expectation that the NCAA and its Board of Governors would inform Plaintiffs and the public of sexual harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

370.    The NCAA and its Board of Governors willfully disregarded precautions that would reasonably protect Plaintiffs and the Class and their safety and well-being in the following, including but not limited to by failing to:

        a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

        b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

        c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.   require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

e.   maintain all reports in a centralized repository so that all complaints about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel can be tracked by the NCAA and its member institutions;

f.   require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

g.   implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

h.   ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.   mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations.

j.   mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.   protect Plaintiffs and members of the Classes from such abuse and other known and foreseeable risks; and

l.   provide a safe environment for NCAA student-athletes free from sexual

abuse and/or sexual harassment.

371.   The NCAA and its Board of Governors' conduct described above demonstrated a willful disregard for substantial risks to Plaintiffs and the Class.

372.   The NCAA and its Board of Governors' reckless conduct exhibited a willful disregard for necessary precautions to reasonably protect Plaintiffs and the Class, which was a substantial contributing cause of Plaintiffs' sexual assault, sexual and psychological abuse, and molestation.

373.   As a direct and proximate result of Defendants' reckless indifference to Plaintiffs, Plaintiffs have suffered and continue to suffer from emotional distress, physical manifestations of emotional distress, loss of self-esteem, fright, anxiety, grief, humiliation and loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; and have sustained financial losses including but not limited to the amounts of tuition paid because of loss of scholarship due to Defendants' actions and inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and despair caused by Defendants' actions.

**COUNT II**
**NEGLIGENCE**
**(PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA AND ITS BOARD OF GOVERNORS)**

374.   Plaintiffs incorporate by references all prior paragraphs as if set forth in full herein.

375.   At all relevant times, the NCAA and its Board of Governors owed a duty to Plaintiffs and the Class to implement and enforce rules and bylaws to, *inter alia*:

a.   prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

b.   prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.   prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.  require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

e.  maintain all reports in a centralized repository so that all complaints about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel can be tracked by the NCAA and its member institutions;

f.  require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

g.  implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

h.  ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.  mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations.

j.  mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.  protect Plaintiffs and members of the Classes from such abuse and other foreseeable risks; and

l.  provide a safe environment for NCAA student-athletes free from sexual

1        abuse and/or sexual harassment.

2   376. The NCAA and its Board of Governors' duty arose from the following:

3       a. The NCAA's Constitution and Bylaws, which, among other things,

4         establish a duty to protect the health and well-being of NCAA student-

5         athletes, including in the areas of health and safety and in gender equity,

6         which includes student-athlete/coach relationships;

7       b. The NCAA's website, which establishes a duty to exercise reasonable care

8         concerning the health and well-being of its student-athletes in connection

9         with its sports;

10      c. The NCAA's positioning of itself as the exclusive authority in

11        intercollegiate athletics to preserve its goal of preserving amateurism; and

12      d. The Board of Governors being charged with ensuring that each NCAA

13        Division operates consistently with the basic purposes, fundamental

14        policies, and general principles of the NCAA.

15   377. The NCAA acted negligently, carelessly, and indifferently in its position as the

16 regulatory body for college athletics among its members' institutions and its student-athletes,

17 including Plaintiffs and the Class, and the NCAA Board of Governors acted negligently,

18 carelessly, and indifferently in its role of ensuring that each NCAA Division operates consistently

19 with the purposes, policies, and principles of the NCAA.

20   378. The NCAA and its Board of Governors knew or should have known that its

21 actions or inactions in the area of gender equity with respect to sexual relationships, abuse and

22 harassment by athletics department personnel of student-athletes created an unreasonable risk of

23 harm to Plaintiffs and the Class, such that the risk was so great that it was highly probable that the

24 harm would result.

25   379. The NCAA's Board of Governors has been aware of the issue for years, and has

26 ignored previous calls by eight United States senators and its own study commission to fix the

27 problem. In fact, the NCAA Board of Governors disbanded the NCAA study group called the

28 Commission to Combat Campus Sexual Violence in 2018, promising only to continue to

1   "monitor and track on sexual violence issues."

2       380.    The NCAA and its Board of Governors knew or should have known that the power

3   differential between coaches, trainers and other athletics department personnel on the one hand,

4   and student-athletes on the other hand, so favors the athletics department personnel that student-

5   athletes cannot effectively protect themselves from inappropriate conduct. Moreover, this

6   disparity of power negates any purported consent by the student-athlete when confronted by

7   inappropriate conduct.

