# EXHIBIT A

S259216

# IN THE
# SUPREME COURT OF CALIFORNIA

---

**YAZMIN BROWN**, et al.,

*Petitioners,*

*v.*

**USA TAEKWONDO**, et al.,

*Respondents.*

---

*On Review From the Court of Appeal,*
*Second Appellate District, Division 7, No. B280550*

---

**APPLICATION TO FILE AMICUS CURIAE BRIEF &
BRIEF OF AMICUS CURIAE OF THE
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
IN SUPPORT OF RESPONDENT THE UNITED STATES
OLYMPIC COMMITTEE**

---

Donald B. Verrilli, Jr.
(*pro hac vice* pending)
MUNGER, TOLLES & OLSON LLP
1155 F St., NW
Washington, D.C. 20004
(202) 220-1100
Donald.Verrilli@mto.com

*Hailyn J. Chen (SBN 237436)
John B. Major (SBN 306416)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, California 90071
(213) 683-9100
Hailyn.Chen@mto.com
John.Major@mto.com

*Counsel for Amicus Curiae the National Collegiate Athletic Association*

Document received by the CA Supreme Court.

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

The undersigned certifies that there are no interested entities or persons to be listed under Rule 8.208 of the California Rules of Court.

Dated: September 18, 2020

Hailyn J. Chen
John B. Major
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, California 90071
(213) 683-9100

Donald B. Verrilli, Jr.*
MUNGER, TOLLES & OLSON LLP
1155 F St., NW
Washington, D.C. 20004
(202) 220-1100

*Counsel for Amicus Curiae the National Collegiate Athletic Association*

**Pro hac vice* pending.

Document received by the CA Supreme Court.

## **TABLE OF CONTENTS**

**Page**

APPLICATION TO FILE BRIEF OF *AMICUS CURIAE* ...........6

*AMICUS CURIAE* BRIEF...........................................13

INTRODUCTION ........................................................13

ARGUMENT ...............................................................17

    I.    The Court of Appeal Correctly Applied a Two-Step Test in Analyzing Whether the USOC Owed a Duty .......................................................................17

    II.    The Court of Appeal Correctly Held that the USOC Owed No Duty Given Its Tenuous Relationship to Plaintiffs ...............................................................21

        A.    The Special Relationship Test Does Not Favor Imposing a Duty on the USOC.......................22

        B.    The *Rowland* Factors Do Not Support Imposing a Duty on the USOC ......................................28

            1.    There Is No "Close Connection" Between the USOC's Conduct and Plaintiffs' Injury .....................................................30

            2.    The USOC's Issuance of Best Practices Was Not Morally Blameworthy.............34

            3.    The Policy of Preventing Future Harm Favors Encouraging Issuance of Best Practices .................................................38

            4.    The Burden of Recognizing a Tort Duty Would Be Extensive ...............................44

    III.    Courts Across the Country Have Recognized the Harmful Impact of Recognizing This Type of Duty .47

CONCLUSION...........................................................51

Document received by the CA Supreme Court.

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page(s)**</u>

**CASES**

*Barenborg v. Sigma Alpha Epsilon Fraternity*
(2019) 33 Cal.App.5th 70...............................................19, 24, 28

*Brown v. USA Taekwondo*
(2019) 40 Cal.App.5th 1077.........................................13, 15, 22

*C.A. v. William S. Hart Union High School District*
(2012) 53 Cal.4th 861....................................................18, 35, 36

*Estate of Catlin v. General Motors Corp.*
(Tex.Ct.App. 1996) 936 S.W.2d 447 .........................................50

*Conti v. Watchtower Bible & Tract Society of New
York, Inc.*
(2015) 235 Cal.App.4th 1214.....................................................45

*Delgado v. Trax Bar & Grill*
(2005) 36 Cal.4th 224.........................................................17, 18

*Doe v. Superior Court*
(2015) 237 Cal.App.4th 239......................................................19

*Doe v. United States Youth Soccer Association, Inc.*
(2017) 8 Cal.App.5th 1118............................................19, 35, 36

*Everitt v. General Elec. Co.*
(2009) 979 A.2d 760 ..................................................................50

*Foster v. National Christian Counselors Ass'n, Inc.*
(M.D.N.C., June 1, 2004, No. 1:03cv00296) 2004
WL 1497562.............................................................................48

*Lanni v. Nat'l Collegiate Athletic Ass'n*
(Ind.Ct.App. 2015) 42 N.E.3d 542...........................................36

*Martinez v. Bank of America Nat. Trust & Savings
Ass'n*
(2000) 82 Cal.App.4th 883.........................................................34

Document received by the CA Supreme Court.

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Morris v. De La Torre*
(2005) 36 Cal.4th 260................................................................. 40

*Mynhardt v. Elon University*
(N.C.Ct.App. 2012) 725 S.E.2d 632.................................... 48, 49

*Premo v. General Motors Corp.*
(Mich.Ct.App. 1995) 533 N.W.2d 332 ..................................... 49

*Regents of University of California v. Superior Court*
(2018) 4 Cal.5th 60..........................................................passim

*Rowland v. Christian*
(1968) 69 Cal.2d 108 .......................................................passim

*Sakiyama v. AMF Bowling Centers, Inc.*
(2003) 110 Cal.App.4th 398........................................ 31, 32, 36

*University of Southern California v. Superior Court*
(2018) 30 Cal.App.5th 429.................................................passim

*Vasilenko v. Grace Family Church*
(2017) 3 Cal.5th 1077.................................................. 30, 39, 40

*Yost v. Wabash College*
(Ind. 2014) 3 N.E.3d 509.......................................................... 49

**OTHER AUTHORITIES**

NCAA Constitution, art. 2, § 2.2.3
<https://web3.ncaa.org/lsdbi/search/bylawView?id=
7> [as of Sept. 18, 2020]................................................ 8, 27, 42

NCAA Constitution, art. 2, § 2.2.4
<https://web3.ncaa.org/lsdbi/search/bylawView?id=
7> [as of Sept. 18, 2020]................................................ 8, 27, 43

Document received by the CA Supreme Court.

S259216

# IN THE
# SUPREME COURT OF CALIFORNIA

═══════════════════════

**YAZMIN BROWN**, et al.,

*Petitioners,*

*v.*

**USA TAEKWONDO**, et al.,

*Respondents.*

═══════════════════════

*On Review From the Court of Appeal,*
*Second Appellate District, Division 7, No. B280550*

═══════════════════════

**APPLICATION TO FILE BRIEF OF AMICUS CURIAE**
**THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**
**IN SUPPORT OF RESPONDENT THE UNITED STATES**
**OLYMPIC COMMITTEE**

═══════════════════════

Document received by the CA Supreme Court.

## APPLICATION TO FILE BRIEF OF *AMICUS CURIAE*

Pursuant to California Rules of Court, rule 8.520, subdivision (f), the National Collegiate Athletic Association ("NCAA") respectfully requests permission to file the accompanying *amicus curiae* brief in support of Respondent the United States Olympic Committee.[1]

The NCAA is a voluntary unincorporated association created by member colleges and universities across the country to administer intercollegiate athletics. The NCAA has nearly 1,100 member institutions. The NCAA, among other things, facilitates member institutions' adoption of rules and regulations relating to athletics and provides guidance and educational resources for the benefit of member institutions. In defining the NCAA's powers, the NCAA's members have explicitly chosen to retain for themselves the responsibility for the health and safety of their student-athletes and the regulation of the student-athlete/coach relationship. The NCAA Constitution provides that it "is the

---

[1] The NCAA certifies that no person or entity other than the NCAA and its counsel authored this proposed brief in whole or in part and that no person or entity other than the NCAA made any monetary contribution intended to fund the preparation or submission of the proposed brief. (See Cal. Rules of Court, rule 8.520, subd. (f)(4).)