8       381.    The NCAA and its Board of Governors thus owed its student-athletes a duty to

9   protect them from the foreseeable risk of coaches or trainers who take advantage of the power

10  differential for improper purposes.

11      382.    The NCAA and its Board of Governors knew or should have known that college

12  athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member

13  institutions to have nearly unfettered access to victims, and so owed its student-athletes a duty to

14  protect them from the foreseeable risk of such coaches or trainers.

15      383.    The NCAA and its Board of Governors knew or should have known of an

16  extremely high incidence of marriages between coaches or trainers and student-athletes/former

17  student-athletes to indicate the existence of improper relationships between coaches and trainers

18  and student-athletes, and so owed its student-athletes a duty to protect them from the foreseeable

19  risk of such improper relationships.

20      384.    Plaintiffs had a reasonable expectation that the NCAA and its Board of Governors

21  would require its member institutions to employ (and the member institutions would employ)

22  skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports,

23  who would carry out said coaching and training without sexual harassment, sexual, physical, and

24  psychological abuse, and molestation.

25      385.    Plaintiffs also had a reasonable expectation that the NCAA and its Board of

26  Governors would inform Plaintiffs and the public of sexual harassment, sexual, physical, and

27  psychological abuse, and molestation committed by NCAA coaches and trainers.

28      386.    The NCAA and its Board of Governors willfully disregarded precautions that

CLASS ACTION COMPLAINT                          - 79 -

1    would reasonably protect Plaintiffs and the Class and their safety and well-being in the following,

2    including but not limited to by failing to:

3        a.    prohibit sexual harassment and/or sexual abuse of student-athletes by

4              athletics department personnel;

5        b.    prohibit any romantic or sexual relationships between athletics department

6              personnel and student-athletes;

7        c.    prohibit grooming and other sexually-exploitative behavior by athletics

8              department personnel of student-athletes;

9        d.    require NCAA member institutions to immediately report any allegations

10             of sexual relationships, harassment, or abuse of a student-athlete by

11             athletics department personnel;

12       e.    maintain all reports in a centralized repository so that all complaints about

13             sexual relationships, harassment, or abuse of a student-athlete by athletics

14             department personnel can be tracked by the NCAA and its member

15             institutions;

16       f.    require that all reports of sexual relationships, harassment, or abuse of a

17             student-athlete by athletics department personnel be independently

18             investigated;

19       g.    implement public sanctions on member institutions and athletics

20             department personnel where allegations of sexual relationships,

21             harassment, or abuse of a student-athlete by athletics department personnel

22             are substantiated;

23       h.    ban athletics department personnel from working or volunteering for any

24             member institution where allegations of sexual relationships, harassment,

25             or abuse of a student-athlete by such athletics department personnel are

26             substantiated;

27       i.    mandate training of athletics department personnel regarding grooming,

28             sexual relationships with student-athletes, sexual abuse and harassment, the

CLASS ACTION COMPLAINT                           - 80 -

prohibition thereof, and reporting obligations.

    j.    mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

    k.    protect Plaintiffs and members of the Classes from such abuse and other foreseeable risks; and

    l.    provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment.

387.    The NCAA and its Board of Governors' conduct described above demonstrated a negligent disregard for substantial risks to Plaintiffs and the Class.

388.    The NCAA and its Board of Governors' negligent conduct exhibited a disregard for necessary precautions to reasonably protect Plaintiffs and the Class, which was a substantial contributing cause of Plaintiffs' sexual assault, sexual and psychological abuse, and molestation.

389.    As a direct and proximate result of Defendants' negligent indifference to Plaintiffs, Plaintiffs have suffered and continue to suffer from emotional distress, physical manifestations of emotional distress, loss of self-esteem, fright, anxiety, grief, humiliation and loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; and have sustained financial losses including but not limited to the amounts of tuition paid because of loss of scholarship due to Defendants' actions and inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and despair caused by Defendants' actions.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA)**

390.    Plaintiffs incorporate by references all prior paragraphs as if set forth in full herein.

391.    The NCAA owed a fiduciary duty to Plaintiffs and the Class that arose out of the

1   special relationship founded upon trust and confidence between the NCAA and its student-

2   athletes.  A fiduciary duty was formed because the NCAA actively promoted itself as providing a

3   safe and nurturing environment for its student-athletes, and intended that Plaintiffs and the Class

4   believe this to be true so as to participate in NCAA sports.

5       392.   Plaintiffs and the Class believed and trusted the NCAA that its member institutions

6   would employ skilled, trained, competent, and ethical coaches and trainers in connection with

7   NCAA sports, who would carry out said coaching and training without sexual assault, sexual,

8   physical, and psychological abuse, and molestation.