Document received by the CA Supreme Court.

responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes."  (NCAA Constitution, art. 2, § 2.2.3 <https://web3.ncaa.org/lsdbi/search/bylawView?id=7> [as of Sept. 18, 2020].)  The NCAA Constitution also provides that it "is the responsibility of each member institution to establish and maintain an environment that fosters positive relationship between the student-athlete and coach."  (*Id.*, § 2.2.4.)  Consistent with its Constitution, the NCAA supports its member institutions in carrying out their retained responsibility for student-athlete health and safety.  The NCAA's member institutions work hard to prevent sexual abuse on their campuses, and the NCAA has supported their efforts to do so.  This support includes model policies, educational resources, and forums for members to share best practices.

For that reason, the NCAA has a strong interest in the question whether standard-setting, oversight, or other member-driven organizations might face liability for misconduct by third-parties who are related in some way to an organization's member entities.

Document received by the CA Supreme Court.

8

In this case, the Court has granted review on the following question:  What is the appropriate test that minor plaintiffs must satisfy to establish a duty by defendants to protect them from the sexual abuse of third parties?  Specifically, the Court will determine whether Plaintiffs can impose liability for sexual abuse on oversight organizations with no direct role in the abuse, including the United States Olympic Committee ("USOC").[2]  The question under review will thus require the Court to determine the appropriate test for imposing a tort-law duty on oversight organizations like the USOC.

The present case will therefore bear directly on a legal issue of great importance to the NCAA.  Courts throughout California (and the country) often must decide when voluntary associations like the NCAA can be held liable for misconduct by member institutions or employees of member institutions.  The NCAA therefore expects that the Court's decision will have ramifications for all sorts of voluntary associations, like the NCAA, that provide guidance for their members but have limited

---

[2]  This brief refers to Respondent as the United States Olympic Committee throughout because that was the name used when this lawsuit was initiated.  In June 2019, the name was changed to the United States Olympic and Paralympic Committee.

Document received by the CA Supreme Court.

day-to-day insight into their members' operations and limited ability to control the conduct of third parties employed by or affiliated with member institutions.

The NCAA submits this brief to address the proper standard for imposing a duty on organizations like the USOC to prevent sexual abuse by third parties over which the organization has no direct day-to-day supervision or control. As Respondents ably explain, this Court's precedents require a two-step analysis: first, a court must analyze whether the organization had a "special relationship" with the victim or perpetrator that could theoretically support imposing a tort duty to prevent harm to the victim by a third party; and second, the court must then determine whether the analysis set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*), justifies imposing such a duty in the particular circumstances presented. In other words, under a proper understanding of this State's law (as well as fundamental principles of tort law), the existence of a special relationship is necessary to imposing a duty on organizations like the USOC to prevent harm to third parties, but it is not sufficient. A court must also determine that imposing such a duty is indicated by the *Rowland* factors. The *Rowland* factors

Document received by the CA Supreme Court.

narrow the scope of the duty based on policy considerations. They do not expand it.

The NCAA also explains why neither the "special relationship" test nor the *Rowland* factors—considered separately or together—favor imposing a duty in circumstances like those presented here.  Plaintiffs' argument rests almost entirely on the fact that the USOC had authority to issue guidelines regulating the operations of the organizations it oversaw, including USA Taekwondo ("USAT").  Indeed, Plaintiffs repeatedly point to one such guideline, Safe Sport, in contending that imposing a duty on the USOC is appropriate.  But accepting that argument would have far-reaching consequences.  It would force standard-setting and oversight organizations to make an impossible choice: whether to issue guidance to their members and thereby trigger potentially crippling liability, or withhold such guidance to avoid the risk of liability.  The NCAA's experience provides context for why this Court should not allow that result.

For the foregoing reasons, the NCAA respectfully asks that the Court grant its application for leave to appear as *amicus curiae* and allow the accompanying brief to be filed.

Document received by the CA Supreme Court.

Dated: September 18, 2020

Hailyn J. Chen (SBN 237436)
John B. Major (SBN 306416)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, California 90071
(213) 683-9100
Hailyn.Chen@mto.com
John.Major@mto.com

Donald B. Verrilli, Jr.*
MUNGER, TOLLES & OLSON LLP
1155 F St., NW
Washington, D.C. 20004
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Amicus Curiae the
National Collegiate Athletic
Association*

**Pro hac vice* pending.

Document received by the CA Supreme Court.

## *AMICUS CURIAE* BRIEF

## INTRODUCTION

Schools, athletic associations, community groups, churches, and countless other organizations across the United States have been forced to face the painful reality that their students, members, or employees have been subjected to sexual abuse, and they have responded with vigorous measures to combat such abuse.  This case presents two important questions relating to that response:  First, what test should be used to determine when an entity has a legal duty to prevent sexual abuse in these settings, and second, how far should that duty stretch?

The Court of Appeal's well-reasoned decision answered both questions correctly.  As to the first question, the Court of Appeal recognized that the existence of a duty to prevent abuse turns on an exacting two-step inquiry, asking first whether there was a "special relationship" between the defendant and the victim or perpetrator, and then asking whether imposing a duty would be consistent with the *Rowland* factors.  (See *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1092 (*Brown*).)

That approach makes sense.  The special relationship test is a necessary predicate to imposing a tort duty.  Imposing

Document received by the CA Supreme Court.

13

liability on an organization for the actions of a third party who is not an employee or agent of the organization is unusual.  It subjects a potentially far-removed organization to tort liability for misconduct in which it had no direct role.  Unless a special relationship exists, there is simply no basis to hold such an organization responsible for the harmful actions of a third party, because the organization could not have prevented the harm.

But the existence of a special relationship is not a sufficient basis for imposing liability, because the special-relationship analysis does not fully take into account all of the considerations that appropriately bear on the question of whether the imposition of a tort duty is appropriate.  That is where the *Rowland* factors come in.  The *Rowland* analysis narrows the scope of tort liability even when a special relationship exists—based on considerations of justice and sound policy.  The "special relationship" test focuses heavily on a defendant's degree of control and ability to prevent harm.  The *Rowland* factors add an additional level of analysis that focuses specifically on policy concerns, including moral blameworthiness, preventing future harm, and the consequences of imposing a duty.  Imposing liability without satisfying both steps might subject all manner of organizations to

Document received by the CA Supreme Court.

14

a tort-law duty to prevent harm, no matter how far removed from the harm.  Such wide-ranging liability also might increase rather than mitigate the risk of future harm by deterring desirable behavior, such as the issuance of best practices.  For that reason, this Court and many Court of Appeal decisions have applied a two-step test.  The Court should reaffirm that approach as the correct one.

As to the second question—how far a duty should stretch—the Court of Appeal correctly held that the USOC, as a high-level organization multiple levels removed from the abuse Plaintiffs suffered, did not owe a duty to prevent the abuse.  (*Brown*, *supra*, 40 Cal.App.5th at 1101–1102.)  The USOC is a regulatory organization that has certified 49 separate sport-specific governing bodies for Olympic sports in the United States.  It oversees those governing bodies and requires them to implement certain policies.  But it has no direct interaction with—much less control over—athletes or coaches.  Such attenuated connections do not justify imposing a duty under the "special relationship" test, as the Court of Appeal correctly held.