9       393.   Plaintiffs and the Class believed and trusted that the NCAA would inform

10  Plaintiffs and the public of any allegations and concerns relating to sexual harassment, sexual,

11  physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

12      394.   The NCAA owed Plaintiffs the highest duty to protect them and other student-

13  athletes from sexual predator coaches and trainers like Rembao.

14      395.   The NCAA breached its fiduciary duty to Plaintiffs and the Class by failing to

15  protect them from sexual predators such as Rembao, and failing to warn them regarding same.

16      396.   NCAA's breaches of its fiduciary duties were substantial contributing casus of

17  Plaintiffs' injuries and played a substantial part in bringing about the harm to Plaintiffs.

18      397.   As a direct and proximate result of NCAA's breaches of its fiduciary duties,

19  Plaintiffs suffered and continue to suffer from emotional distress, physical manifestations of

20  emotional distress, loss of self-esteem, fright, anxiety, grief, humiliation and loss of enjoyment of

21  life; were prevented and will continue to be prevented from performing their daily activities and

22  obtaining the full enjoyment of life; and have sustained financial losses including but not limited

23  to the amounts of tuition paid because of loss of scholarship due to NCAA's actions and

24  inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the

25  mental anguish and despair caused by NCAA's actions.

26

27

28

COUNT IV
**NEGLIGENT MISREPRESENTATIONS AND OMISSIONS**
**(PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST NCAA)**

398.   Plaintiffs incorporate by references all prior paragraphs as if set forth in full herein.

399.   The NCAA negligently concealed facts and information which were material to Plaintiffs and the Class.  As more fully described above, the NCAA knew or should have known that its actions or inactions in the area of gender equity, including with respect to sexual harassment, sexual, physical, and psychological abuse, and molestation of its student-athletes by coaches or trainers, would cause harm to Plaintiffs and the Class.

400.   The NCAA knew or should have known but negligently concealed the following facts:

a.   The power differential between coaches and trainers and student-athletes exists and/or that certain coaching styles create a disparity of power, which would make student-athletes vulnerable to coaches or trainers who take advantage of the power differential for improper purposes, including sexual harassment, physical, sexual, or psychological abuse, and molestation;

b.   College athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims, which would make student-athletes vulnerable to such predators; and

c.   An extremely high incidence of marriages between coaches or trainers and student-athletes/former student-athletes which indicates the existence of improper relationships between coaches and trainers and student-athletes, making student-athletes vulnerable to such inappropriate relationships.

401.   Through negligent concealment of material facts, the NCAA intended to induce a false belief in its student-athletes that NCAA sports were safe from sexual relationships, abuse or harassment by athletics department personnel, and that NCAA sports were a safe and nurturing

environment for student-athletes.  It failed to provide Plaintiffs and other student-athletes with a reasonably safe place for NCAA sports activities and interactions with coaches and trainers of NCAA member institutions.

402.    Plaintiffs and the Class were lulled into a false sense of belief that NCAA member institutions employed skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would carry out said coaching and training without sexual harassment, sexual, physical, and psychological abuse, and molestation.

403.    Plaintiffs could not have discovered the truth through a reasonably inquiry and/or were prevented from doing so, because (1) the NCAA did not require nor encourage member institutions to publicly or privately report sexual abuse or harassment by athletics department personnel and thus fraudulently concealed the true nature and scope of the problem; (2) coaches demand unquestioning loyalty, and the NCAA and member institutions knowingly empowered the coaches with full discretion over the student-athlete's scholarship and, hence, academic and athletic careers.

404.    The concealed information was such that Plaintiffs would have acted differently, including with respect to their college and coaching choices, had they been aware of all material facts.

405.    As a proximate cause of NCAA's concealment, Plaintiffs and the Class suffered harm described above.

**COUNT V**
**BREACH OF CONTRACT**
**(PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST NCAA)**

406.    Plaintiffs incorporate by references all prior paragraphs as if set forth in full herein.

407.    Each Plaintiff and class member entered into a contract with the NCAA. The NCAA required that each student-athlete, prior to participation as an NCAA athlete, affirm in writing that they read the NCAA regulations and the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative

Bylaws (collectively "Manual").  The contract for Division I is called a Form 19-1a, and the most recent version is attached as Exhibit A.  Based upon information and belief, the NCAA, University of Arizona, and/or University of Texas at Austin would have Ms. Aldrich's contract and the NCAA and University of Texas at Austin would have Ms. Johnson's and Ms. Bevins's contracts.