At bottom, Plaintiffs' case for imposing liability rests primarily on a single fact:  That the USOC issued "Safe Sport"

Document received by the CA Supreme Court.

guidelines, which provided guidance to governing bodies regarding how to prevent sexual abuse.  But imposing a duty based on the USOC's issuance of guidelines would be dangerously counterproductive.  It would force organizations like the USOC (and others, like the NCAA) to reevaluate whether to provide policy guidance to the entities they oversee, for fear that such guidance would create far-reaching liability arising out of situations that the organizations have no ability to control or even monitor.  It would also impose vast and unmanageable enforcement burdens on organizations like the USOC, requiring them to monitor thousands of individuals with whom they have no direct relationship.  Courts in this state and throughout the country have refused to impose a duty in similar circumstances precisely because imposing such a duty would deter the issuance of regulations and guidance.

The Court of Appeal therefore correctly applied the two-step test that this Court has prescribed to determine whether the USOC owed a duty to Plaintiffs and correctly refused to impose a duty on the USOC here.  This Court should affirm.

Document received by the CA Supreme Court.

# ARGUMENT

## I.   The Court of Appeal Correctly Applied a Two-Step Test in Analyzing Whether the USOC Owed a Duty

As Respondents ably explain, the Court of Appeal correctly applied a two-step inquiry in evaluating whether Respondents owed a duty here.  That approach is consistent with years of precedent from both this Court and the Court of Appeal.

To begin, this Court's decisions have repeatedly analyzed the duty question by analyzing both the special relationship test and the *Rowland* factors.  For example, in *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 229 (*Delgado*), this Court analyzed whether a business proprietor owed a duty to protect its patrons from assault.  In undertaking that analysis, the Court first analyzed whether the proprietor had a "special relationship" with its patrons and concluded the proprietor "owed a duty to plaintiff pursuant to the special relationship doctrine."  (*Id.* at p. 242.) But before imposing a duty, the Court also analyzed "the *Rowland* factors" to determine whether they supported "a special-relationship-based duty," and if so, what the scope of that duty should be.  (*Id.* at pp. 245–246.)

Document received by the CA Supreme Court.

The Court took a similar approach in *C.A. v. William S. Hart Union High School District* (2012) 53 Cal.4th 861, 877 & fn. 8 (*William S. Hart Union High School District*).  There, the Court considered whether a school was responsible for the sexual abuse of a minor based on a negligent hiring decision.  As in *Delgado*, the Court first looked to the "special relationship" test, and then turned to the *Rowland* factors, because the Court has "used [the *Rowland* factors] to decide the scope of duty arising *from a special relationship*." (*Ibid.*, emphasis added.)

The Court applied the same two-step analysis in *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 613 (*Regents*).  There, the Court considered "whether, and under what circumstances, a college or university owes a duty of care to protect students . . . from harm." (*Ibid.*, footnote omitted.)  The Court held that whether a duty existed "depend[ed] *first* on whether [the] university [had] a special relationship with its students." (*Id.* at p. 620, emphasis added.)  But the Court also observed that "[w]hether a new duty should be imposed in any particular context is essentially a question of public policy," and the "court may depart from the general rule of duty . . . if other policy considerations clearly require an exception." (*Id.* at pp.

Document received by the CA Supreme Court.

627–628.)  As this Court made clear, the *Rowland* factors operate to *narrow* the potential scope of any duty that might be imposed on the basis of a special relationship—not to impose liability where no special relationship exists.  Those factors are directed at determining whether to recognize an "exception" to special-relationship liability.  (*Ibid.*)

Following that clear guidance, Courts of Appeal have repeatedly evaluated questions of duty by first applying the special relationship test, then examining the *Rowland* factors.  Most recently, in *Barenborg*, the court held that "plaintiffs alleging a defendant had a duty to protect them must establish: (1) that an exception to the general no-duty-to-protect rule applies; *and* (2) that the *Rowland* factors support the imposition of a duty."  (*Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 77 (*Barenborg*).)  In *Doe v. United States Youth Soccer Association, Inc.* (2017) 8 Cal.App.5th 1118, 1128 (*United States Youth Soccer*), the court similarly observed that in cases involving a duty based on "a special relationship, . . . courts have balanced the [*Rowland*] factors . . . to assist in their determination of the existence and scope of a defendant's duty in a particular case."  And in *Doe v. Superior Court* (2015) 237

Document received by the CA Supreme Court.

Cal.App.4th 239, 247, the court held that a duty existed based on the special relationship test, and then used the *Rowland* factors to analyze the proper "scope" of that duty.

The two-step approach repeatedly endorsed by this Court and applied in the Courts of Appeal makes sense. The existence of a "special relationship" is *necessary* to the imposition of liability on an organization for the acts of a third party because absent such a relationship there would be no basis in the law for imposing such a duty. But, as this Court has made clear, it is not alone a *sufficient* justification for imposing a duty. The additional legal and policy considerations encompassed within the *Rowland* factors may require an "exception" to liability notwithstanding the existence of a special relationship. The *Rowland* factors reflect this Court's recognition that the significant step of imposing liability on an organization for the acts of a third party requires more than just an abstract inquiry into whether a "special relationship" exists. It requires a careful, situation-specific analysis of such considerations as foreseeability, moral blame, the policy of preventing future harm, and burden, to determine whether it is appropriate to hold an

Document received by the CA Supreme Court.

organization responsible for prevention of particular harms inflicted by third parties.

Accordingly—as the Court of Appeal correctly concluded—an exception to the general "no duty" rule is warranted only when both the "special relationship" test and the *Rowland* factors are satisfied.  Only in that circumstance will a duty target the right defendants (those that could have prevented the harm) in a way that benefits society at large (by accounting for the policy repercussions of recognizing a duty).

## II.  The Court of Appeal Correctly Held that the USOC Owed No Duty Given Its Tenuous Relationship to Plaintiffs

The Court of Appeal also correctly held that the USOC did not owe a duty to Plaintiffs, regardless of the applicable test. Whether viewed as separate tests or a two-step inquiry, the USOC owed no duty because neither the special relationship test nor the *Rowland* factors favor imposing one.  The NCAA's own experience as a member-driven organization underscores the potential negative policy implications and heavy burdens that imposing a duty on the USOC would create.

Document received by the CA Supreme Court.

## A. The Special Relationship Test Does Not Favor Imposing a Duty on the USOC

The USOC's connection to Plaintiffs and their abuser, Marc Gitelman, is far too attenuated to warrant imposing a duty under the "special relationship" test. As the Court of Appeal recognized, the USOC did not have "the ability to control Gitelman's conduct" and was not "in the best position to protect plaintiffs from Gitelman's sexual abuse." (*Brown*, *supra*, 40 Cal.App.5th at p. 1102.) In particular, the "USOC's indirect control over Gitelman through its regulation of USAT is too remote to create a special relationship." (*Ibid.*) Were it otherwise, organizations like the USOC might face a wide-ranging duty to control third parties employed by or affiliated with member institutions, even though they have limited day-to-day insight into their operations.