408.    The NCAA required that each student-athlete affirm in writing to having "read the Summary of NCAA Regulations, or another outline or summary of NCAA legislation provided by your director of athletics (or his or her designee) or read the bylaws of the NCAA Division I Manual that address your eligibility. You are responsible for knowing and understanding the application of all NCAA Division I bylaws related to your eligibility."  *Id.* at 1.

409.    For its part, in the Manual, the NCAA promised to perform the following for the student-athlete's benefit:

a.    "To initiate, stimulate and improve intercollegiate athletics programs for student athletes…," NCAA Const., Art.1, § 1.2(a);

b.    "To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

c.    "To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics;…. NCAA Const., Art.1, § 1.2(h);

d.    To conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

e.    To require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

f.    To require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete

1          and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

2          g.     To require that "each member institution to establish and maintain an

3                 environment in which a student-athlete's activities are conducted as an

4                 integral part of the student-athlete's educational experience," NCAA

5                 Const., Art. 2, § 2.2 (Adopted: 1/10/95); and

6          h.     To "assist the institution in its efforts to achieve full compliance with all

7                 rules and regulations and shall afford the institution, its staff and student-

8                 athletes fair procedures in the consideration of an identified or alleged

9                 failure in compliance," NCAA Const., Art. 2, § 2.8.2.

10         410.   For consideration in return for the NCAA's undertakings, each student-athlete

11    agrees to abide by the Manual and any other NCAA rules, participates in an NCAA sport which

12    provides a benefit to the NCAA and its member institutions, and agrees to waive certain rights,

13    including the right to profit from participation.

14         411.   The Manual thus constitutes a contract between the NCAA and Plaintiffs and the

15    Class members.

16         412.   Plaintiffs have fulfilled their obligations under the contract by providing their

17    services as student-athletes in the NCAA.

18         413.   The NCAA has breached its contractual obligations to Plaintiffs and the Class by

19    failing to:

20         a.     prohibit sexual harassment and/or sexual abuse of student-athletes by

21                athletics department personnel;

22         b.     prohibit any romantic or sexual relationships between athletics department

23                personnel and student-athletes;

24         c.     prohibit grooming and other sexually-exploitative behavior by athletics

25                department personnel of student-athletes;

26         d.     require NCAA member institutions to immediately report any allegations

27                of sexual relationships, harassment, or abuse of a student-athlete by

28                athletics department personnel;

CLASS ACTION COMPLAINT            - 86 -

e.  maintain all reports in a centralized repository so that all complaints about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel can be tracked by the NCAA and its member institutions;

f.  require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

g.  implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

h.  ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.  mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

j.  mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.  protect Plaintiffs and members of the Classes from such abuse and other foreseeable risks; and

l.  provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment.

414.  As a direct result of those breaches, Plaintiffs and the Class have suffered harm described above, including but not limited to the amounts of tuition paid because of loss of

CLASS ACTION COMPLAINT                                   - 87 -

scholarship due to NCAA's actions and inactions, as well as out-of-pocket costs for therapy,

counseling, and medication to address the mental anguish and despair caused by NCAA's actions.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
**(PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST NCAA)**

415. Plaintiffs incorporate by references all prior paragraphs as if set forth in full herein.

416. To the extent an express contract does not exist, the facts and circumstances set forth above establish an implied contract wherein student-athletes, in return for participation, agreed to be bound by NCAA rules and expected the NCAA to provide appropriate rules and regulations so as to protect their health and safety to the extent possible.

417. NCAA has breached its contractual obligations to Plaintiffs and the Class by failing to:

    a.     prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

    b.     prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

    c.     prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

    d.     require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

    e.     maintain all reports in a centralized repository so that all complaints about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel can be tracked by the NCAA and its member institutions;

    f.     require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently

CLASS ACTION COMPLAINT

- 88 -

1        investigated;

2    g.    implement public sanctions on member institutions and athletics

3          department personnel where allegations of sexual relationships,

4          harassment, or abuse of a student-athlete by athletics department personnel

5          are substantiated;

6    h.    ban athletics department personnel from working or volunteering for any

7          member institution where allegations of sexual relationships, harassment,

8          or abuse of a student-athlete by such athletics department personnel are

9          substantiated;

10   i.    mandate training of athletics department personnel regarding grooming,

11         sexual relationships with student-athletes, sexual abuse and harassment, the

12         prohibition thereof, and reporting obligations.