Plaintiffs argue a duty is appropriate because the USOC had the "ability to control the policies adopted by USAT, which in turn would impact the conduct of coaches registered with USAT." (*Brown*, *supra*, 40 Cal.App.5th at p. 1103.) But what Plaintiffs describe as "control," is, as their own words make clear, nothing of the sort. Rather, USOC had only the "power to promulgate specific and detailed *guidelines* regarding coach-athlete

Document received by the CA Supreme Court.

interactions" (Opening Brief 61, emphasis added) that were

"'model policies' meant to assist [national governing bodies like

USAT] in adopting and implementing" their own institution-

specific sexual abuse policies (*id.* 57).  Indeed, the implication of

Plaintiffs' argument is stunning:  It would create a special

relationship between the USOC and *every athlete* overseen by all

49 sport-specific governing bodies that are members of the USOC

based on nothing more than the USOC's efforts to provide

general guidance and best practices for protecting young athletes

from abuse.

 The Court of Appeal rejected that argument, and this

Court's prior decisions make clear that it was correct in doing so.

 This Court's decision in *Regents* exemplifies that the

"special relationship" test is far narrower than Plaintiffs claim.

(*Regents*, *supra*, 4 Cal.5th at p. 620.)  There, this Court

considered whether a university had a duty to prevent an attack

on a student.  (*Ibid.*)  The Court recognized such a duty, but it did

so because "colleges are the party best situated to implement

safety measures" and colleges "have superior control over the

environment and the ability to protect students."  (*Id.* at pp. 625–

626.)  The Court also limited the scope of the duty to "students

Document received by the CA Supreme Court.

while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services," to avoid imposing liability when the school lacked the ability to prevent harm. (*Id.* at p. 625.) That limited scope was important because schools only "have a superior ability to provide . . . safety with respect to activities they sponsor or facilities they control." (*Ibid.*) Thus, the Court recognized that the "special relationship" test focuses on whether a particular defendant is in a superior position to prevent a particular harm because it has day-to-day control over the setting in which the risk of harm is present.

Courts of Appeal have followed the teachings of *Regents*. For example, in *Barenborg*, the court held that a national fraternity organization lacked a special relationship with a local chapter because the national organization was not in "the best position to protect against the risk of harm." (*Barenborg*, *supra*, 33 Cal.App.5th at p. 78, citation omitted.) The court observed that the mere "existence of general policies governing the operation of local chapters and the authority to discipline them for violations" was not enough to create a special relationship. (*Id.* at p. 79.) Rather, the court held a special relationship

Document received by the CA Supreme Court.

generally will exist only when an oversight organization can "monitor the day-to-day activities" of an affiliate "contemporaneously," because only in that situation will the organization have an "ability to prevent the harm" and be in a "unique position to protect against the risk of harm." (*Id.* at pp. 79–80.)

Applying those principles, the Court of Appeal rightly held that the USOC had no special relationship with Plaintiffs or Gitelman. The USOC lacked any "control" over the environment in which the assaults on Plaintiffs occurred and was therefore not in the best position to prevent them. As a national organization that oversees dozens of sport-specific governing bodies, the USOC has only a limited relationship with each of those bodies, and no direct relationship with the thousands of coaches and athletes those bodies oversee. In particular, the USOC had no direct ability to exert day-to-day control over coaches' (including Gitelman's) behavior. Recognizing a "special relationship" on these facts would create a novel and far-reaching duty to prevent unknown harm by third parties—a duty that courts have repeatedly rejected. The Court of Appeal correctly refused to find a "special relationship" here.

Document received by the CA Supreme Court.

The NCAA's experience illustrates why recognizing a
"special relationship" in a case like this one would be troubling.
The NCAA is an Indiana-based voluntary association with nearly
1,100 member institutions scattered throughout the United
States.  Those 1,100 member institutions employ tens of
thousands of coaches and enroll hundreds of thousands of
student-athletes.  The NCAA, like the USOC, provides guidance
to its member institutions regarding a wide array of topics,
including student-athlete nutrition, medical care, and mental
wellbeing.  (See NCAA, Well-Being <http://www.ncaa.org/health-
and-safety> [as of Sept. 18, 2020].)  The NCAA also provides
member institutions with educational resources and best
practices relating to sexual assault.  (See NCAA, Sexual Assault
<http://www.ncaa.org/sport-science-institute/topics/sexual-
assault> [as of Sept. 18, 2020].)

The NCAA cannot, however, monitor the day-to-day
conduct of coaches and athletic personnel employed by the
NCAA's nearly 1,100 member institutions.  It does not and
cannot direct, supervise, or otherwise police the conduct of the
tens of thousands of coaches or hundreds of thousands of student-
athletes that work for or attend its member institutions.  It is the

Document received by the CA Supreme Court.

26

member institutions themselves—which have a direct
relationship with the coaches and student-athletes—that must
implement and enforce appropriate policies and best practices.
The NCAA has limited ability to take on that burden.

The governing structure of the NCAA underscores that the
NCAA cannot control the day-to-day operations of its members.
The NCAA's member institutions have reserved for themselves
responsibility for "the health of . . . student-athletes" and the
"relationship between the student-athlete and coach."  (NCAA
Constitution, art. 2, §§ 2.2.3, 2.2.4 <https://web3.ncaa.org/
lsdbi/search/bylawView?id=7> [as of Sept. 18, 2020].)  By
retaining those responsibilities, the NCAA's members have
decided that they—rather than the NCAA itself—are better
positioned to ensure the health and safety of the student-athletes
they enroll.  That approach is not uncommon for member-driven
organizations like the NCAA—members often want to maintain
independence while benefiting from the guidance provided by a
national governing body.

The NCAA's experience thus reinforces that organizations
like the USOC generally cannot enforce guidelines like Safe Sport
or monitor the thousands of athletes or coaches who participate

Document received by the CA Supreme Court.

in the activities of the organizations they oversee.  That lack of day-to-day control over athletes and coaches—and inability to closely monitor coaches' and athletes' compliance with guidelines—should be dispositive on the question of whether a "special relationship" exists here.  (See *Regents*, *supra*, 4 Cal.5th at pp. 625–626 [holding that duty was appropriate because college was "party best situated to implement safety measures" and had "superior control over the environment and the ability to protect students"]; *Barenborg*, *supra*, 33 Cal.App.5th at pp. 79–80 [holding that special relationship test requires "ability to prevent the harm" and "unique position to protect against the risk of harm"].)  If this Court were to find a "special relationship" on these facts, the NCAA and organizations like it would face the prospect of massive potential liability for conduct they can neither monitor nor control.

### B. The *Rowland* Factors Do Not Support Imposing a Duty on the USOC

The *Rowland* factors also do not support imposing a duty on the USOC.  The *Rowland* factors look to whether a potentially applicable duty of care based on the existence of a special relationship should nonetheless be "excus[ed] or limit[ed]" based

Document received by the CA Supreme Court.

on policy concerns.  (*Regents*, *supra*, 4 Cal.5th at p. 628.)  The factors include "[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved."  (*Rowland*, *supra*, 69 Cal.2d at p. 113.)

The USOC explains why these factors do not support imposing a duty here.  (Respondent USOC Brief 45–51.)  Rather than repeat those arguments, the NCAA focuses on why, based on the NCAA's own experience, many of the *Rowland* factors cut strongly against imposing a duty on standard-setting organizations like the USOC to prevent unknown sexual abuse, based on the issuance of or failure to enforce best practices or guidance.  Indeed, were such a duty imposed, organizations like the USOC (or the NCAA) might be forced to stop issuing certain

Document received by the CA Supreme Court.

best practices or guidance, despite its potential positive impact, for fear of vast enforcement burdens and far-reaching liability.