13   j.    mandate training of athletics department personnel and student-athletes to

14         recognize the signs of grooming and sexual abuse and harassment by

15         athletics department personnel, and to provide confidential avenues to

16         report the abuse;

17   k.    protect Plaintiffs and members of the Classes from such abuse and other

18         foreseeable risks; and

19   l.    provide a safe environment for NCAA student-athletes free from sexual

20         abuse and/or sexual harassment.

21   418.   As a direct result of those breaches, Plaintiffs and the Class have suffered harm

22   described above, including but not limited to the amounts of tuition paid because of loss of

23   scholarship due to NCAA's actions and inactions, as well as out-of-pocket costs for therapy,

24   counseling, and medication to address the mental anguish and despair caused by NCAA's actions.

25                                    **COUNT VII**
     **BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES**
26   **(PLAINTIFFS AND THE NATIONWIDE CLASS AGAINST THE NCAA)**

27   419.   Plaintiffs incorporate by references all prior paragraphs as if set forth in full

28

1    herein.

2        420.    To the extent the Court finds no contract exists, either express or implied, between

3    Plaintiffs and the Class and the NCAA, then the NCAA and its member institutions were parties

4    to a contract. As an express condition of their membership in the NCAA, each institution must

5    agree to abide by the respective NCAA Division Manual, each of which expressly encompasses

6    the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively "Manual").

7    The Manual thus constitutes a contract between the NCAA and its member institutions.

8        421.    Plaintiffs and the Class are third-party beneficiaries of the contract between the

9    NCAA and its members because the parties to the contract intended to benefit the student-

10   athletes.

11       422.    In the Manual, NCAA promises to perform the following for the student-athlete's

12   benefit:

13           a.      "to initiate, stimulate and improve intercollegiate athletics programs for

14                   student athletes…," NCAA Const., Art.1, § 1.2(a);

15           b.      "to uphold the principal of institutional control of, and responsibility for,

16                   all intercollegiate sports in conformity with the constitution and bylaws of

17                   this association," NCAA Const., Art.1, § 1.2(b);

18           c.      to conduct intercollegiate athletics programs "in a manner designed to

19                   protect and enhance the physical and educational wellbeing of student-

20                   athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

21           d.      to require "each member institution to protect the health of, and provide a

22                   safe environment for, each of its participating student-athletes," NCAA

23                   Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

24           e.      to require "each member institution to establish and maintain an

25                   environment that fosters a positive relationship between the student-athlete

26                   and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

27           f.      to require that "each member institution to establish and maintain an

28                   environment in which a student-athlete's activities are conducted as an

CLASS ACTION COMPLAINT                          - 90 -

1    integral part of the student-athlete's educational experience," NCAA

2    Const., Art. 2, § 2.2 (Adopted: 1/10/95);

3    g.   to "assist the institution in its efforts to achieve full compliance with all

4    rules and regulations and shall afford the institution, its staff and student-

5    athletes fair procedures in the consideration of an identified or alleged

6    failure in compliance," NCAA Const., Art. 2, § 2.8.2.

7    423.   NCAA has breached its contractual obligations to Plaintiffs and the Class by

8    failing to:

9    a.   prohibit sexual harassment and/or sexual abuse of student-athletes by

10    athletics department personnel;

11    b.   prohibit any romantic or sexual relationships between athletics department

12    personnel and student-athletes;

13    c.   prohibit grooming and other sexually-exploitative behavior by athletics

14    department personnel of student-athletes;

15    d.   require NCAA member institutions to immediately report any allegations

16    of sexual relationships, harassment, or abuse of a student-athlete by

17    athletics department personnel;

18    e.   maintain all reports in a centralized repository so that all complaints about

19    sexual relationships, harassment, or abuse of a student-athlete by athletics

20    department personnel can be tracked by the NCAA and its member

21    institutions;

22    f.   require that all reports of sexual relationships, harassment, or abuse of a

23    student-athlete by athletics department personnel be independently

24    investigated;

25    g.   implement public sanctions on member institutions and athletics

26    department personnel where allegations of sexual relationships,

27    harassment, or abuse of a student-athlete by athletics department personnel

28    are substantiated;

CLASS ACTION COMPLAINT                           - 91 -

h.   ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.   mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations.

j.   mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.   protect Plaintiffs and members of the Classes from such abuse and other foreseeable risks; and

l.   provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment.

424.   As a direct result of those breaches, Plaintiffs and the Class have suffered harm described above, including but not limited to the amounts of tuition paid because of loss of scholarship due to NCAA's actions and inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and despair caused by NCAA's actions.