### 1.   There Is No "Close Connection" Between the USOC's Conduct and Plaintiffs' Injury

The *Rowland* factor addressing "the closeness of the connection between the defendant's conduct and the injury suffered" strongly cuts against imposing a duty on the USOC. (*Rowland*, *supra*, 69 Cal.2d at p. 113.)  That factor disfavors imposing a duty when the connection between a defendant's negligence and a plaintiff's harm is "attenuated" and when "third-party or other intervening conduct" severed the connection between the defendant's negligence and the plaintiff's harm. (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1086 (*Vasilenko*).)

Applying that factor, courts have repeatedly held that the "closeness" factor does not support a duty based on a failure to adequately enforce high-level policies, given the often-attenuated connection to a plaintiffs' harm.  For example, in *University of Southern California v. Superior Court* (2018) 30 Cal.App.5th 429, 453 (*University of Southern California*), a plaintiff attempted to hold USC liable for an injury she suffered at a fraternity party

Document received by the CA Supreme Court.

based on USC's alleged duty to enforce its alcohol and social event policies.  (*Ibid.*)  The court refused to recognize such a duty based on "[t]he attenuated connection between USC's failure to enforce its policies and the independent conduct by [those that more directly caused the plaintiff's harm]."  (*Id.* at p. 454.)  In particular, there were many layers of "intervening conduct" between USC and plaintiff's harm, including a fraternity "hosting an unauthorized party," the plaintiff "attending the party," and an individual at the party causing the plaintiff's injury.  That attenuated connection—and the fact that "USC did nothing to increase the risks inherent in the activity"—weighed against imposing a duty.  (*Id.* at pp. 453–454.)

Along similar lines, in *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, 409–410 (*Sakiyama*), the plaintiffs claimed that a venue hosting a "rave party" caused a car accident by failing to prevent drug use at its events.  The court refused to recognize a duty to prevent such drug use, holding that the plaintiffs' injuries were "not closely connected to the rave party" because they were separated from the venue's conduct by the driver's decision to take drugs and then drive.  (*Id.* at pp. 409–410.)  The venue's decision to host the party was thus

Document received by the CA Supreme Court.

many steps removed from the plaintiffs' harm.  That was particularly true because the venue did not "encourage[]" drug use and, in fact, "took numerous steps to prevent drug use at its facility."  (*Id.* at pp. 408–410.)

For the same reasons, the "closeness" factor weighs against imposing a duty on the USOC.  Like the university in *University of Southern California* or the venue in *Sakiyama*, the USOC's alleged negligence was many steps removed from the harms Plaintiffs suffered.  The USOC's alleged negligence is based on its issuance of "Safe Sport guidelines," which "were intended to address and rectify sexual abuse of athletes in Olympic sports." (Opening Brief 44.)  But the USOC's issuance or failure to enforce those guidelines is multiple levels removed from Plaintiffs' harm, separated by (i) USAT's alleged failure to adequately implement the guidelines, (ii) Gitelman's failure to comply with them, and (iii) Gitelman's criminal decision to abuse Plaintiffs.  That sort of "attenuated" link does not support imposing a duty on the USOC.

As the NCAA's experience shows, there will seldom be a "close connection" between a national organization and third-party misconduct.  The NCAA is based in Indiana, but it has member institutions in all 50 states and provides guidance to all

Document received by the CA Supreme Court.

of those member institutions.  To the extent misconduct occurs at any of those member institutions, it occurs far from the NCAA, without the NCAA's knowledge or day-to day supervision or control.  Such misconduct is separated from the NCAA by multiple layers of authority, including member institutions themselves, the member institutions' Title IX policies, the individual decisions of coaches and campus Title IX officials employed by member institutions, and so on.  Misconduct also often occurs, as it did here, in situations where there was no prior indication of the risk presented by a particular individual, rendering it even more difficult to prevent.  Finally, such misconduct occurs in spite of the NCAA's issuance of best practices and other resources for member institutions.  Simply put, misconduct that occurs at institutions that are affiliated with standard-setting or member-driven organizations like the USOC or the NCAA is almost always highly attenuated from any action taken by the organization itself.

Indeed, if that sort of "closeness" were enough, all manner of member-driven organizations might face liability.  Such organizations have some potential connection to all sorts of harm, because they have a broad reach by design.  They attempt to

Document received by the CA Supreme Court.

impose uniformity, establish standards, and provide guidance to nationwide (or worldwide) groups and help them implement best practices and policies. The broader their reach, the greater their potential positive impact. But because of that broad reach, such organizations necessarily lack any connection—much less a close connection—to the vast majority of misconduct committed by those involved with their member institutions. The "closeness" required to impose a duty on such organizations will therefore generally be lacking, and was lacking here.

2. *The USOC's Issuance of Best Practices Was Not Morally Blameworthy*

The "moral blame" factor also cuts against imposing a duty on the USOC. That factor favors imposing a duty only when a defendant engages in conduct with a "higher degree of moral culpability" than ordinary negligence, as is the case when a defendant "intended or planned the harmful result," had "actual or constructive knowledge" of likely harm, "acted in bad faith or with a reckless indifference," or "engaged in inherently harmful acts." (*Martinez v. Bank of America Nat. Trust & Savings Ass'n* (2000) 82 Cal.App.4th 883, 896.) The cases applying this factor

Document received by the CA Supreme Court.

focus on two principles, both of which demonstrate that "moral blame" weighs against imposing a duty here.

*First*, the moral blame factor does not favor imposing a duty unless a defendant knew of a specific risk of harm yet failed to address it.  For example, in *United States Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1137, the court held that the moral blame factor weighed against imposing a duty because there was "nothing in the present record indicating that defendants were in any way involved in the sexual assault of plaintiff or knew that [her particular abuser] would harm her."  Along similar lines, in *William S. Hart Union High School District*, *supra*, 53 Cal.4th at p. 878, this Court held that the "moral blame" factor did not support imposing a duty because there was no evidence that a school knew a particular teacher was dangerous, and there was "little or no moral blame attached" to the failure to prevent harm unless the school "knew or should have known of the [teacher's] dangerous propensities."

*Second*, the moral blame factor does not favor imposing a duty when a defendant made efforts, even imperfect ones, to prevent the harm a plaintiff suffered.  Looking again to *United States Youth Soccer*, the court there held that "moral blame" did

Document received by the CA Supreme Court.

not favor imposing a duty because the organization had adopted procedures to prevent the sort of harm the plaintiff suffered, even though those procedures did not prevent the harm in that case. (*United States Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1137.) Similarly, in *Sakiyama*, the court held that the "moral blame" factor did not favor imposing a duty to prevent drug use because an event host had taken "numerous steps to prevent drug use," even though those steps were unsuccessful. (*Sakiyama*, *supra*, 110 Cal.App.4th at p. 410.)

The same considerations render the "moral blame" factor inapplicable here. As in *United States Youth Soccer* and *William S. Hart*, there is no allegation that the USOC knew that Gitelman presented a risk to Plaintiffs. (Respondent USOC Brief 38–39.) Further, the "blame" factor cuts against imposing a duty because the USOC took substantial steps to prevent sexual abuse—efforts that unfortunately did not prevent Plaintiffs' abuse but that negate the existence of morally blameworthy, "bad faith" conduct. (Cf. *Lanni v. Nat'l Collegiate Athletic Ass'n* (Ind.Ct.App. 2015) 42 N.E.3d 542, 553 [observing that "[i]t is commendable for the NCAA to actively engage its member institutions . . . in how to avoid unsafe practices"].)