**IX.    CLAIMS AGAINST THE NCAA AND JOHN REMBAO ON BEHALF OF THE NCAA-REMBAO SUBCLASS**

**COUNT VIII**
**CIVIL BATTERY**
**(PLAINTIFFS AND THE REMBAO SUBCLASS AGAINST THE NCAA AND JOHN REMBAO)**

425.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

426.    Rembao intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and the Class members. He did so by, *inter alia*:

   a.    Isolating Plaintiffs and Class members in closed quarters and dismissing any bystanders; and

   b.    Demanding or threatening sexual contact.

427.    Rembao did commit an unwanted contact with Plaintiffs and the Class members' person or property in a harmful or offensive manner, including, but not limited to, causing sexual contact between Rembao and each Class member.

428.    Rembao's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm of each Class member.

429.    Rembao's conduct was committed within the scope of his position as an NCAA coach.

430.    A causal nexus existed between (i) Rembao's recruitment and grooming of student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

431.    Each act of battery of a Class member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable given, *inter alia*, the use of NCAA materials to lure the victims and the commission of the acts on the property of NCAA member institutions or with the chattels of NCAA member institutions.

432.    Rembao's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's business. Assaults in the

context of NCAA athletics by coaches and other athletics department personnel are exactly why

student-athletes would expect the NCAA to take extra precautions, or would expect the NCAA to

require member institutions to implement extra precautions, to ensure that they are protected from

abuse by athletics department personnel.

433.    Holding the NCAA liable furthers the policy goals of *respondeat superior*,

including the prevention of future injuries and the assurance of compensation to victims, given

that Plaintiffs and the Class members do not have separate remedies under Title VII because they

were not employees of the NCAA, or Title IX because the NCAA does not receive federal

funding.

**COUNT IX**
**ASSAULT**
**(PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS THE NCAA AND JOHN**
**REMBAO)**

434.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if

fully set forth herein.

435.    Rembao intended to cause apprehension of harmful or offensive conduct against

Plaintiffs and the Subclass members. He did so by, *inter alia*:

  a.    Isolating Plaintiffs and the Subclass members in closed quarters and
        dismissing any bystanders;

  b.    Demanding or threatening sexual contact;

  c.    Cornering, blocking, or otherwise using his heft to cause Plaintiffs and the
        Subclass to fear that Rembao had the ability to carry out his physical
        threats; and

  d.    Threatening harm to the athletic careers, team participation, scholarships,
        and reputations of Plaintiffs and the Subclass members if they did not
        participate in such conduct.

436.    Rembao's actions did, in fact, cause Plaintiffs and the Subclass members to fear

imminent harmful or offensive contact by Rembao.

437.    Rembao's conduct was committed within the scope of his position as an NCAA

1    coach.

2         438.    A causal nexus existed between (i) Rembao's recruitment and grooming of

3    student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter

4    those women.

5         439.    Each act of assault of a Subclass member lured with the prospect of being an

6    NCAA student-athlete and/or to be coached by Rembao was foreseeable given, *inter alia*, the use

7    of NCAA materials to lure the victims and the commission of the acts on the property of NCAA

8    member institutions or with the chattels of NCAA member institutions.

9         440.    Rembao's conduct is not so unusual or startling that it would seem unfair to

10   include the loss resulting from it among other costs of the NCAA's business. Assaults in the

11   context of NCAA athletics by coaches and other athletics department personnel are exactly why

12   student-athletes would expect the NCAA to take extra precautions, or would expect the NCAA to

13   require member institutions to implement extra precautions, to ensure that they are protected from

14   abuse by athletics department personnel.

15        441.    Holding the NCAA liable furthers the policy goals of *respondeat superior*,

16   including the prevention of future injuries and the assurance of compensation to victims, given

17   that Plaintiffs and the Subclass members do not have separate remedies under Title VII because

18   they were not employees of the NCAA, or Title IX because the NCAA does not receive federal

19   funding.

20                                    **COUNT X**
                                 **FALSE IMPRISONMENT**
21   **(PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND THE**
                                      **NCAA)**
22

23        442.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if

24   fully set forth herein.

25        443.    Plaintiffs and Class members were willfully detained by Rembao, without their

26   consent, while he battered, assaulted, and attempted to assault them.

27        444.    Rembao willfully detained Plaintiffs and Class Members through physical force

28   and/or through intimidation. In many instances, Rembao used such intimidation that Plaintiffs and

CLASS ACTION COMPLAINT                          - 95 -

1   Class Members stopped resisting rather than risk injury.

2      445.   Rembao's conduct was committed within the scope of his position as an NCAA

3   coach.