Document received by the CA Supreme Court.

Plaintiffs nonetheless contend that this factor favors a duty because the "USOC promulgated its own Safe Sport rules and programs" yet left enforcement of Safe Sport and other programs to organizations like USAT.  (Opening Brief 44–45.)  But the USOC's decision to leave enforcement of the Safe Sport guidelines to the organizations charged with implementing them was not blameworthy—it was the sort of decision that member-driven institutions typically make, for both financial and logistical reasons.  The USOC oversees 49 separate, sport-specific organizations.  Those organizations, in turn, oversee thousands of athletes.  The USOC cannot monitor all of those athletes' participation in their respective sports and ensure that they do not suffer sexual abuse by third-party coaches that are not employed by or subject to the USOC's day-to-day control.  That is particularly true in cases, like this one, in which there is no allegation that the USOC knew or had any reason to know that a particular coach presented a risk.

The NCAA's experience reflects the same reality.  The NCAA, like the USOC, issues best practices and guidance for its nearly 1,100 member institutions.  But the NCAA does not have the ability—with its few hundred employees—to police the day-

Document received by the CA Supreme Court.

to-day conduct of the thousands of coaches and student-athletes that work for or attend its member institutions.  The NCAA therefore faces a choice familiar to all oversight or member-driven organizations (and similar to the choice that the USOC faced here)—whether it is better to issue best practices in an effort to prevent harm, even though it is logistically impossible to strictly enforce them.  The NCAA chooses, as the USOC did, to issue best practices and leave their application largely to member institutions.  The NCAA does so because the best practices provide an important social benefit, giving member institutions additional information and guidance, even if the NCAA generally cannot directly enforce them on a day-to-day basis or police their implementation.  That choice is the polar opposite of morally blameworthy.

        3.    *The Policy of Preventing Future Harm Favors Encouraging Issuance of Best Practices*

Imposing a duty on the USOC also would not serve the policy of preventing future harm.  To the contrary, it would exacerbate the risk of harm by deterring the USOC and similar organizations from promulgating guidance and promoting best practices.

Document received by the CA Supreme Court.

*First*, "[t]he policy of preventing future harm is ordinarily served by allocating costs to those responsible for the injury and thus best suited to prevent it." (*Vasilenko*, *supra*, 3 Cal.5th at p. 1087.)  This factor therefore cuts against imposing a duty when there are "other entities" that "have much greater and more direct ability to reduce" a particular risk.  (*Id.* at p. 1190.)  For example, in *University of Southern California*, *supra*, 30 Cal.App.5th at p. 454, this factor weighed against a duty because "colleges' control of off-campus social activities is limited, [so] their ability to reduce the risk of injury in those settings is limited."  Along similar lines, in *Vasilenko*, *supra*, 3 Cal.5th at p. 1087, this factor cut against imposing a duty because a landowner had a limited ability to protect invitees from harm suffered when crossing the street to access a nearby parking lot.

*Second*, this factor counsels against imposing a duty when imposing a duty might lead to negative policy outcomes.  For example, in *University of Southern California*, *supra*, 30 Cal.App.5th at pp. 454–455, the court held that this factor did not favor imposing a duty to enforce alcohol and event policies because "finding a duty in these circumstances could create a disincentive for universities to regulate alcohol use and social

Document received by the CA Supreme Court.

activities and provide security patrols, which to some degree could frustrate the policy of preventing future harm." (See also *Morris v. De La Torre* (2005) 36 Cal.4th 260, 280 (concurring opn. of Brown, J.) [explaining potential negative policy implications of imposing broad duty to protect].)

Both of these concerns—whether the USOC was best suited to prevent Plaintiffs' harm and the policy implications of imposing a duty—cut against imposing a duty here.

To begin, the USOC was not "best suited" to prevent the harm Plaintiffs suffered. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1087.) As discussed above, all manner of other entities were closer to Plaintiffs' harm and were better situated to prevent it, including USAT, local law enforcement, and others. (See *supra* 32–33.)

The same is almost always true with respect to organizations like the USOC. The NCAA often finds itself in a similar position, separated both geographically and administratively from harms that occur on the campuses of its member institutions and therefore poorly situated to prevent such harms. Bad actors in such cases are not NCAA employees or agents, but rather, are employees or agents of the NCAA's member institutions. Accordingly, many other entities or

Document received by the CA Supreme Court.

individuals—such as member-institution officials, Title IX offices, and local law enforcement—are far closer to and far more able to prevent this type of harmful conduct. (See *supra* 32–33.)

Beyond that, the "policy of preventing future harm" cuts against imposing a duty because of the potential negative policy implications of such a duty. Future harm is best prevented by encouraging organizations like the USOC to enact policies, like Safe Sport, that provide guidance and best practices for avoiding sexual abuse. If such guidance were instead a basis for tort liability, the USOC and others would be powerfully discouraged from issuing such guidance and might have to reevaluate how and whether they provide it, for fear of a far-reaching duty to thousands of athletes across the country.

Plaintiffs' arguments for why a duty should be imposed show that this case threatens these types of negative policy outcomes. In arguing that the *Rowland* factors are satisfied, Plaintiffs point to a series of desirable and prudent actions by the USOC, including the USOC requiring organizations to carry liability insurance to cover sexual abuse; appointing a "task force" to study sexual abuse of minor athletes; mandating that all governing bodies "adopt a 'Safe Sport Program' to protect athletes

Document received by the CA Supreme Court.

from sexual abuse"; and requiring governing bodies to contribute funding towards a "Safe Sport Center." (Opening Brief 40–41.) These sorts of actions are exactly what oversight organizations like the USOC *should* be doing. But to Plaintiffs, they are hooks for liability. Imposing liability would disincentivize rather than encourage the prudent actions that Plaintiffs highlight.

The NCAA would face the same difficult and unfortunate choices if this Court recognized a broad duty to prevent unknown sexual abuse by third parties based on the issuance of policies or best practices (or based on the failure to "enforce" them). The NCAA cannot exert day-to-day control over and monitor the thousands of coaches and student-athletes employed by and enrolled at its nearly 1,100 member institutions across the country or to ensure compliance with its guidance.

Moreover, the NCAA's member institutions have expressly chosen to retain for themselves the responsibility for health and safety and for the student-athlete/coach relationship. Indeed, the NCAA Constitution provides that it "is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes." (NCAA Constitution, *supra*, art. 2, § 2.2.3.) Similarly, the NCAA

Document received by the CA Supreme Court.

Constitution provides that it "is the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach." (*Id*., § 2.2.4.)  Consistent with its Constitution, the NCAA provides support and educational resources to member institutions so that each member institution can take actions—consistent with the federal, state and local laws applicable to the member institution—to protect the safety of its student-athletes.  Such support has included assembling commissions and task forces to bring attention to the problem of campus sexual abuse and developing publications and guidance that member institutions can use.

If these sorts of actions were enough to support a duty, or if this Court imposed a duty to *enforce* guidance or best practices, the NCAA may be forced to stop providing policy guidance altogether or, at a minimum, carefully consider when and how to issue guidance.  The NCAA might, for example, forgo guidance relating to sexual misconduct, instead leaving that issue to member institutions better situated to control such misconduct.  Or it might decline to offer safety trainings to student-athletes or employees of member institutions, for fear

Document received by the CA Supreme Court.

that such trainings might later be deemed inadequate and therefore tortious.  All manner of important, sensible policies might be pared back to avoid liability.  To state the obvious, that result would undermine the policy of preventing future harm.