4      446.   A causal nexus existed between (i) Rembao's recruitment and grooming of

5   student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter

6   those women.

7      447.   Each act of false imprisonment of a Class member lured with the prospect of being

8   an NCAA student-athlete and/or to be coached by Rembao was foreseeable given, *inter alia*, the

9   use of NCAA materials to lure the victims and the commission of the acts on the property of

10  NCAA member institutions or with the chattels of NCAA member institutions.

11     448.   Rembao's conduct is not so unusual or startling that it would seem unfair to

12  include the loss resulting from it among other costs of the NCAA's business. Assaults in the

13  context of NCAA athletics by coaches and other athletics department personnel are exactly why

14  student-athletes would expect the NCAA to take extra precautions, or would expect the NCAA to

15  require member institutions to implement extra precautions, to ensure that they are protected from

16  abuse by athletics department personnel.

17     449.   Holding the NCAA liable furthers the policy goals of *respondeat superior*,

18  including the prevention of future injuries and the assurance of compensation to victims, given

19  that Plaintiffs and the Subclass members do not have separate remedies under Title VII because

20  they were not employees of the NCAA, or Title IX because the NCAA does not receive federal

21  funding.

22                          **COUNT XI**
                **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
23   **(PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND THE**
                              **NCAA)**
24

25     450.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if

26  fully set forth herein.

27     451.   Rembao's extreme and outrageous conduct intentionally or recklessly caused

28  severe emotional distress to Plaintiffs and the Subclass members.

452.    Rembao's outrageous conduct was not the type of ordinary rude or obnoxious behavior that student-athletes should be expected to weather.  Rather, Rembao's conduct exceeded all possible bounds of decency.

453.    Rembao acted with intent or recklessness, knowing that the student-athletes were likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

454.    Rembao's conduct caused suffering for Plaintiffs and the Subclass members at levels that no reasonable person should have to endure.

455.    Rembao's conduct was committed within the scope of his position as an NCAA coach.

456.    A causal nexus existed between (i) Rembao's recruitment and grooming of student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

457.    Each act of false imprisonment of a Subclass member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable given, *inter alia*, the use of NCAA materials to lure the victims and the commission of the acts on the property of NCAA member institutions or with the chattels of NCAA member institutions.

458.    Rembao's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's business. Assaults in the context of NCAA athletics by coaches and other athletics department personnel are exactly why student-athletes would expect the NCAA to take extra precautions, or would expect the NCAA to require member institutions to implement extra precautions, to ensure that they are protected from abuse by athletics department personnel.

459.    Holding the NCAA liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Subclass members do not have separate remedies under Title VII because they were not employees of the NCAA, or Title IX because the NCAA does not receive federal

funding. Rembao's conduct was committed within the scope of his position as an NCAA coach.

460.    A causal nexus existed between (i) Rembao's recruitment and grooming of student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

461.    Each act of false imprisonment of a Subclass member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable given, *inter alia*, the use of NCAA materials to lure the victims and the commission of the acts on the property of NCAA member institutions or with the chattels of NCAA member institutions.

462.    Rembao's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's business. Assaults in the context of NCAA athletics by coaches and other athletics department personnel are exactly why student-athletes would expect the NCAA to take extra precautions, or would expect the NCAA to require member institutions to implement extra precautions, to ensure that they are protected from abuse by athletics department personnel.

463.    Holding the NCAA liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Subclass members do not have separate remedies under Title VII because they were not employees of the NCAA, or Title IX because the NCAA does not receive federal funding.

**COUNT XII**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND THE NCAA)**

464.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

465.    Rembao's conduct negligently caused emotional distress to Plaintiffs and the Subclass members.

466.    Rembao could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Subclass members.

467.     Plaintiffs and the Subclass members were in a specific zone of danger meeting with Rembao and at risk of physical harm, causing their fear.

468.     Plaintiffs and the Subclass members, immediately or shortly after meeting with Rembao, suffered distress and emotional harm.

469.     Rembao's conduct was committed within the scope of his position as an NCAA coach.

470.     A causal nexus existed between (i) Rembao's recruitment and grooming of student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

471.     Each act of infliction of emotional distress on a Subclass member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable given, *inter alia*, the use of NCAA materials to lure the victims and the commission of the acts on the property of NCAA member institutions or with the chattels of NCAA member institutions.

472.     Rembao's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's business. Assaults in the context of NCAA athletics by coaches and other athletics department personnel are exactly why student-athletes would expect the NCAA to take extra precautions, or would expect the NCAA to require member institutions to implement extra precautions, to ensure that they are protected from abuse by athletics department personnel.