That impact would be felt beyond athletics-focused organizations like the USOC or the NCAA.  Thousands of similar organizations provide best practices or guidance to their members in a variety of contexts.  Were liability imposed on the USOC based on its issuance of policies, all of those organizations would have to reevaluate the guidance they provide, for fear of boundless liability.  Organizations would face a terrible choice—to not issue guidance that could enhance children's safety, or to issue such guidance and face the risk of potentially ruinous liability for the tortious or criminal conduct of third parties outside of the organizations' day-to-day control.  The "policy of future harm" factor counsels against forcing organizations to make that choice.

4. *The Burden of Recognizing a Tort Duty Would Be Extensive*

Finally, the "burden" factor does not favor imposing a duty on the USOC.  This factor looks to the "extent of the burden to

*Document received by the CA Supreme Court.*

44

the defendant and consequences to the community of imposing a duty." (*Rowland*, *supra*, 69 Cal.2d at p. 113.)  It cuts against imposing a duty when the suggested duty will impose far-reaching and uncertain burdens on defendants.

For example, in *Conti v. Watchtower Bible & Tract Society of New York, Inc.* (2015) 235 Cal.App.4th 1214, 1231, the court held that this factor weighed against imposing a duty on churches to monitor whether their members were engaged in sexual abuse because it "would place an intolerably great and uncertain burden on a church to require that it continuously monitor a member for inappropriate behavior."  In *University of Southern California*, 30 Cal.App.5th at p. 455, the court similarly held this factor counseled against a duty to prevent harm at off-campus parties because "effective control of off-campus fraternity parties, if achievable, would require close monitoring and considerable resources."

The same concerns counsel against imposing a duty on the USOC to have prevented Plaintiffs' abuse.  Plaintiffs argue that the burden is minimal because the USOC already takes significant steps to prevent sexual abuse, such as adopting the Safe Sport guidelines.  But the burden Plaintiffs seek to impose is

Document received by the CA Supreme Court.

far broader.  They argue that issuing Safe Sport guidelines was
not enough and that the USOC should have "actually enforced its
avowed Safe Sport rules."  (Opening Brief 50.)

That type of enforcement burden would be nearly limitless
in scope.  There is no allegation that the USOC (or even USAT)
knew that Gitelman presented a risk to Plaintiffs before their
abuse.  (Respondent USOC Brief 38–39.)  Accordingly, imposing a
duty would effectively require the USOC to prevent all sexual
abuse by all coaches, even those (like Gitelman) for whom the
USOC had *no notice of a risk*.

Such a wide-ranging duty would put the USOC in an
impossible position: it would be forced to monitor and evaluate all
of the thousands of coaches involved with the various Olympic
sports it oversees and attempt to ensure they did not commit any
sexual misconduct, anywhere, at any time.  An effort of that sort
would require thousands of staff and millions of dollars.  Indeed,
this Court has recognized that sort of duty—a "broad duty to
prevent" harm—will be "impossible to discharge in many
circumstances."  (*Regents*, *supra*, 4 Cal.5th at p. 633.)

The NCAA's experience demonstrates just how significant
that burden would be.  Like the USOC, the NCAA issues

Document received by the CA Supreme Court.

guidance for the benefit of its member institutions.  Those institutions employ thousands of coaches and enroll thousands of student-athletes.  For organizations like the NCAA, monitoring those coaches' and student-athletes' day-to-day compliance with NCAA policies and guidance would be impossible.  The NCAA's hundreds of employees simply cannot exercise control over the thousands of coaches or hundreds of thousands of student-athletes to which the NCAA's policies may apply.  Accordingly, the NCAA and organizations like it have no ability to perform the sort of oversight that a tort duty would require.  The "burden" factor therefore cuts against imposing a broad duty to enforce best practices or policy guidance.

*          *          *

Whether viewed as a separate test for establishing a duty or as a separate requirement that must be met before imposing one, a majority of the *Rowland* factors weigh against imposing a duty on the USOC here.

### III.   Courts Across the Country Have Recognized the Harmful Impact of Recognizing This Type of Duty

Decisions from across the country reinforce the negative policy implications of imposing a duty on the USOC.  Courts in

Document received by the CA Supreme Court.

all sorts of contexts have held that conduct like the USOC's—

issuing guidance and best practices—should be encouraged.

Courts have therefore repeatedly refused to impose tort-law

duties based on the issuance of policy guidance, because such a

duty would disincentivize organizations from providing it.

    For example, in *Foster v. National Christian Counselors

Association, Inc.* (M.D.N.C., June 1, 2004, No. 1:03cv00296) 2004

WL 1497562, at *4 fn. 5, the court refused to impose a duty on a

religious instruction organization based on the mere fact that it

failed to adequately enforce its code of ethics.  The court observed

that "[r]egulating activity is not enough to subject a party to

liability for the actions of those being regulated."  (*Ibid.*)  "Were

the law otherwise, professional organizations and government

entities would be endlessly liable for the actions of their members

or the persons they seek to regulate," including "bar, medical, and

other regulated associations."  (*Ibid.*)  The court noted the

negative policy implications of recognizing a duty, explaining that

it "would discourage entities from engaging in regulatory activity,

a result that would not be in the public interest."  (*Ibid.*)

    Along similar lines, in *Mynhardt v. Elon University*

(N.C.Ct.App. 2012) 725 S.E.2d 632, 636–637, the North Carolina

Document received by the CA Supreme Court.

Court of Appeals refused to impose a duty on a university to prevent harm at a fraternity party based on the university's issuance (and failure to enforce) safety guidelines.  As the court put it, "[w]e want to encourage universities and Greek organizations to adopt policies to curb underage drinking and drinking-related injuries or other incidents."  (*Ibid.*)  In *Yost v. Wabash College* (Ind. 2014) 3 N.E.3d 509, 518, the court similarly refused to recognize a duty based on the failure to adequately enforce policies because "colleges and universities should be encouraged, not disincentivized, to undertake robust programs to discourage hazing and substance abuse."  The court held that "[t]o judicially impose liability under a theory of gratuitously assumed duty is unwise policy and should be cautiously invoked only in extreme circumstances."  (*Ibid.*)

Other courts have reached similar conclusions, focusing on the potential negative policy implications of recognizing a duty in these circumstances.  (See, e.g., *Premo v. General Motors Corp.* (Mich.Ct.App. 1995) 533 N.W.2d 332, 333 [refusing to recognize duty based on employer's adoption "of work rules, policies, etc. undertake[n] to address the problem of alcohol and/or abuse" by employees, because it is "clearly against public policy and would

Document received by the CA Supreme Court.

49

encourage employers to abandon all efforts which could benefit
such employees in order to avoid future liability" (citation
omitted)]; *Everitt v. General Elec. Co.* (2009) 979 A.2d 760, 762–
763 [holding that adoption of alcohol use policy did not support
imposition of duty and noting that "numerous jurisdictions have
found that the adoption of an internal corporate policy to deal
with situations involving an impaired employee does not give rise
to a duty to the general public"]; *Estate of Catlin v. General
Motors Corp.* (Tex.Ct.App. 1996) 936 S.W.2d 447, 451 [holding
that company's "mere creation of an internal policy" regarding
alcohol consumption at work events did not create a
responsibility to control employees' drinking and driving].)