473.     Holding the NCAA liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Subclass members do not have separate remedies under Title VII because they were not employees of the NCAA, or Title IX because the NCAA does not receive federal funding.

**COUNT XIII**
**RATIFICATION**
**(PLAINTIFFS AND THE REMBAO SUBCLASS VERSUS JOHN REMBAO AND NCAA)**

474.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if

CLASS ACTION COMPLAINT                          - 99 -

1   fully set forth herein.

2      475.   Rembao was an NCAA coach for several decades.

3      476.   At the time of the acts alleged herein, there was an actual or assumed agency

4   relationship between Rembao and the NCAA.

5      477.   All acts or omissions alleged herein were ratified by the NCAA. The NCAA had

6   knowledge that coaches like Rembao were in sexual relationships with student-athletes and/or

7   were sexually abusing or harassing student-athletes and refused to take any action to stop him or

8   other predators like him. Moreover, NCAA member institutions hid this information so that

9   Rembao could continue to work for the NCAA and its member institutions.

10      478.   Despite knowledge of Rembao's sexual misconduct by the NCAA and/or its

11   agents, no disciplinary action was taken and he was allowed to be alone with student-athletes

12   while on NCAA business.

13      479.   The NCAA is thus responsible for Rembao's acts of assault, battery, and

14   intentional or negligent infliction of emotional distress.

## X.    **PRAYER FOR RELIEF**

16
       WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request
17
   that the Court enter a judgment on their behalf and against the NCAA, its Board of Governors,
18
   and John Rembao, and further grant the following relief:
19
       A.   Certify the proposed Class and Subclass pursuant to the Federal Rules of Civil
20
   Procedure Rule 23(a), (b)(2), (b)(3) and/or (c)(4);
21
       B.   Designate Plaintiffs as representatives of the proposed Class and Subclass and
22
   Plaintiffs' counsel as Class counsel;
23
       C.   Award injunctive relief requiring the NCAA and its Board of Governors to
24
   implement and enforce rules and bylaws that are considered consensus best practices, including
25
   those set out above because (1) there is a substantial likelihood that Plaintiffs and Class will
26
   prevail on the merits; (2) there is a real and substantial threat that the Class will suffer irreparable
27
   injury if the injunction is not granted; (3) the Class's threatened injury outweighs any threatened
28

CLASS ACTION COMPLAINT          - 100 -

1  harm to the NCAA and its Board of Governors; and (4) granting the injunction will serve the

2  public interest.

3          D.      Award Plaintiffs and Class members compensatory damages, punitive damages,

4  pain and suffering, and any other relief to which they are entitled under the law;

5          E.      Award Plaintiffs and the Class prejudgment interest, costs and attorneys' fees; and

6          F.      Award to the Plaintiffs and Class for such other and further relief as the Court

7  deems just and proper.

8  **XI.     <u>DEMAND FOR TRIAL BY JURY</u>**

9
       Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by
10
   jury as to all matters so triable.
11

12  Dated: March 11, 2020                      Respectfully submitted,

13

14                                             _____

15                                             Jonathan D. Selbin (Cal. Bar No. 170222)
                                               jselbin@lchb.com
16                                             Annika K. Martin *(to be admitted pro hac vice)*
                                               akmartin@lchb.com
17                                             Rhea Ghosh *(to be admitted pro hac vice)*
                                               rghosh@lchb.com
18                                             LIEFF CABRASER HEIMANN & BERNSTEIN,
                                               LLP
19                                             275 Battery Street, 29th Floor
                                               San Francisco, CA  94111
20                                             Telephone: (415) 956-1000
                                               Facsimile: (415) 956-1008
21

22                                             Elizabeth A. Fegan *(to be admitted pro hac vice)*
                                               beth@feganscott.com
23                                             FEGAN SCOTT, LLC
                                               150 S. Wacker Dr., 24th Floor
24                                             Chicago, IL 60606
                                               Telephone: (312) 741-1019
25                                             Facsimile: (312) 264-0100

26                                             Lynn A. Ellenberger *(to be admitted pro hac vice)*
                                               lynn@feganscott.com
27                                             FEGAN SCOTT, LLC
                                               500 Grant St., Suite 2900
28

CLASS ACTION COMPLAINT                          - 101 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pittsburgh, PA 15219
Telephone: (412) 515-1529
Facsimile: (412) 785-2400

*Attorneys for Plaintiffs and the Proposed Class*