All of these courts recognize a straightforward principle:
That the issuance of policy guidance and best practices benefits
society and should be encouraged.  If Plaintiffs' arguments were
accepted, though, the issuance of best practices would come
paired with far-reaching tort liability.  Organizations across the
country (including ones like the NCAA) would be forced to think
carefully about whether to restrict their issuance of policy
guidance.  This Court should avoid that negative result and,

Document received by the CA Supreme Court.

consistent with decisions from across the country, affirm the Court of Appeal's decision that the USOC owed no duty here.

## CONCLUSION

This Court should re-affirm that a two-step inquiry is required to impose a duty to prevent sexual abuse, in which both the special relationship test and the *Rowland* factors favor imposing a duty.  Applying that test, this Court should hold that the USOC did not owe a duty to Plaintiffs.

Document received by the CA Supreme Court.

Dated: September 18, 2020

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

_____

Hailyn J. Chen (SBN 237436)
John B. Major (SBN 306416)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, California 90071
(213) 683-9100
Hailyn.Chen@mto.com
John.Major@mto.com

Donald B. Verrilli, Jr.*
MUNGER, TOLLES & OLSON LLP
1155 F St., NW
Washington, D.C. 20004
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Amicus Curiae the
National Collegiate Athletic
Association*

\*_Pro hac vice_ pending.

Document received by the CA Supreme Court.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared in compliance with Rule 8.204 of the California Rules of Court. The brief was prepared with 13 point font or more. The brief, excluding the cover, the required tables, the signature block, and this certificate, is 7,466 words long, which is less than the total number of words permitted by the Rules of Court. In making this representation, Counsel relies on the word count of the Microsoft Word word-processing program used to prepare this brief.

Dated: September 18, 2020

_____

Hailyn J. Chen

Document received by the CA Supreme Court.

## PROOF OF SERVICE

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 350 South Grand Avenue, Fiftieth Floor, Los Angeles, CA 90071-3426.

On September 18, 2020, I served true copies of the following document(s) described as

**APPLICATION TO FILE AMICUS CURIAE BRIEF & BRIEF OF AMICUS CURIAE OF THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION IN SUPPORT OF RESPONDENT THE UNITED STATES OLYMPIC COMMITTEE**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY ELECTRONIC SERVICE:**  I electronically filed the document with the Clerk of the Court by using the TrueFiling system.  Participants in the case who are registered TrueFiling users will be served by TrueFiling.  Participants in the case who are not registered TrueFiling users will be served by mail.

**BY MAIL:**  I enclosed the document in a sealed envelope to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing following our ordinary business practices.  I am familiar with the firm's practice for collecting and processing correspondence for mailing.  On the day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the U.S. Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 18, 2020, at Los Angeles, California.

_Mary L. Pantoja_
_____
Mary Pantoja

Document received by the CA Supreme Court.

## SERVICE LIST

| | |
|---|---|
| ESTEY & BOMBERGER, LLP<br>Stephen J. Estey, Esq.<br>2869 India Street<br>San Diego, CA 92103<br>(619) 295-0035<br>steve@estey-bomberger.com | Attorneys for<br>Appellants<br><br>*Via TrueFiling* |
| CORSIGLIA MCMAHON & ALLARD, LLP<br>B. Robert Allard, Esq.<br>96 N. 3rd Street, Suite 620<br>San Jose, CA 95112<br>(408) 289-1417<br>rallard@cmalaw.net | |
| WILLIAMS IAGMIN LLP<br>Jon R. Williams, Esq.<br>666 State Street<br>San Diego, CA 92101<br>(619) 238-0370<br>williams@williamsiagmin.com | |
| TUREK LAW P.C.<br>Kenneth C. Turek, Esq.<br>603 North Highway 101, Suite C<br>Solana Beach, CA 92075<br>(619) 234-9000<br>ken@kenturek.com | |
| CLYDE & CO US LLP<br>Douglas J. Collodel, Esq.<br>355 S. Grand Avenue, Suite 1400<br>Los Angeles, CA 90071<br>(562) 317-3344<br>douglas.collodel@clydeco.com | Attorneys for<br>Respondent<br>UNITED STATES<br>OLYMPIC<br>COMMITTEE |

Document received by the CA Supreme Court.

| | |
|---|---|
| CLYDE & CO US LLP<br>Margaret M. Holm, Esq.<br>2020 Main Street, Suite 1100<br>Irvine, CA 92614<br>(949) 852-8200<br>margaret.holm@clydeco.com | *Via TrueFiling* |
| COVINGTON & BURLING LLP<br>Beth S. Brinkmann, Esq.<br>One CityCenter, 850 10th Street NW<br>Washington, D.C. 20001<br>(202) 662-5312<br>bbrinkmann@cov.com | |
| COVINGTON & BURLING LLP<br>Mitch A. Kamin, Esq.<br>Carolyn J. Kubota, Esq.<br>1999 Avenue of the Stars, Suite 3500<br>Los Angeles, CA 90067<br>(424) 332-4800<br>mkamin@cov.com; ckubota@cov.com | |
| HORVITZ & LEVY LLP<br>Mitchell C. Tilner, Esq.<br>Steven S. Fleischman, Esq.<br>Yen-Shyang Tseng, Esq.<br>3601 West Olive Avenue, 8th Floor<br>Burbank, CA 91505<br>(818) 995-0800<br>mtilner@horvitzlevy.com<br>sfleischman@horvitzlevy.com<br>ytseng@horvitzlevy.com | Attorneys for<br>Respondent<br>USA<br>TAEKWONDO<br><br>*Via TrueFiling* |
| KJAR, MCKENNA & STOCKALPER, LLP<br>Patrick E. Stockalper, Esq.<br>Matthew A. Schiller, Esq.<br>841 Apollo Street, Suite 100<br>El Segundo, CA 90245<br>(424) 217-3026<br>pstockalper@kmslegal.com<br>mschiller@kmslegal.com | |

Document received by the CA Supreme Court.

| | |
|---|---|
| ESNER, CHANG & BOYER<br>Holly N. Boyer, Esq.<br>234 East Colorado Blvd., Suite 975<br>Pasadena, CA 91101<br>(626) 535-9860<br>hboyer@ecbappeal.com | Attorneys for<br>*Amicus Curiae*<br>Manly, Stewart &<br>Finaldi<br><br>*Via TrueFiling* |
| ARBOGAST LAW<br>David M. Arbogast, Esq.<br>7777 Fay Avenue, Suite 202<br>La Jolla, CA 92037<br>(619) 374-1281<br>david@arbogastlaw.com | Attorneys for<br>*Amicus Curiae*<br>Consumer<br>Attorneys of<br>California<br><br>*Via TrueFiling* |
| Hon. Michael P. Vicencia Los Angeles<br>Superior Court<br>Governor George Deukmejian Courthouse<br>275 Magnolia Avenue, Dept. S26<br>Long Beach, CA 90802 | Trial Judge,<br>Case No.<br>BC599321<br><br>*Via U.S. Mail* |
| California Court of Appeal<br>Second Appellate District, Division 7<br>Ronald Reagan State Building<br>300 S. Spring Street<br>2nd Floor, North Tower<br>Los Angeles, CA 90013 | Case No. B280550<br><br>Service Copy<br>*Via TrueFiling* |

Document received by the CA Supreme Court.