# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| ERIN ALDRICH, LONDA BEVINS, JESSICA JOHNSON, and BEATA CORCORAN, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:20-cv-02310-JRS-MPB |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and THE BOARD OF GOVERNERS OF THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.       INTRODUCTION ........................................................................................... 1

II.      BACKGROUND ............................................................................................ 2

         A.      The NCAA owed and breached its duty to implement policies
         prohibiting sexual relations between coaches and student-athletes. .................................. 2

         B.      Plaintiffs are former or current student-athletes who suffered, or
         are at risk of, sexual abuse, because of NCAA's breach of duty. ....................................... 2

         C.      Procedural History .................................................................................. 4

III.     LEGAL STANDARD ..................................................................................... 4

IV.      ARGUMENT ................................................................................................ 5

         A.      Plaintiffs' claims are not barred by the statute of limitations. ............................... 5

                 1.      Judge Davila's ruling should be given deference ............................................. 5

                 2.      Erin Aldrich's claims are timely. ...................................................... 5

                 3.      Jessica Johnson's and Londa Bevins' claims are timely. ................................ 9

         B.      Plaintiff Corcoran, as a current NCAA student-athlete, has
         standing to bring claims for injunctive relief. .................................................... 13

                 1.      Corcoran adequately alleges injury-in-fact based on increased
                 risk of sexual abuse. ...................................................................... 13

                 2.      Corcoran adequately alleges causation and redressability. ........................... 17

                 3.      Corcoran has standing based on breach of contract. ..................................... 19

         C.      The NCAA Board is an entity with the capacity to be sued. ................................ 19

         D.      Plaintiffs state plausible negligence claims. ................................................ 20

                 1.      The NCAA voluntarily assumed a special duty of care. ................................ 20

                 2.      The NCAA owes a duty based on its special relationship with
                 student-athletes. ........................................................................ 21

                 3.      The NCAA owes a duty to Plaintiffs based on its special
                 relationship with and control over its coaches. .......................................... 22

                 4.      The NCAA owes a duty to student-athletes under common
                 law. ..................................................................................... 24

E.    Plaintiffs adequately allege a fiduciary relationship with NCAA. ...................... 25

F.    Plaintiffs plausibly plead negligent misrepresentations and omissions............................................................................................................ 25

G.    Plaintiffs plausibly allege breach of express and implied contracts. ................... 26

H.    Plaintiffs plausibly allege that they are third-party beneficiaries of the member institutions' contracts with the NCAA........................................... 28

I.    Plaintiffs allege that NCAA is liable under *respondeat superior.* ....................... 29

    1.    Plaintiffs plausibly allege Rembao was an agent of the NCAA. .................. 29

    2.    Plaintiffs plausibly allege that Rembao acted within the scope of his employment or agency. ................................................................ 31

J.    Plaintiffs plausibly allege ratification. ................................................................ 33

V.    CONCLUSION............................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*Aldrich v. NCAA*,
    2020 WL 5255671 (N.D. Cal. Sept. 3, 2020) ................................................. 1, 4, 5, 6, 9, 13

*Alonso v. Blue Sky Resorts, LLC*,
    179 F. Supp. 3d 857 (S.D. Ind. 2016) ................................................................ 17

*Area Transp., Inc. v. Ettinger*,
    219 F.3d 671 (7th Cir. 2000) ............................................................................. 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 4

*Askin v. Quaker Oats Co.*,
    818 F. Supp. 2d 1081 (N.D. Ill. 2011) ............................................................... 13

*Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc.*,
    717 F. Supp. (S.D. Ind. 1989) ............................................................................ 10

*Bailor v. Salvation Army*,
    854 F. Supp. 1341 (N.D. Ind. 1994) ................................................................... 22

*Binder v. Aetna Life Ins. Co.*,
    75 Cal. App. 4th 832 (1999) ............................................................................... 28

*Bloom v. NCAA*,
    93 P.3d 621 (Colo. App. 2004) .......................................................................... 29

*Bowman v. Niagara Machine & Tool Works, Inc.*,
    620 F. Supp. 1484 (S.D. Ind. 1985) ..................................................................... 1

*Bradley v. Nat'l Collegiate Athletic Ass'n*,
    249 F. Supp. 3d 149 (D.D.C. 2017) ............................................................... 22, 26

*Brown v. USA Taekwondo*,
    40 Cal. App. 5th 1077 ................................................................................... 23, 24

*Burks v. Rushmore*,
    534 N.E.2d 1101 (Ind. 1989) .............................................................................. 9

*C.R. v. Tenet Healthcare Corp.*,
    169 Cal. App. 4th 1094 (2009) .......................................................................... 34

*Central Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002) ......................................................................... 15, 17

*City of Indianapolis v. West*,
    81 N.E.3d 1069 (Ind. Ct. App. 2017) ................................................ 32

*Commissioning Agents, Inc. v. Long*,
    143 F. Supp. 3d 775 (S.D. Ind. 2015) ............................................... 29

*Cox v. Evansville Police Dep't*,
    107 N.E.3d 453 (Ind. 2018) ...................................................... 31, 32

*Cunningham v. Foresters fin. Servs., Inc.*
    300 F. Supp. 3d 1004 (N.D. Ind. 2018) ........................................... 29

*D.H. v. Whipple*,
    103 N.E.3d 1119 (Ind. Ct. App. 2018) ............................................. 22

*Delta Tau Delta v. Johnson*,
    712 N.E.2d 968 (Ind. 1999) ......................................................... 20

*Dinerstein v. Google, LLC*,
    2020 WL 5296920 (N.D. Ill. Sept. 4, 2020) ...................................... 19

*DMC Mach. Am. Corp. v. Heartland Mach. & Eng'g, LLC*,
    2018 WL 4590393 (S.D. Ind. Sept. 25, 2018) ..................................... 5

*Doe v. Baylor Univ.*,
    240 F. Supp. 3d 646 (W.D. Tex. 2017) ........................................ 15, 23

*Doe v. Delta Tau Delta Beta Alpha Chapter*,
    2018 WL 3375016 (S.D. Ind. July 11, 2018) .................................. 24, 25

*Doe v. Lafayette School Corp.*,
    846 N.E.2d 691 (Ind. Ct. App.) ..................................................... 33

*Doe v. Roe*,
    955 P.2d 951 (Ariz. 1998) ......................................................... 5, 6

*Doe v. Shults-Lewis*,
    718 N.E.2d 738 (Ind. 1999) ........................................................... 9

*Doe v. Univ. of Tennessee*,
    186 F. Supp. 3d 788 (M.D. Tenn. 2016) ...................................... 15, 18

*Doe v. Vigo Cnty.*,
    905 F.3d 1038 (7th Cir. 2018) ...................................................... 32

*Duvall v. Heart of CarDon, LLC*,
    2020 WL 1274992 (S.D. Ind. Mar. 17, 2020) .................................... 27

*Estate of Amaro v. City of Oakland*,
    653 F.3d 808 (9th Cir. 2011) ........................................................ 11

*Estate of Mayer v. Lax, Inc.*,
    998 N.E.2d 238 (Ind. Ct. App. 2013) ............................................. 33

*Fager v. Hundt*,
    610 N.E.2d 246 (Ind. 1993) ............................................. 8

*Flynn v. FCA US LLC*,
    No. 15-0855, 2016 WL 5341749 ............................................. 17

*Frederick v. Lawson*,
    2020 WL 4882696 (S.D. Ind. Aug. 20, 2020) ............................................. 18-19

*Gared Holdings, LLC v. Best Bolt*,
    991 N.E.2d 1005, 1012 (Ind. Ct. App. 2013) ............................................. 19

*Green v. Perry*,
    549 N.E.2d 385 (Ind. Ct. App. 1990) ............................................. 30

*Greiber v. NCAA*,
    2017 WL 6940498 (N.Y. Sup. Ct. Sept. 5, 2017) ............................................. 22

*Guar. Tr. Co. v. York*,
    326 U.S. 99 (1945) ............................................. 12

*Hairston v. Pac-10 Conference*,
    101 F.3d 1315 (9th Cir. 1996) ............................................. 29

*Hansen v. Bd. of Trustees For Hamilton Se. Sch. Corp.*,
    2007 WL 3091580, (S.D. Ind. Oct. 19, 2007) ............................................. 33

*Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*,
    551 F.3d 599 (7th Cir. 2008) ............................................. 33

*Harleysville Lake States Ins. Co. v. Hostetle*r.
    2006 WL 360857 (N.D. Ind. Feb. 13, 2006) ............................................. 29

*Harrick v. NCAA*,
    454 F. Supp. 2d 1255 (N.D. Ga. 2006) ............................................. 30

*Hildebrand v. Hildebrand*,
    736 F. Supp. 1512 (S.D. Ind. 1990) ............................................. 6, 7, 8, 10,11

*Heslep v. Ams. for African Adoption, Inc.*,
    890 F. Supp. 2d 671, 678 (N.D.W. Va. 2012) ............................................. 19

*Hill v. Slippery Rock Univ.*,
    138 A.3d 673 (Pa. Super. 2016) ............................................. 21

*Ind. Coal. for Pub. Educ. v. McCormick*,
    338 F. Supp. 3d 926 (S.D. Ind. 2018) ............................................. 19

*Indiana Carpenters Pension Fund v. Hammond*,
  2019 WL 9093756 (S.D. Ind. Apr. 23, 2019) ..................................................... 4

*Interstate Indus., Inc. v. Barclay Indus., Inc.*,
  540 F.2d 868 (7th Cir. 1976) ........................................................................ 27

*J.A.W. v. Roberts*,
  627 N.E.2d 802 (Ind. Ct. App. 1994) ........................................................ 12, 21

*John R. v. Oakland Unified Sch. Dist.*,
  48 Cal. 3d 438 (1989) ................................................................................ 11

*Juarez v. Boy Scouts of Am., Inc.*,
  81 Cal. App. 4th 377 (2000) ........................................................................ 24

*Kemether v. Pennsylvania Interscholastic Athletic Ass'n*,
  15 F. Supp. 2d 740 (E.D. Pa. 1998) ........................................................ 31, 34

*Knelman v. Middlebury College*,
  898 F. Supp. 2d 697 (D. Vt. 2012) .............................................................. 29

*Konkle v. Henson*,
  672 N.E.2d 450 (Ind. Ct. App. 1996) ............................................................ 33

*Lac Du Flambeau Band v. Norton*,
  422 F.3d 490 (7th Cir. 2005) ...................................................................... 14

*LaCava v. LaCava.*,
  907 N.W. 2d 154 (Ind. Ct. App. 2009) ............................................................ 8

*Langston v. Mid-America Intercollegiate Athletics Ass'n*,
  2020 WL 1445631 (N.D. Ill. Mar. 25, 2020) .............................................. 10, 22

*Lanni v. NCAA*,
  42 N.E.3d 542 (Ind. Ct. App. 2015) ............................................................ 22

*Lozano v. Baylor Univ.*,
  2019 WL 4742302 (W.D. Tex. Sept. 27, 2019) ................................................ 23

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................ 13, 17

*Maxitrol Co. v. Lupke Rice Ins. Agency*,
  924 N.E.2d 179 (Ind. Ct. App. 2010) ........................................................ 33, 34

*Mullen v. GLV, Inc.*,
  444 F. Supp. 3d 883 (N.D. Ill. 2020) ............................................................ 24

*Nahas v. Shore Med. Ctr.*,
  2018 WL 1981474 (D.N.J. Apr. 27, 2018) ...................................................... 20

*Ocean Advocates v. U.S. Army Corps.*,
   402 F.3d 846 (9th Cir. 2005) ............................................................................... 15

*Oliver v. NCAA*,
   155 Ohio Misc. 2d 8 (2008) ................................................................................ 29

*Passmore v. Multi-Mgmt. Servs.*,
   810 N.E.2d 1022 (Ind. 2004) .............................................................................. 26

*Pinkney v. Thomas*,
   583 F. Supp. 2d 970 (N.D. Ind. 2008) ................................................................ 31

*Plotkin v. Ryan*,
   239 F.3d 882 (7th Cir. 2001) ............................................................................... 17

*Powell v. Illinois*,
   2019 WL 4750265 (N.D. Ill. Sept. 30, 2019) ............................................... 14, 17

*Pyrolyx USA Indiana, LLC v. Zeppelin Sys. GmbH*,
   2020 WL 3976975 (S.D. Ind. July 14, 2020) ......................................................... 5

*Regents of Univ. of Cal. v. Superior Court*,
   4 Cal. 5th 607 (2018) .......................................................................................... 21

*Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*,
   388 F. Supp. 2d 919 (S.D. Ind. 2005) ................................................................ 25

*Reilly v. Ceridian Corp.*,
   664 F.3d 38 (3d Cir. 2011) .................................................................................. 15

*Remijas v. Neiman Marcus Grp., LLC*,
   794 F.3d 688 (7th Cir. 2015) .......................................................................... 13, 14

*Rolan v. Atl. Richfield Co.*,
   2017 WL 3191791 (N.D. Ind. July 26, 2017) ..................................................... 19

*Schmitz v. NCAA*,
   67 N.E.3d 852 (Ohio Ct. App. Dec. 8, 2016) ..................................................... 22

*Siegler v. Sorrento Therapeutics, Inc.*,
   2019 WL 581719 (S.D. Cal. Feb. 13, 2019) ....................................................... 19

*Sierakowski v. Ryan*,
   223 F.3d 440 (7th Cir. 2000) ............................................................................... 16

*Sierra Club v. Franklin Cty. Power of Illinois, LLC*,
   546 F.3d 918 (7th Cir. 2008) ............................................................................... 18

*Smith v. Delta Tau Delta, Inc.*,
   9 N.E.3d 154 (Ind. 2014) ............................................................................... 24, 30

*SoderVick v. Parkview Health Sys.Inc.*,
    148 N.E.3d 1124 (Ind. Ct. App. 2020) ............................................................................ 33

*Southport Little League v. Vaughan*,
    734 N.E.2d 261 (Ind. Ct. App. 2000) ................................................................. 31, 32, 34

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................................................. 13

*Springer v. Cleveland Clinic Emp. Health Plan Total Care*,
    900 F.3d 284 (6th Cir. 2018) ....................................................................................... 19

*State v. Jacobson*,
    930 A.2d 628 (Conn. 2007) .......................................................................................... 24

*State v. Perry*,
    182 A.3d 558 (R.I. 2018) ............................................................................................. 24

*Stropes v. Heritage House Child.'s Center, Inc.*,
    547 N.E.2d 244 (Ind. 1989) ................................................................................... 31, 32

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ................................................................................................. 14

*Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*,
    212 F. Supp. 3d 816 (N.D. Cal. 2016) .......................................................................... 20

*Tippecanoe Loan & Tr. Co. v. Jester*,
    180 Ind. 357 (1913) .................................................................................................... 31

*Toney v. Quality Res., Inc.*,
    75 F. Supp. 3d 727 (N.D. Ill. 2014) .............................................................................. 30

*Ulibarri v. Gerstenberger*,
    781 P.2d 698 (Ariz. Ct. App. 1993) .............................................................................. 12

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
    412 U.S. 669 (1973) .................................................................................................... 16

*Walgreen Co. v. Hinchy*,
    21 N.E.3d 99 (Ind. Ct. App. 2014) ............................................................................... 31

*Webb v. Jarivs*,
    575 N.E.2d 992 (Ind. 1991) ......................................................................................... 24

*Wehling v. Citizens Nat'l Bank*,
    586 N.E.2d 840 (Ind. 1992) ....................................................................................... 6, 7

*Weston v. Big Sky Conf.*,
    2020 WL 3129548 (N.D. Ill. June 12, 2020) ...................................................... 26, 27, 29

*Wisniewski v. Diocese of Belleville*,
 943 N.E.2d 43 (Ill. App. 2011) ........................................................... 11

*Yeakle's Sports Bar & Grill,*
 62 N.E.3d 384 (Ind. 2016) ................................................................. 24

*Yost v. Wabash College,*
 3 N.E.3d 509 (Ind. 2014) ............................................................. 23, 30

*Young v. United States*,
 535 U.S. 43 (2002) ........................................................................... 12

*Zander v. Orlich,*
 907 F.3d 956 (7th Cir. 2018) ............................................................. 32

**Statutes**

A.R.S. § 12-502 .................................................................................... 5

Ind. Code. § 34-11-5-1 ......................................................................... 9

**Rules**

Fed. R. Civ. P. 12 ................................................................................. 4

**Other**

Alan S. Gutterman, Business Transactions Solutions § 73:18 ................. 19

Plaintiffs Erin Aldrich, Londa Bevins, Jessica Johnson, and Beata Corcoran ("Plaintiffs") respectfully submit this Opposition to Defendants National Collegiate Athletic Association and the Board of Governors of the National Collegiate Athletic Association's (collectively, "NCAA" or "Defendants") motion to dismiss.

## I.    INTRODUCTION

Prior to transferring this case to this Court, the Honorable Edward J. Davila stated:

> The seriousness of the issue before the Court cannot be overstated. In recent years, it has become clear that sexual assault on college campuses is a pervasive problem. Of course, as Larry Nassar demonstrated, sexual assault on college campuses is not limited to peer-to-peer assault; it also occurs between coaches and their athletes. This case focuses on that latter type of sexual assault and addresses the National Collegiate Athletic Association's ("NCAA") responsibility (if any) to prevent sexual misconduct by collegiate coaches.

*Aldrich v. NCAA*, No. 5:20-cv-01733, 2020 WL 5255671, at *1 (N.D. Cal. Sept. 3, 2020). Judge Davila also held that, as to the state law claims asserted against Coach John Rembao, "various tolling doctrines prevent the Court from finding that Plaintiffs' claims are time-barred." *Id.*

Defendants National Collegiate Athletic Association and its Board of Governors seek to evade any responsibility for preventing sexual misconduct by collegiate coaches—as a matter of law, no less—despite its President's proclamation to Congress that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[1] The NCAA long has known its coaches wield power over student-athletes that allows those who are sexual predators to groom and sexually abuse NCAA student-athletes with impunity. While many other sports-governing bodies have adopted policies to prohibit sexual contact between coaches and athletes since the 1990s, the NCAA deliberately chose *not* to enact any such rules.

---

[1] *See* U.S. Senate, Comm. on Commerce, Science and Transportation, "Promoting the Well-Being and Academic Success of College Athletes" (July 9, 2014), available at https://bit.ly/3i596YO ("Senate Tr."). *See also Bowman v. Niagara Machine & Tool Works, Inc.,* 620 F. Supp. 1484, 1485 (S.D. Ind. 1985) (judicial notice of Congr. hearing).

The NCAA thus breached its duty to protect the safety and welfare of student-athletes like Plaintiffs Erin Aldrich, Londa Bevins, Jessica Johnson, and Beata Corcoran. For the reasons set forth below, the NCAA's motion to dismiss should be denied.

## II.    BACKGROUND

### A.  The NCAA owed and breached its duty to implement policies prohibiting sexual relations between coaches and student-athletes.

As detailed in the Second Amended Complaint ("SAC" or "Complaint"), the NCAA knew or should have known that student-athletes are at risk of sexual abuse and contact by athletics department personnel, including coaches. Academic research and studies show that student-athletes are at risk for sexual abuse because of the power imbalance in the coach/athlete relationship. SAC ¶¶ 33-45, 121. Public records show an alarmingly high number of coaches accused of sexual abuse and assault. *Id.* ¶¶ 94-117. Other governing sports organizations, including the U.S. Olympic Committee, adopted policies prohibiting sexual contact between athletes and coaches as "exploitative." *Id.* ¶¶ 58-81.

The NCAA *never* adopted formal polices to protect student-athletes from predatory coaches at its member institutions, *id*. ¶¶ 93-94, despite expressly promising that its athletics programs are "designed to protect the physical and educational wellbeing of student-athletes." *Id.* ¶¶ 85-89. While the NCAA extensively regulates student-athlete and coach behavior, *id*. ¶¶ 90-92, it entirely ignores predatory sexual abuse. *Id.* ¶¶ 7, 145-52.

### B.  Plaintiffs are former or current student-athletes who suffered, or are at risk of, sexual abuse, because of NCAA's breach of duty.

Plaintiffs Aldrich, Johnson, and Bevins were star high school track and field athletes. *Id.* ¶¶ 165-67, 208-09, 267-68. Rembao began grooming the high-school Plaintiffs, sending them letters, talking to them for hours on the phone, and delving into their personal lives. *Id.* ¶¶ 165-76, 208-20, 267-74. Each then committed to the schools where he coached. *Id.* ¶¶ 171, 223, 270.

Before her freshman year of college at Arizona, Erin Aldrich was to compete at the

World Junior Championships in Sydney, Australia. On the plane there, Rembao fondled and digitally penetrated her. *Id.* ¶¶ 177-80. Rembao sexually abused Aldrich throughout her freshman year. *Id.* ¶¶ 181-84. After being caught, Rembao left for UT-Austin. *Id.* ¶¶ 188-92. While Aldrich later transferred to UT-Austin, she resisted further abuse. *Id.* ¶¶ 198-200. Rembao retaliated by restricting her diet and subjecting her to extreme criticism. *Id.* ¶¶ 201-02. Aldrich repressed much of her memories of the abuse. *Id.* ¶¶ 181, 345.

As for Jessica Johnson, Rembao and his wife often invited Johnson over for dinner while she was a student at UT-Austin, after which Rembao would give Johnson inappropriate massages. *Id.* ¶¶ 225-29. Rembao began controlling Johnson's diet and critiquing her weight. *Id.* ¶ 233. He repeatedly called her in to his office and demanded extremely uncomfortable physical contact. *Id.* ¶ 234. He licked Johnson's neck, and appeared without consent in her dorm room while she was sleeping and kissed her foot. *Id.* ¶¶ 236-37, 246-48. Similarly, Rembao began abusing Londa Bevins at UT-Austin. In his office, Rembao would embrace her, rub her with his erection, touch her hair and legs, kiss her head and neck, and rub her shoulders. *Id.* ¶¶ 287-91.

On August 9, 2000, Johnson filed a complaint about Rembao's conduct with UT-Austin, and on November 21, 2000, the university issued a report after an investigation ("UT-Austin Report"). *Id.* ¶¶ 254, 366. The UT-Austin Report concluded that Rembao did nothing wrong, causing Johnson and Bevins to conclude they did not have any legal rights. *Id.* ¶¶ 255, 367-75. It was not until 2019, when Aldrich watched the movie *Leaving Neverland*, that she realized she was the victim of sexual abuse. *Id.* ¶¶ 205, 347. In October 2019, Aldrich called Johnson and revealed that she was sexually abused by Rembao. *Id.* ¶ 357. Johnson called Bevins. *Id.* ¶ 379. Plaintiffs filed their complaint on March 11, 2020, within a year of Aldrich watching *Leaving Neverland* and her calls to Johnson and Bevins.

Plaintiff Beata Corcoran is now a junior at Princeton University, and a member of the

NCAA Division I Women's Rowing team. As a condition of participation, she signed a Form 19-1a, affirming that she read the NCAA regulations and the NCAA Division I Manual, which encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively, the "Manual"). *Id.* ¶¶ 24, 450. Although Corcoran has not been sexually abused by a coach, she is at risk of abuse because of the NCAA's lack of policies. *Id.,* ¶ 25.

### C. Procedural History

Plaintiffs filed this proposed class action in the Northern District of California against the NCAA s and Rembao and were later joined by Corcoran. *Aldrich v. NCAA,* No. 5:20-cv-01733 (N.D. Cal.). The NCAA Defendants filed a motion to dismiss for lack of personal jurisdiction and based on the statute of limitations. Rembao moved to dismiss, focusing on statute of limitations and the failure to state a claim. On September 3, 2020, Judge Davila granted the NCAA's motion to transfer. Judge Davila denied Rembao's Rule 12 motion in its entirety, holding that Plaintiffs' claims may be tolled by various exceptions to the applicable statutes of limitation. *Aldrich,* 2020 WL 5255671, at *12-15.

### III.   LEGAL STANDARD

Fed. R. Civ. P. 12(b)(6) allows for dismissal only if the complaint "fail[s] to state a claim upon which relief can be granted." A complaint must state a plausible claim to by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," accepting all allegations as true and construing them in the light most favorable to plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A court may not dismiss a complaint unless it appears beyond a doubt that the plaintiffs can prove no set of facts in support of their claims to entitle them to relief." *Indiana Carpenters Pension Fund v. Hammond*, No. 18-03176, 2019 WL 9093756, at *3 (S.D. Ind. Apr. 23, 2019).

## IV.   ARGUMENT

### A.  Plaintiffs' claims are not barred by the statute of limitations.

#### 1.  Judge Davila's ruling should be given deference.

Judge Davila ruled that the statute of limitations for Aldrich, Johnson, and Bevins's claims were tolled under applicable laws. "[C]ourts should refrain from reopening issues decided in earlier stages of the same litigation" and this "applies when a when a case is transferred from one district court to another." *DMC Mach. Am. Corp. v. Heartland Mach. & Eng'g, LLC*, No. 17-00369, 2018 WL 4590393, at \*3 (S.D. Ind. Sept. 25, 2018) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). It would be incongruous for this Court to find that the Plaintiffs' claims cannot survive based on the limitations period. "Where the same dispute is 'framed in formally separate actions, either simultaneously or sequentially, in circumstances that do not support claim preclusion or issue preclusion[,] . . . later courts tend to adhere to earlier rulings by other courts for the same reasons that inform general law-of-the-case practices.'" *Pyrolyx USA Indiana, LLC v. Zeppelin Sys. GmbH*, No. 20-00108, 2020 WL 3976975, at \*7 (S.D. Ind. July 14, 2020) (citing 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478.4 (2d ed. Apr. 2020 Update)). This Court should view Judge Davila's decision as law of the case or, at a minimum, as persuasive.

#### 2.  Erin Aldrich's claims are timely.

Judge Davila held that Aldrich's claims are timely under the Arizona tolling statute, A.R.S. § 12-502. *Aldrich v. NCAA*, 2020 WL 5255671, at \*12-14. That holding is instructive when applying Indiana law.

Under A.R.S. § 12-502, a cause of action does not accrue if a person is of "unsound mind," a term that is applied broadly beyond legal incapacity. A person can be of "unsound mind" if she is unable "to understand his legal rights or liabilities." *Doe v. Roe*, 955 P.2d 951, 964 (Ariz. 1998). In *Roe,* a 34-year-old plaintiff filed suit after she experienced a flashback

memory of her father sexually abusing her when she was a child while watching a television program on incest. *Id.* at 953. After watching the program, she "developed feelings of hysteria, even panic, and immediately sought counseling," and was hospitalized for psychiatric care. *Id.* *Roe* held that the repression created a genuine dispute of fact as to plaintiff's ability to understand her legal rights. *Id.* at 967. It held that "unsound mind" does *not* require evidence the alleged victim is totally incapacitated or unable to manage her daily affairs. *Id.* at 965.

Judge Davila applied *Doe v. Roe* to Aldrich's case, finding that "allegations create a dispute as to whether Plaintiff Aldrich was able to understand her legal rights." *Aldrich*, 2020 WL 5255671, at *13.  He found:

> Plaintiff Aldrich repressed her memories of the abuse and was in denial that any abuse took place. Because of this denial, she did not understand her legal rights. Indeed, if one is to accept that events occurred and is unable to articulate them, they likely do not understand their legal rights. This is confirmed by Plaintiff Aldrich's feelings of complicity, guilt and shame, which further evidences that she did not understand that a wrong occurred. While Plaintiff Aldrich was able to recall some of the events, she did not realize that they qualified as abuse until *Leaving Neverland* "triggered" her realization. *See Doe*, 955 P.2d at 953.

*Id.* (internal citation omitted). He concluded:

> Like the plaintiff in *Doe*, Plaintiff Aldrich did not understand her legal rights until she was "triggered." Again, like the plaintiff in *Doe*, this realization had a physical effect on Plaintiff Aldrich. The allegations of repression are thus analogous to those in *Doe.* Therefore, it is not apparent from the face of the complaint that the relevant statutes of limitation bar this action.

*Id.* at *14 (internal citation omitted). For similar reasons, Aldrich's claims are timely under Indiana's discovery rule.

Indiana's discovery rule provides that a "cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat'l Bank,* 586 N.E.2d 840, 843 (Ind. 1992) (merging the "ascertainment" and "discovery" rules). *See also Hildebrand v. Hildebrand*, 736 F. Supp. 1512,

1521 (S.D. Ind. 1990) ("a cause of action accrues when the harm suffered is ascertained or ascertainable"). "The inquiry into when damages are ascertainable is governed by 'the nature of the harm for which a plaintiff seeks damages,' and how that harm could reasonably have been ascertained." *Hildebrand,* 736 F. Supp. at 1521. What controls the analysis is "the time that damage is or could be ascertained, not the time the wrongful act transpired." *Id.* at 1517.

In *Hildebrand,* plaintiff was sexually abused by her father in her childhood. Throughout her adolescence and college, she attended counselling and suffered from depression and low self-esteem. It was not until eight years after the last incident of abuse, at a counselling session with a new therapist, that plaintiff first connected her depression with the childhood sexual abuse. She filed suit within two years of that realization. While plaintiff "had always known that her father physically and sexually abused her … she did not know until her therapy with Ms. Hall that her psychological problems were caused by that abuse." *Id.* at 1521. The court concluded that it was a question for the jury whether plaintiff ascertained her injuries earlier. *Id.* at 1523. "[T]he jury will have to make a factual determination concerning the ascertainability of [plaintiff's] alleged injuries." *Id.* at 1525. "When dealing with subtle issues of psychological injuries, a court should hesitate to intrude on the factfinding prerogative of the jury." *Id.* at 1523.

*Hildebrand* demonstrates that Aldrich's claims are timely. Like Hildebrand, while Aldrich repressed many memories of the abuse, she did not realize that those she did recall were acts of sexual abuse. Aldrich did not understand the root of her ongoing trauma until she watched *Leaving Neverland,* like Hildebrand's counselling session. Until then, the harm Aldrich suffered was not ascertainable. Because she then filed within a year, her claims are timely.

*Hildebrand* applied the "general" or "ascertainment" rule, not the "discovery" rule, articulating differences between them. 736 F. Supp. at 1518. However, in *Wehling,* 586 N.E.2d 840, the Indiana Supreme Court merged the rules into the current incarnation of the discovery

rule. Had *Hildebrand* been decided thereafter, the court likely would have also applied the discovery rule. *See Fager v. Hundt,* 610 N.E.2d 246, 250 (Ind. 1993). Moreover, Aldrich's facts as to discovery of her injuries are plausible and for a jury.

Aldrich's claims are also timely under the discovery rule due to her repressed memories of the sexual abuse. While she had the ability to recall some of the events, she did not realize she had been sexually abused, and experienced feelings of complicity and shame. *Leaving Neverland* was the stimulus or "trigger" for her realization that she was a victim of sexual abuse. The realization had a physical effect on Aldrich. Shortly after the movie, with the stress of the past triggered and realized, Aldrich was hospitalized with sepsis from bacterial pneumonia. SAC, ¶ 206. She filed suit within a year of her discovery, and therefore, her claims are timely.

The fact that Aldrich did not repress *all* memories of what occurred should not defeat application of the discovery rule. While some courts have applied a rigid rule requiring total amnesia, other courts permit the claims to proceed beyond summary judgment stage even though plaintiff retained some memories of the abuse. *See Fager,* 610 N.E.2d at 252 (reversing summary judgment where plaintiff "was unaware of some of the sexual acts as they occurred and did not discover them until age 36"); *LaCava v. LaCava.,* 907 N.W. 2d 154, 165 (Ind. Ct. App. 2009) (affirming denial of summary judgement where plaintiffs had certain abuse memories).

A flexible approach is consistent with the phenomenon of repressed memories. "As people are being traumatized, this narrowing of consciousness sometimes evolves into amnesia for parts of the event, or for the entire experience." *See Roe*, 955 P.2d at 957, n.4. Indeed, the Indiana Supreme Court has recognized that the term "repressed memory syndrome" applies to individuals with absolutely no memory of the abuse "as well as those who remember parts of the incident but have a significant amount of amnesia." *Fager,* 610 N.E.2d at 252, n.3. The NCAA's argument that Aldrich "was charged during this period prior to 1998 with a duty to investigate

Rembao's conduct" (Br. 7), is a *non sequitur* considering the allegations. Until 2019, Aldrich was not aware that Rembao caused her injury.

### 3.   **Jessica Johnson's and Londa Bevins' claims are timely.**

Judge Davila held that "fairness may dictate that the relevant statutes of limitations should be tolled" for Johnson and Bevins's claims based on the sham investigation conducted by UT-Austin. *Aldrich*, 2020 WL 5255671, at *15. He found:

> The injustice arising from a refusal to toll the statutes of limitations would be great. As discussed, after the abuse occurred, Plaintiff Johnson filed a report with UT Austin. UT Austin conducted an investigation during which it allegedly "badgered Johnson and Bevins [and] subject[ed] them to cross-examination and accusations." UT Austin told Plaintiff Johnson her accusation that Defendant Rembao licked her neck was "boorish" and not sexual in nature. The investigation and report made Plaintiffs Johnson and Bevins believe that Defendant Rembao did nothing wrong and that they were overreacting. The investigation created self-doubt, blame, minimization, and uncertainty regarding Defendant Rembao's actions (and this is on top of the shame and blame that victims of sexual abuse already suffer). This report led them to believe that they did not have a claim. As soon as they realized they did have a claim (i.e. after Plaintiff Aldrich's phone call), they filed the case at hand.

*Id.* (internal citations omitted). For similar reasons, Johnson and Bevins's claims are timely under Indiana law on grounds of equitable tolling and fraudulent concealment/equitable estoppel.

The NCAA recognizes that Indiana courts apply equitable tolling where a fraudulent concealment has occurred. Br. 11. Fraudulent concealment "operates as an equitable doctrine to estop a defendant from asserting a statute of limitations when he has, either by deception or by a violation of duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action." *Burks v. Rushmore*, 534 N.E.2d 1101, 1104 (Ind. 1989). "With respect to fraudulent concealment, 'principles of equity always intervene . . . to prevent a party from gaining an advantage' by wrongfully concealing an injury from one who does not become aware of the injury until a time after the statute of limitations has run." *Doe v. Shults-Lewis,* 718 N.E.2d 738, 747 (Ind. 1999). *See also* Ind. Code. § 34-11-5-1. The concealment must be active and intentional, but it need not be active if the defrauder has a duty to disclose material

information to individuals with whom he has a fiduciary or confidential relationship. *Hildebrand,* 736 F. Supp. at 1523 (citing cases).

The doctrine of equitable estoppel goes hand-in-glove with the doctrine of fraudulent concealment under Indiana law and "will serve the same purpose and foreclose the use of a statute of limitations to a defendant who through fraud or misrepresentation prevents a plaintiff from commencing an action within the statute's original time frame." *Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc.,* 717 F. Supp. at 1374, 1388 (S.D. Ind. 1989).

Here, two separate circumstances warrant application of equitable tolling and fraudulent concealment/equitable estoppel. First, the NCAA was on notice of the prevalence of coaches who take advantage of their power over student-athletes to subject them to sexual abuse. The NCAA acknowledges, "sexual relationships between coaches and student-athletes are a serious problem." Br. 27. The NCAA, however, chose to ignore the issue, even though other sports organizations adopted policies to prohibit this conduct.

In *Langston v. Mid-America Intercollegiate Athletics Ass'n,* No. 16-8727, 2020 WL 1445631 (N.D. Ill. Mar. 25, 2020), plaintiffs brought suit against the NCAA for football brain injuries that caused the decedent to commit suicide. *Id.* at *1. The court applied equitable estoppel, pointing to plaintiff's allegations that the NCAA knew and concealed the risks of developing degenerative brain diseases. *Id.* at *7. Highlighting allegations that the NCAA remained silent despite knowledge, the court denied the motion to dismiss, holding that whether the allegations "give rise to estoppel is a question of fact." *Id.* The same is true here. Plaintiffs allege that the NCAA knew of the risk of sexual abuse by coaches but failed to act.

Second, the UT-Austin investigation warrants application of equitable tolling and fraudulent concealment/equitable estoppel. "Estoppel most commonly results from misleading

statements about the need for or advisability of a claim; actual fraud or the intent to mislead is not essential." *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438, 445 (1989); *see also Hildebrand,* 736 F. Supp. at 1523 (the concealment need not be active if the defrauder has a duty to disclose material information to individuals with whom he has a fiduciary or confidential relationship). UT-Austin intentionally misled Johnson and Bevins and minimized egregious sexual misconduct to forestall them from filing suit. *See, e.g.*, SAC ¶¶ 237, 370. Johnson and Bevins plausibly allege intentional concealment of material facts on which they relied to their detriment, supporting tolling.

In *Estate of Amaro v. City of Oakland*, 653 F.3d 808 (9th Cir. 2011), the court applied equitable estoppel to preserve plaintiff's suit over her son's death after a police beating. While the decedent told his mother he had been beaten, the police misrepresented the events and stonewalled providing information. *Id.* at 811. More than eight years after the incident, the FBI received a tip and opened an investigation, which resulted in plaintiff's late-filed suit. *Id.* The court noted that "the focus of the equitable estoppel analysis is not whether the plaintiff knew she had a cause of action. . .but whether the defendant's fraudulent concealment or misrepresentation deprived the plaintiff of a full understanding of the true facts, and thus, dissuaded the plaintiff from filing the claim at issue within the limitations period." *Id.* at 813. The court found defendant's misrepresentations and stonewalling prevented plaintiff "from appreciating the full nature of her claim and dissuaded her from filing [suit]." *Id.* at 814. The same is true here. Johnson filed her complaint about Rembao with UT-Austin, and the university investigated. The investigation and its outcome caused both Johnson and Bevins to doubt themselves. They were, like the plaintiff in *Amaro,* prevented from appreciating the full nature of their claims. *See also Wisniewski v. Diocese of Belleville,* 943 N.E.2d 43, 68 (Ill. App. 2011) (affirming timeliness of plaintiff's sexual abuse claims, filed 24 years after the abuse, due to fraudulent concealment).

11

The NCAA argues that equitable tolling and fraudulent concealment/equitable estoppel do not apply because "UT's investigation cannot be attributed to the NCAA." Br. 11. However, *Shults-Lewis,* 718 N.W.2d at 747, confirms that the doctrine of fraudulent concealment applies when a party *or one of its agents or representatives* engages in some calculated conduct, such as concealment of facts, which induced the plaintiff not to file a claim. There, the court applied fraudulent concealment where one plaintiff pointed to specific acts of the defendant institution which misled plaintiff regarding her cause of action. *Id.* Whether the NCAA had control over the actions of its member institutions is again a fact question. As Judge Davila noted, "without equitable tolling to protect sexual abuse survivors' access to justice, the intimidation tactics allegedly used by UT Austin would be condoned." *Aldrich*, 2020 WL 5255671, at *15.

This Court should also apply equitable principles and toll the limitations period because of the nature of sexual abuse and because Rembao was in a position of power and trust. Courts equate abuse by such an authority figure to the sexual abuse of children. *See Ulibarri v. Gerstenberger,* 781 P.2d 698, 705 (Ariz. Ct. App. 1993); *see also J.A.W. v. Roberts*, 627 N.E.2d 802, 809 (Ind. Ct. App. 1994) (finding special relationships in power imbalances). This Court should thus apply equity to preserve Plaintiffs' claims. The NCAA argues that this court is not positioned to "create" such equitable exceptions, citing *Guar. Tr. Co. v. York*, 326 U.S. 99 (1945). Br. 13. That case*,* however, stands for the unremarkable proposition that a diversity court will apply the relevant state's limitations laws. "It is hornbook law that limitations periods are customarily subject to equitable tolling," *Young v. United States*, 535 U.S. 43, 49 (2002), and Indiana courts apply the doctrines in these circumstances as well. Thus, this Court's application of equitable principles is appropriate. *See id.* at 49-50 (recognizing that tolling might be appropriate in various circumstances).

**B. Plaintiff Corcoran, as a current NCAA student-athlete, has standing to bring claims for injunctive relief.**

To establish Article III standing, a plaintiff must show that she (1) suffered an injury in fact, (2) arising out of the defendant's conduct, that (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Standing must "be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561. Thus, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, and "the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor," *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015).[2] Here, Plaintiff Corcoran has two independent bases for standing to seek injunctive relief. *First,* she, like all other current NCAA student-athletes, is at an increased risk of sexual abuse due to the NCAA's lack of protective policies. *Second,* she did not receive the benefit of her contracted bargain with the NCAA.

**1. Corcoran adequately alleges injury-in-fact based on increased risk of sexual abuse.**

The NCAA primarily challenges the first prong of the standing inquiry—the sufficiency of the injury Corcoran alleges. For standing purposes, an injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, *Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). That said, "as long as the plaintiff has shown that [she] has 'an actual stake in the outcome that goes beyond intellectual or academic curiosity, even a minor or non-economic injury will satisfy the structures of Article III.'" *Askin v. Quaker Oats Co.*, 818 F. Supp. 2d 1081, 1083 (N.D. Ill. 2011) (quoting *Family &*

---

[2] In their motion to dismiss in the Northern District of California, Defendants argued that "Plaintiffs lack standing to pursue their claims for injunctive relief because they are not current student-athletes." *Aldrich v. NCAA*, 5:20-cv-01733-EJD (N.D. Cal.) (Dkt #33 at 2). Plaintiffs amended their complaint to add a current student-athlete, Plaintiff Corcoran, *id.* (Dkt # 54). Defendants now argue that Corcoran does not have standing to assert claims for injunctive relief (or any other claims). Br. 13-16.

*Children's Ctr., Inc. v. School City of Mishakaka*, 13 F.3d 1052, 1058 (7th Cir. 1994)). Here, Corcoran adequately alleges injury-in-fact due to an increased risk of sexual abuse—above the baseline societal risk—that she, and all other current student-athletes, are currently subjected to due to the NCAA's lack of policies against abuse by coaches.[3]

The Supreme Court, as well as the Seventh Circuit, have consistently recognized that allegations of future or threatened injury are sufficient to confer standing where, as here, there is a "'substantial risk' that the harm will occur." *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted). In *Lac Du Flambeau Band v. Norton*, 422 F.3d 490 (7th Cir. 2005), a Native American tribe challenged the government's adoption of a compact it alleged might make it more difficult for the tribe to secure permits to build casinos. The tribe had not been denied a permit, and several possible contingencies, such as the location of the approved casino, could obviate the harm entirely. *Id.* at 488-89. The Seventh Circuit held that "[n]one of these possibilities show that [plaintiffs have] failed to plead an actual or imminent injury . . . . none of these contingencies shows that actual or imminent harm to [plaintiffs] is inconsistent with the pleadings." *Id.* at 499. Likewise, in *Remijas*, a data breach case where hackers collected data associated with 350,000 Neiman Marcus customers, the Seventh Circuit held that plaintiffs should not have to wait until the hackers commit identity theft fraud to have standing, because there is "an 'objectively reasonable likelihood' that such an injury will occur." 794 F. 3d at 693 (citation omitted). *See also, e.g.*, *Powell v. Illinois,* No. 18-6675, 2019 WL 4750265, at *8 (N.D. Ill. Sept. 30, 2019) (recognizing injury from the increased "threat of continuing exposure to incidents of gun violence" in a Chicago neighborhood).

---

[3] Contrary to Defendants' reading, Br. 15, Plaintiffs did not and do not argue that Corcoran's *fear* of potential future abuse is her injury-in-fact.

Consistent with that approach, courts have held that increased risk of sexual abuse or assault constitutes a cognizable injury, notwithstanding the lack of certainty. In *Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788, 812-13 (M.D. Tenn. 2016), for example, current and former female students brought an action against their university, alleging that the school's policies rendered female students vulnerable to sexual assault.[4] The court declined to dismiss the plaintiffs' claim for injunctive relief, finding that the current student plaintiff had standing based on her "increased risk of sexual assault" due to the university's inadequate policies. *Id.* at 813. *See also Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 662 (W.D. Tex. 2017) (denying dismissal where Baylor's custom of inadequate handling of sexual assault "created a heightened risk of sexual assault, thereby inflicting the injury").

The reason an increased risk suffices as injury-in-fact has much to do with the fact that sexual abuse is an irreparable harm; monetary compensation alone is inadequate to address it. "Courts resist strictly applying the 'actual injury' test when the future harm involves human suffering or premature death." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011). Because the trauma of sexual assault cannot be retroactively "undone" by a cash payment, it instead must be proactively prevented— making injunctive relief mandatory to eliminate that increased threat from the NCAA's lack of policies.[5] The increased risk of sexual abuse is thus an injury-in-fact.

---

[4] While the plaintiff in *Doe v. Univ. of Tennessee* had previously been assaulted, that fact was immaterial to the court's analysis. 186 F. Supp. 3d at 813. To the contrary, it reasoned that "if the plaintiffs' allegations are taken as true, the plaintiffs are at increased risk of sexual assault by *other* male UT athletes, not just the ones who already assaulted them." *Id.* Corcoran need not allege abuse by any coach to establish an actual injury-in-fact here.

[5] This reasoning is analogous to that in numerous cases finding increased risk of irreparable environmental harms constitutes injury-in-fact. *See, e.g., Central Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) (in environmental cases, "in contrast to many other types of harms, monetary compensation may well not adequately return plaintiffs to their original position."); *Ocean Advocates v. U.S. Army Corps*, 402 F.3d 846, 860 (9th Cir. 2005) (finding standing based on increased risk of oil spill). Similarly, here "[w]aiting for a plaintiff to suffer physical injury before allowing any redress whatsoever is both overly harsh and economically inefficient." *Sutton*, 419 F.3d at 575.

The NCAA's arguments to the contrary are unavailing. *First*, the increased risk here is not "speculative," but an actual, non-hypothetical concern for NCAA student-athletes. Br. 13. The NCAA and numerous studies reveal the scope of the problem; given the known underreporting of abuse, they likely only scratch the surface. *See, e.g.*, SAC ¶¶ 1, 49-51, 53, 118-125. And, indeed, evidence of a reduction of incidents after other sports implemented policies underscores the increased risk the NCAA creates by *not* implementing such policies. *See id.* ¶¶ 46, 53-57, 60-85, 96-144. Moreover, the past harms by NCAA coaches emphasize the real and ongoing threat to student-athletes' safety and well-being. *See Sierakowski v. Ryan*, 223 F.3d 440, 445 (7th Cir. 2000) ("[P]ast wrongs, while not sufficient to confer standing for injunctive relief, may be evidence that future violations are likely to occur."). The risk to Corcoran is all too real.[6]

*Second*, the increased risk here is sufficiently particularized. That increased risk affects Corcoran in a personal and individual way. SAC ¶¶ 25-26. Contrary to the NCAA's suggestion (Br. 14-15), that the increased risk *also* affects other current NCAA student-athletes has no impact on her standing. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687-88 (1973) ("[S]tanding is not to be denied simply because many people suffer the same injury . . . . To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."). Indeed, the Seventh Circuit rejected defendants' argument in *Lac,* finding that the argument that plaintiffs' injury would affect nearly all Indian tribes in Wisconsin equally was "based on a flawed understanding of the particularity

---

[6] Although Defendants contend that future coaching changes are "too speculative" to support an injury in fact, the SAC alleges that Corcoran works directly with six members of the coaching staff, *id.* ¶ 24—a number of staff members for which employment changes over the course of years are not only plausible but likely—and further that these coaching changes happen "often," *id.* ¶ 25.

requirement." *Id.* at 496-97. *See also Powell*, 2019 WL 4750265, at *7 (increased risk of violence in "discrete pockets" of Chicago constituted sufficiently particularized injury in fact).

*Plotkin v. Ryan*, 239 F.3d 882 (7th Cir. 2001), does not alter this analysis. In *Plotkin*, the alleged injury—harm caused by the state's issuance of commercial drivers' licenses to unqualified applicants—affected each and every user of Illinois highways. *Id.* at 886. Thus, it was insufficiently particularized, as it "rais[ed] only a generally available grievance about government." *Id.* Here, the harm alleged is far more like *Lac*—related to a specific subset of the population, student-athletes, at a particularly heightened risk of harm—rather than a generalized grievance as in *Plotkin*.[7] In sum, Corcoran "at the very least raise[s] a material question of fact with respect to the issue whether [she] suffer[ed] a substantial risk of harm as a result of the [NCAA's] policies." *Central Delta Water Agency v. United States,* 306 F.3d 938, 950 (9th Cir. 2002). Accordingly, the motion to dismiss for lack of standing should be denied.

### 2. **Corcoran adequately alleges causation and redressability.**

Defendants also briefly challenge the remaining two standing prongs, causation and redressability. Br. 16. To satisfy the causation element, Corcoran's injury "must be fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 561 (citation and internal quotations omitted). For redressability, "it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation omitted).

Plaintiffs' allegations that the NCAA purposely chose not to implement policies protecting student-athletes from predatory coaches, ignored and whitewashed reports of abuse, and that the

---

[7] The remaining cases the NCAA cites are similarly unavailing. *See Flynn v. FCA US LLC*, No. 15-0855, 2016 WL 5341749, *2–3 (S.D. Ill. Sept. 23, 2016) (noting that only "four owners in a universe of over a million reported anything close to a safety-related problem" (emphasis omitted)); *Alonso v. Blue Sky Resorts, LLC*, 179 F. Supp. 3d 857 (S.D. Ind. 2016) (finding the plaintiffs' allegations based on fear of identity theft from a data breach insufficient for a fact-specific reason: because the information stolen did not include social security numbers and could be remedied with relative ease, *i.e.*, by cancelling the credit card whose information had been stolen).

lack of policies allowed abusers access and opportunity and impunity, SAC ¶¶ 93, 320-322, 365-371, show that the NCAA fostered an environment conducive to and permissive of coach abuse, making the increased risk directly traceable to the NCAA. *See, e.g., Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788, 812 (M.D. Tenn. 2016) ("Allegations that UT is biased in its investigation and disciplinary proceedings … and fails to protect victims of athlete assaults—in order that athlete assailants are protected in their ability to remain at UT and be eligible to play sports, while victims who pursue accusations against athletes are shunned or even forced to leave the school altogether—supports both the theory that UT's actions fostered an environment in which the plaintiffs were more vulnerable to sexual assault as well as the theory that UT's actions contributed to additional injuries to the plaintiffs in the aftermath of reporting their assaults.").

The NCAA's argument against traceability misses the mark. Br. 16. Corcoran does not need to show that *past* coach-abuse incidents were precipitated by NCAA acts to establish standing; she seeks only *prospective* injunctive relief. The NCAA's summary assertion that Corcoran's injuries cannot be redressed by judicial decision is also meritless. This is the quintessential case in which a harm can be redressed through the requested relief. *See, e.g.*, *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 928 (7th Cir. 2008) (injunctive relief redressed injury caused by government policy by halting the harmful activity).

Contrary to NCAA's contention, Br. 16, the involvement of non-parties in the causal chain does not alter the standing analysis. *See, e.g., Lac*, 422 F.3d at 488-89 (finding tribe had standing despite fact decision to grant a permit rested with a third party). Causation requires that the injury be "fairly traceable" to the defendant's conduct—not *only* traceable to the defendant's conduct. *See Frederick v. Lawson*, No. 19-01959, 2020 WL 4882696, at *10 (S.D. Ind. Aug. 20, 2020) (defendant "sufficiently connected with the duty of enforcement of the challenged

provisions," notwithstanding the fact that policies were implemented by third parties).[8] The

motion to dismiss should be denied.

### 3.  Corcoran has standing based on breach of contract.

Courts generally find that breach of contract allegations provide an independent basis for

Article III standing.[9] Corcoran alleges that the NCAA continues to breach its contract with her

by failing to implement standard policies to prohibit sexual abuse. SAC ¶¶ 24-26, 450-451, 453-

459. Thus, she has not received the benefit of her bargain, and states a cognizable injury.[10]

### C.  The NCAA Board is an entity with the capacity to be sued.

The NCAA's argument that "the Board does not exist separately from the NCAA and

thus cannot be sued independently" is inaccurate and belied by its own materials. Br. 17. While a

suit against the board of an incorporated entity is "a suit against the corporation,"[11] the boards of

unincorporated associations are subject to greater liability and have greater legal separation from

the business organization. *See* Alan S. Gutterman, Business Transactions Solutions § 73:18.[12]

While Indiana law is silent as to whether the NCAA Board is an entity with the capacity to be

---

[8] The cases cited by the NCAA are inapposite. *See Area Transp., Inc. v. Ettinger*, 219 F.3d 671 (7th Cir. 2000) (plaintiff did not have standing to require a harsher sanction by the federal government against a rival where the rival ceased competing after a cease and desist order); *Ind. Coal. for Pub. Educ. v. McCormick*, 338 F. Supp. 3d 926, 939-41 (S.D. Ind. 2018) (on a motion for summary judgment, finding that the policy at issue had "no coercive or determinate effect on" the multiple independent, third-party decisions that were the primary cause of the harm).

[9] *Dinerstein v. Google, LLC*, No. 19-4311, 2020 WL 5296920, at *5-7 (N.D. Ill. Sept. 4, 2020) (breach of contract allegations, without actual damages, suffice to confer standing). *See also, e.g.*, *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018) ("Like any private contract claim, his injury does not depend on allegation of financial loss. His injury is that he was denied the benefit of his bargain...."). As discussed in *supra*, note 10, actual damages are not required to establish standing for a breach of contract claim.

[10] The authority cited by the NCAA, *Gared Holdings, LLC v. Best Bolt*, states only (uncontroversially) that the elements of a breach of contract claim include damages. 991 N.E.2d 1005, 1012 (Ind. Ct. App. 2013). The case says nothing at all about the requirements for *standing* to assert a breach of contract claim. *Id. See Rolan v. Atl. Richfield Co.*, No. 16-357, 2017 WL 3191791, at *5 (N.D. Ind. July 26, 2017) (denying motion to dismiss for lack of standing where "Defendant DuPont's argument conflates the requirements for adequately alleging a claim with the requirements of standing.").

[11] *Siegler v. Sorrento Therapeutics, Inc.*, No. 18-01681, 2019 WL 581719, at *14 (S.D. Cal. Feb. 13, 2019), *reconsideration denied*, No. 18-01681, 2019 WL 1574321 (S.D. Cal. Apr. 11, 2019).

[12] *Heslep v. Ams. for African Adoption, Inc.*, 890 F. Supp. 2d 671, 678 (N.D.W. Va. 2012), which the NCAA cites, concerns the board of a corporation rather than an unincorporated association— an entirely inapposite circumstance.

sued, cases from other jurisdictions with similar statutory schemes support this reading. *Nahas v. Shore Med. Ctr.*, No. 13-6537, 2018 WL 1981474, at *5 (D.N.J. Apr. 27, 2018) (analyzing cases and concluding that a hospital's medical executive committee "has the capacity to sue or be sued" as an entity independent of the hospital itself). The NCAA's website, for example, emphasizes that the Board serves a different role than the organization at large, and is responsible for only a subset of policy decisions. *See* SAC ¶ 32. The Board of Governors is (1) recognized as a collective entity within the NCAA, (2) governed by a set of formal bylaws, (3) authorized to make rules and recommendations on behalf of the NCAA, and (4) presents itself as an entity distinct from other bodies within the NCAA. *Id*. ¶¶ 30-32.  "Those qualities . . . suggest a legal capacity to sue or be sued." *Nahas*, 2018 WL 1981474, at *5.[13]

### D.  Plaintiffs state plausible negligence claims.

Plaintiffs sufficiently state claims for gross negligence (Count I) and negligence (Count II) against the NCAA under Indiana law.

#### 1.  The NCAA voluntarily assumed a special duty of care.

Under Indiana law, "[a] duty of care may . . . arise where one party assumes such a duty, either gratuitously or voluntarily. The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999) (citation omitted). "The existence and extent of such a duty is ordinarily a question of fact for the trier of fact." *Id.*[14]

Here, the NCAA expressly undertook a duty to protect its student-athletes. The NCAA's

---

[13] *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816 (N.D. Cal. 2016), the other case cited by NCAA, does not compel a different result. The decision provides a threadbare conclusion, with no reasoned analysis. By contrast, *Nahas* engages in lengthy and detailed analysis of the history and policy considerations at issue. It is entitled to greater weight.

[14] While the *Delta Tau Delta v. Johnson* court found that a national fraternity did not have a duty to a party-goer who was assaulted, the court's determination of duty in that case was later called into question because it applied a test that imposed an unnecessarily higher burden on the issue of duty. *Goodwin*, 62 N.E.3d at 391.

promise to its student-athletes is contained in its Constitution and Bylaws, where it vows that "athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes." SAC ¶ 85. *See also id*., ¶¶ 87-89 (repeating promise on website). And NCAA President Mark Emmert reiterated that promise, telling the Senate that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes." *See* Senate Tr., *supra* n.1. Contrary to the NCAA's assertion, its conduct has gone above and beyond merely developing publications and other "informational resources and guidance for member institutions and student-athletes." Br. 30-31. Instead, the NCAA's proclamations, promises, and representations are clearly "affirmative, deliberative conduct," evidencing the voluntary and gratuitous assumption of a duty of care.

### 2. The NCAA owes a duty based on its special relationship with student-athletes.

A duty may also be imposed based on a special relationship where there is a power imbalance, such as supervising adults and children, teachers and students, and nursing homes and nursing home patients. *J.A.W.,* 627 N.E.2d at 809. "The underlying thread binding these cases together is the level of interaction or dependency between the parties that surpasses what is common or usual. Under those circumstances the relationship is characterized as 'special.'" *Id.* (finding question of fact as to special relationship between sex abuse victim and clergyman).

Based on the power imbalance between a coach and student-athlete, the NCAA is in a special position to protect its student-athletes. For many, "college is the first time they have lived away from home. Although college students may no longer be minors under the law, they may still be learning how to navigate the world as adults." *Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 625 (2018). Courts consistently find that resolving whether the NCAA has a duty to protect student-athletes is inappropriate on a motion to dismiss. *See Hill v. Slippery Rock Univ*., 138 A.3d 673, 679 (Pa. Super. 2016) (plaintiffs alleged duty on the part of NCAA

sufficient to withstand a motion to dismiss); *Greiber v. NCAA*, No. 600400/17, 2017 WL 6940498, at *1 (N.Y. Sup. Ct. Sept. 5, 2017) (denying NCAA's motion to dismiss plaintiff's negligence claim); *Langston v. Mid-Am. Intercollegiate Athletics Ass'n*, No. 16-8727, 2020 WL 1445631 (N.D. Ill. Mar. 25, 2020) (same); *Schmitz v. NCAA*, 67 N.E.3d 852, 867 (Ohio Ct. App. Dec. 8, 2016) (same); *Bradley v. NCAA*, No. 16-346 (D.D.C. April 12, 2017) (Dkt #36) (same). *See also D.H. v. Whipple*, 103 N.E.3d 1119, 1113 (Ind. Ct. App. 2018) (the existence of a special relationship is a fact question).

The NCAA relies on *Lanni v. NCAA*, 42 N.E.3d 542 (Ind. Ct. App. 2015), where the court granted summary judgment after development of the factual record. But that case is drastically different because the injury resulted from a random accident while plaintiff was watching a fencing bout. Here, and in the above cases, there are allegations of the NCAA's long-standing knowledge of the risk of harm to the student-athletes and its failure to respond. In the cases cited above, it is the harm from repeated head traumas; here, it is coaches who exploit vulnerable student-athletes. Plaintiffs thus plausibly allege the NCAA owed a duty based on its special relationship with student-athletes.

### 3. The NCAA owes a duty to Plaintiffs based on its special relationship with and control over its coaches.

A duty of care also exists because the NCAA has a special relationship with its coaches and is in the best position to control their conduct. Indiana courts look to a special relationship that exists between the actor and the third person, which imposes a duty upon the actor to control the third person's conduct. *Bailor v. Salvation Army*, 854 F. Supp. 1341, 1357 (N.D. Ind. 1994) (citing Restatement (Second) of Torts § 319). Section 319 explains: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." The key is that the defendant's relationship with the tortfeasor places it

in a superior position to prevent the harm. *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, 1092, *as modified on denial of reh'g*, (2019), *review granted,* 257 Cal. Rptr. 3d 188 (2020).

In *Brown*, the trial court found USA Taekwondo ("USAT") owed a duty of care to plaintiffs who were sexually abused by a coach under the control of the USAT. *Id*. at 1093. In finding USAT had a duty, the court considered that to compete in Olympic games, athletes must be members of USAT and train under USAT-registered coaches; the perpetrator was a USAT coach; and USAT had control over the coach through its policies. *Id*. at 1094. The court concluded that "USAT was therefore in the best position to protect against the risk of harm." *Id*.

Here, the NCAA is in the best position to protect against the risk of harm to student-athletes because it extensively regulates the conduct of NCAA coaches. Contrary to its fact-based arguments, the NCAA's Bylaws detail prohibited conduct for coaches, proscribing activities such as sports wagering, using tobacco, and supplying banned substances. NCAA coaches who violate this code are subject to disciplinary or corrective action. SAC ¶¶ 91-92 (citing NCAA Bylaws). To ensure compliance, the NCAA employs a 60-member enforcement staff, and has sanctioned coaches following investigations. *Id*. ¶ 142. Because the NCAA has the proven ability to control the conduct of coaches, this Court should find that a special relationship exists and impose a duty on the NCAA to protect its student-athletes from abusive coaches. *See Lozano v. Baylor Univ.,* No. 16-403, 2019 WL 4742302, at *20 (W.D. Tex. Sept. 27, 2019) (plaintiff plausibly alleged that Baylor University had some ability to control a football player through his membership on the football team and his status as a student).

The NCAA points to *Yost v. Wabash College*, 3 N.E.3d 509, 520 (Ind. 2014), where summary judgment was granted after merits discovery. The court declined to find a fraternity owed a duty to a plaintiff injured during a hazing incident because "[t]he national fraternity lacked any direct oversight and control of the individual fraternity members." *Id*. at 521. The

court in *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154 (Ind. 2014), cited by NCAA, reached the same conclusion. Here however, the factual record has not been developed. And Plaintiffs allege that the NCAA can and does directly control the conduct of its coaches. SAC ¶¶ 90-92. Plaintiffs thus plausibly allege the NCAA owed Plaintiffs a duty.

### 4. The NCAA owes a duty to student-athletes under common law.

In the absence of a special relationship, a duty of care also exists between the NCAA and its student-athletes at common law because "there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it." *Goodwin v, Yeakle's Sports Bar & Grill, Inc,* 62 N.E.3d 384, 392 (Ind. 2016). Analyzing the probability of harm is a "lesser inquiry" than the foreseeability component of proximate cause. *Id.* 390.[15] "[D]efendant's actual knowledge is an appropriate consideration in determining foreseeability and the existence of any duty owed." *Doe v. Delta Tau Delta Beta Alpha Chapter,* No. 16-01480, 2018 WL 3375016, at *4 (S.D. Ind. July 11, 2018).

Plaintiffs allege the NCAA knew of student-athletes' vulnerability to sexual abuse by coaches. *See, e.g.*, SAC ¶¶ 1, 118-125. The NCAA's failure to put in place measures to prohibit sexual contact between coaches and student-athletes could have prevented injuries. *See Mullen v. GLV, Inc.,* 444 F. Supp. 3d 883 (N.D. Ill. 2020) (youth sports club); *Brown*, 40 Cal. App. 5th at 1099 (citing cases); *State v. Jacobson,* 930 A.2d 628 (Conn. 2007) (youth sports coach); *State v. Perry,* 182 A.3d 558, 562 (R.I. 2018) (youth sports); *see also Juarez v. Boy Scouts of Am.*, *Inc.*, 81 Cal. App. 4th 377, 404 (2000) (danger that a Boy Scout would encounter a sexual predator was foreseeable over 40 years ago).

The NCAA's contention that *Goodwin* is analogous is incorrect because it too involved a

---

[15] The NCAA relies on the factors laid out in *Webb v. Jarvis,* 575 N.E.2d 992, 997 (Ind. 1991). Br. 26. However, those factors were called into question as being overly restrictive, and were displaced in *Goodwin,* 62 N.E.3d at 390, 392. Thus, the NCAA's discussion of public policy considerations (Br. 28-29) is irrelevant.

random occurrence—a shooting in a bar that the court found was not foreseeable as a matter of law. *Goodwin,* 62 N.E.3d at 394. Such random occurrences are unlike the NCAA's decades-long knowledge about the prevalence of sexual abuse by coaches, a fact that the NCAA acknowledges. Br. 27. This case is instead more akin to *Doe v. Delta Tau Delta Beta Alpha Chapter*, where the court found a genuine issue of material fact as to whether any prior allegations of sexual assault about the perpetrator had been made, and, if so, whether the fraternity knew or should have known about the perpetrator's past conduct. 2018 WL 3375016, at *4. "[C]ourts will find a duty of care where, in general, reasonable persons would recognize and agree that it exists." *Id.* at *5. Considering the NCAA's knowledge, it cannot disavow its duty for litigation purposes and the motion to dismiss should be denied.

### E. Plaintiffs adequately allege a fiduciary relationship with NCAA.

Plaintiffs state a claim for breach of fiduciary duty against the NCAA in Count III. Under Indiana law, a fiduciary duty may be owed based on the nature of the relationship, especially if it is a relationship of dominance. *See, e.g., Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, 388 F. Supp. 2d 919, 927 (S.D. Ind. 2005). Plaintiffs allege that NCAA owed them a fiduciary duty formed where NCAA actively promoted itself as providing a safe environment for its student-athletes and intended that student-athletes rely on this promise. *Id.* ¶¶ 85-89, 434. As such, the NCAA is duty bound to act for the benefit of its student-athletes to protect them from predatory coaches. Here, Plaintiffs sufficiently plead facts sufficient to show a fiduciary relationship, including NCAA's promises in its governing documents, its website, and its president's own words. *See Reginald Martin Agency,* 388 F. Supp. 2d at 927 (denying defendant's motion for summary judgment in a confidential relationship).

### F. Plaintiffs plausibly plead negligent misrepresentations and omissions.

Indiana law should also apply to Count IV. While application of the tort in Indiana has been described as one of "relative chaos" (*Thomas*, 848 N.E.2d at 760), Indiana courts have

indicated a willingness to allow claims for personal injuries beyond direct business relationships. *See Passmore v. Multi-Mgmt. Servs.*, 810 N.E.2d 1022, 1025 (Ind. 2004). As discussed above, the NCAA actively promoted itself as providing a safe environment for its student-athletes and intended that student-athletes rely on this promise. SAC ¶¶ 85-89. Plaintiffs sufficiently allege the existence of a duty on the part of NCAA to protect student-athletes. This encompasses the duty to use reasonable care in giving information. Plaintiffs allege that NCAA was aware of the risk to student-athletes of sexual abuse from coaches and concealed this information from Plaintiffs. *Id.* ¶¶ 1, 118-144. Accordingly, the motion to dismiss should be denied.

### G. Plaintiffs plausibly allege breach of express and implied contracts.

The NCAA has previously tried—and failed—to dodge breach of contract claims like those here. *See, e.g.*, *Weston v. Big Sky Conf.*, No. 17-4975, 2020 WL 3129548, at *8 (N.D. Ill. June 12, 2020) (denying NCAA's motion to dismiss contract claims based on student's "written agreement with the NCAA that he would comply with the NCAA's Constitution, bylaws, and regulations"); *Richardson v. NCAA,* No. 16-9980 (N.D. Ill. Feb. 14, 2018) (Dkt # 64) (denying NCAA's motion to dismiss student's breach of express and implied contract claims).[16] It should fail here too where the SAC plausibly alleges the existence of an express contract under Indiana law.

Specifically, Plaintiffs allege that, prior to participation as an NCAA athlete, each student was required to affirm in writing that she had read the NCAA regulations and/or bylaws governing substantially all aspects of student-athlete conduct and agreed to be bound by them. SAC ¶¶ 450-51. This attestation was not limited to eligibility requirements, as NCAA incorrectly

---

[16] Unlike here, and unlike *Weston* and *Richardson*, in *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149 (D.D.C. 2017), which the NCAA relies on, the alleged contracts between the student and the NCAA were not the Manual or Form 19-1a, but three different (and entirely unrelated) documents: a HIPPA authorization, a Student–Athlete Concussion Statement, and a consent form for disclosure of health information. *Id.* at 172.

claims (Br. 33), but explicitly covered "NCAA Division I bylaws related to eligibility, recruitment, financial aid, amateur status and involvement in sports wagering activities." SAC, Ex. A at 2. In return, the NCAA agreed, among other things, to conduct intercollegiate athletics in a manner designed to protect and enhance the physical well-being of Plaintiffs and other student-athletes, and to require that each member institution protect the well-being of, and provide a safe environment for, all student-athletes. SAC ¶ 454. The NCAA breached this agreement by failing to ensure that student-athletes were protected from predatory coaches.

As it did in *Weston* and *Richardson*, the NCAA here takes an excessively narrow and formalistic view of contract formation. It contends that "the form contains no mutual assent between the athlete and the NCAA to enter into a contractual relationship," and "does not contain *any* affirmative commitment by the NCAA." Br. 33. But contract formation does not require "magic words." Form 19-1a clearly indicates that the signor agrees to review and be bound by the relevant terms of the NCAA Manual; and it is equally clear that the NCAA will facilitate and permit the signor to participate in NCAA sporting events, as detailed in the Manual. There was clearly a meeting of the minds "on the essential terms and conditions," which suffices to form a legally binding contract. *Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 871 (7th Cir. 1976). *See also Duvall v. Heart of CarDon, LLC*, No. 17-04439, 2020 WL 1274992, at *12 (S.D. Ind. Mar. 17, 2020) ("A valid written contract need not be in a single self-contained document; it may consist of multiple documents so long as the necessary elements for contract formation exist." (citation and quotation marks omitted)).

The NCAA also makes much of the fact that Form 19-1a is returned to and stored by the member institution's director of athletics rather than the NCAA itself (which is outside the Complaint). But the physical location of a contract has no bearing on its validity. To the extent

the NCAA believes the physical location of the contract bears on who assumes the obligations therein, they raise a factual matter inappropriate for disposition on a motion to dismiss.[17]

The NCAA's efforts to deny the existence of an implied contract fare no better. Plaintiffs allege the existence of an implied contract wherein student-athletes, in return for participation and being bound by NCAA policies, expected the NCAA to provide appropriate rules and regulations to protect their safety to the extent possible. Specifically, each Plaintiff expressed her intent to contract by agreeing to participate in her sport, accepting a position on the team, signing an agreement to be bound by the NCAA regulations, and waiving certain rights. SAC ¶¶ 411, 413, 450-53, 455. In exchange, the NCAA conveyed its intent to abide by its own Constitution and Bylaws to protect the safety of student athletes through its speeches and publications, in addition to its written policies. *Id.* ¶ 454. But the NCAA breached those contractual duties owed to Plaintiffs by failing to protect them from sexual predators like Rembao. *Id.* ¶¶ 94, 340, 418.[18]

### H.  Plaintiffs plausibly allege that they are third-party beneficiaries of the member institutions' contracts with the NCAA.

Under Indiana law, a third party can state a claim for breach of contract by showing that the contracting parties intended to benefit him or her. The NCAA does not dispute that the Manual constitutes a valid contract with each University but claims that Plaintiffs were not *intended* third-party beneficiaries. The NCAA has repeatedly made—*and lost*—this absurd

---

[17] NCAA's contention that Plaintiffs do not allege they signed Form 19-1a requires an impermissibly tortured reading of the allegations. Plaintiffs did sign the contracts, which NCAA can seek during discovery. *See* SAC ¶ 452.
[18] It is irrelevant to the analysis that "the Manual divides responsibility [for student well-being] between the NCAA and member institutions." Br. 34. The sole question with respect to contract formation is whether the NCAA's actions reflect an intent to enter into a contract to benefit student-athletes, not who maintains day-to-day responsibility for enforcing those promises. *See Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999).

argument.[19] The intent to benefit student-athletes is clear and unambiguous in the NCAA Manual—indeed, it is difficult to imagine how the NCAA could more clearly express that intent. The NCAA promises to "enact[]" legislation "designed to advance" the "Principle of Student-Athlete Well-Being," which states that "[i]ntercollegiate athletics programs shall be conducted in a manner designed *to protect and enhance the physical and educational welfare of student-athletes*." SAC ¶ 467 (quoting Manual) (emphasis added). Any attempt in the Manual to allocate responsibility for student welfare between the NCAA and its members (Br. 35) has no bearing on the clearly expressed intent to protect and directly benefit student-athletes. *See, e.g.*, *Id.* ¶ 454 (listing promises in Manual to benefit student-athletes). In sum, the NCAA made specific, deliberate contractual commitments to its student-athletes.

## I. Plaintiffs allege that NCAA is liable under *respondeat superior.*
### 1. Plaintiffs plausibly allege Rembao was an agent of the NCAA.

A principal may be liable for an agent's wrongful acts under the doctrine of respondent superior. *Harleysville Lake States Ins. Co. v. Hostetler*, No. 4-306, 2006 WL 360857, at *5 (N.D. Ind. Feb. 13, 2006). As an initial matter, "questions of the existence and scope of an agency relationship are questions of fact." *Commissioning Agents, Inc. v. Long*, 143 F. Supp. 3d 775, 794 (S.D. Ind. 2015) (denying motion to dismiss). For that reason alone, the NCAA's motion to dismiss Plaintiffs' vicarious liability claims should be denied: it is predicated on factual determination that cannot properly be resolved at this stage. *See also Cunningham v. Foresters Fin. Servs., Inc*., 300 F. Supp. 3d 1004, 1151 (N.D. Ind. 2018) (denying motion to

---

[19] *See, e.g.*, *Bloom v. NCAA*, 93 P.3d 621, 623-24 (Colo. App. 2004) (finding third-party beneficiary standing because "the NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit student-athletes"); *Oliver v. NCAA*, 155 Ohio Misc. 2d 8, 13-14 (2008) ("[t]he [student-athlete] plaintiff, who is not a party to the contract between NCAA and [the student's university], stands to benefit from the contract's performance, and thus he acquires rights under the contract"); *Weston*, 2020 WL 3129548, at *9 (same). The NCAA fails to point to a single case holding otherwise. *See Knelman v. Middlebury College*, 898 F. Supp. 2d 697, 715 (D. Vt. 2012) (on summary judgment, the court expressly did "not decide the issue" of whether the student filing suit constituted a third-party beneficiary), *aff'd,* 570 F. App'x 66 (2d Cir. 2014); *Hairston v. Pac-10 Conference,* 101 F.3d 1315, 1320 (9th Cir. 1996) (concerning an entirely different contract with a different organization).

dismiss vicarious liability claim where "it is defendants, not plaintiff, who can reasonably be expected to know" facts about the nature of the agency relationship).

Plaintiffs plausibly allege an agency relationship between Rembao and the NCAA. Under Indiana law, an agency relationship requires (1) the ability of the principal to control the agent's activities, and (2) the agreement of the agent to act for or on behalf of the principal. *Green v. Perry*, 549 N.E.2d 385, 388-89 (Ind. Ct. App. 1990). First, the NCAA exercises substantial control over material terms of Rembao's employment. The NCAA promulgates and enforces extensive policies governing the conduct of college coaches, ranging from daily conduct to broader parameters, including hiring qualifications; salary limitations; outside employment; promotion or endorsement of NCAA competitors; recruitment; and even use of tobacco products. SAC ¶¶ 90-92. Second, Rembao accepted these terms given that the NCAA Bylaws *require* that any "[c]ontractual agreement or appointments between" a member institution and a coach stipulate that "[a]n individual who is found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA infractions process . . . including suspension without pay or termination of employment." *Harrick v. NCAA*, 454 F. Supp. 2d 1255, 1258 (N.D. Ga. 2006). Through acceptance of such onerous terms, Rembao manifested his assent to an agency relationship. *Toney v. Quality Res*., Inc., 75 F. Supp. 3d 727, 742 (N.D. Ill. 2014) (finding mutual manifestation of assent giving rise to agent-principal relationship based on contract).

The cases cited by the NCAA are distinguishable. As noted, both *Smith* and *Yost* were decided on summary judgment after discovery. Both also involved national fraternity organizations which did not have the "right to direct or control a local fraternity member's personal actions and behavioral choices." *Smith*, 9 N.E.3d at 164; *Yost*, 3 N.E.3d at 508. The NCAA, on the other hand, regulates the conduct of coaches, including core, day-to-day activities

like recruitment. Thus, the SAC states a plausible principal-agency relationship.[20]

### 2. Plaintiffs plausibly allege that Rembao acted within the scope of his employment or agency.

Under the doctrine of *respondeat superior*, an employer or principal may be vicariously liable for the actions of its employees or agents committed within the scope of their employment or agency. *Southport Little League v. Vaugha*n, 734 N.E.2d 261, 268 (Ind. Ct. App. 2000). As with the agency relationship, this is a question of fact. *See Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 107 (Ind. Ct. App. 2014), *on reh'g,* 25 N.E.3d 748 (Ind. Ct. App. 2015).

The "scope of employment" is interpreted broadly: even "[c]riminal conduct that violates an employee's official duties, an employer's express orders, or even a most sacred professional duty may nevertheless be within the scope of employment." *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 463-64 (Ind. 2018) (reversing summary judgment for police department where officer sexually assaulted woman in custody). If *any* of the employee's acts were authorized, whether the unauthorized acts were within the scope of employment is for the jury. *Southport*, 734 N.E. at 268. The Indiana Supreme Court has recognized that sexual misconduct may fall within the scope of employment. *Stropes v. Heritage House Child.'s Center, Inc*., 547 N.E.2d 244, 249 (Ind. 1989).

In *Stropes*, a hospital aide employed to "feed, bathe, and change the bedding and clothing of residents" sexually assaulted a mentally handicapped patient. *Id.* at 245-46. The court held that entry of summary judgment on a claim of *respondeat superior* in favor of the hospital was in error, as the "nature of the acts were, at the very least, sufficiently associated with [the

---

[20] The NCAA is also vicariously liable for Rembao's actions under a subagency theory. *See Pinkney v. Thomas*, 583 F. Supp. 2d 970, 981 (N.D. Ind. 2008) (an agent with the power to appoint a subagent can ratify the acts of the subagent to bind the principal). Even treating the member universities as agents of the NCAA, *see, e.g.*, *Kemether v. Pennsylvania Interscholastic Athletic Ass'n*, 15 F. Supp. 2d 740, 763 (E.D. Pa. 1998) (unincorporated athletic association and its member schools had an agency relationship), and Rembao as a subagent of the university, the NCAA may be held liable for Rembao's tortious actions. *See Pinkney*, 583 F. Supp. 2d at 981; *Tippecanoe Loan & Tr. Co. v. Jester*, 180 Ind. 357 (1913).

employee's] authorized duties to escape dismissal on summary judgment." *Id.* at 250. Similarly, in *Southport,* 734 N.E.2d 261, a volunteer little league equipment manager used his position to molest children in a league equipment shed. Noting that some of the defendant's acts, such as fitting the children for uniforms, were authorized when he molested them, the court affirmed denial of little league's motion for summary judgment. *Id.*

Most recently, in *Cox*, a police officer drove a severely intoxicated woman to a hospital while on duty. 107 N.E.3d at 457. After she was discharged back into the officer's custody, he handcuffed the woman and raped her. *Id.* at 458. The Indiana Supreme Court reversed summary judgment for the city on a *respondeat superior* theory, finding that a jury should determine whether the officer's actions fell within the scope of employment. *Id.* at 464.

*Stropes*, *Southport*, and *Cox* reflect that incidents where the conduct began as authorized, but then transformed into conduct that was unauthorized and tortious, can be considered within the scope of employment. *See Southport*, 734 N.E.2d at 268 ("The proper test is whether the employee's actions were at least for a time authorized by his employer.").[21] As in those cases, Rembao's interactions with Plaintiffs frequently started with or arose in the context of authorized duties, such as on the way to track meets, while working out, and in meetings. *See, e.g.*, SAC ¶¶ 178-80, 183, 193-95, 200, 234, 239, 287-91, 296, 299-300. Several of the incidents occurred while Rembao was ostensibly providing "coaching" or physical therapy. *Id.* ¶¶ 226-28, 236-37, 288-91, 300. Additionally, the "broad authority" that coaches possess over athletes comes with an "inherent risk of abuse." *Cox,* 107 N.E.3d at 459, 463. *See, e.g.*, SAC ¶¶ 37 -57, 62-76.

---

[21] While the NCAA attempts to distinguish *Southport* and *Stropes* as cases "involv[ing] close, physical contact that was required by an employee's professional duties," coaching is a profession that requires "close physical contact" with athletes. *See, e.g.*, SAC ¶¶ 226. Moreover, a close physical relationship is *not* required where the abuser has a position of power over the victim. *See Cox*, 107 N.E.3d at 457. Given that *Zander v. Orlich*, 907 F.3d 956, 960 (7th Cir. 2018), *Doe v. Vigo Cnty.*, 905 F.3d 1038, 1043 (7th Cir. 2018), and *City of Indianapolis v. West*, 81 N.E.3d 1069, 1073 (Ind. Ct. App. 2017), predate the Indiana Supreme Court's *Cox* decision, they should be rejected.

The cases cited by the NCAA do not alter this analysis. Each was decided on summary judgment, *after* development of a full record.[22] While the abusers in those cases simply used resources and facilities from their jobs, Rembao's conduct often "came in the midst of performing authorized job duties," such as providing coaching advice, massages, or traveling to track meets. *SoderVick v. Parkview Health Sys., Inc.*, 148 N.E.3d 1124, 1131 (Ind. Ct. App. 2020). *See* SAC ¶¶ 207-09, 267-70, 279-80. Thus, "[b]ecause at least some of the acts surrounding [Rembao's] misconduct were authorized, the issue of *respondeat superior* must be left to the jury." *SoderVick*, 148 N.E.3d at 1131.

## J.  Plaintiffs plausibly allege ratification.

"Ratification is the adoption of that which was done for and in the name of another without authority."  *Maxitrol Co. v. Lupke Rice Ins. Agency*, 924 N.E.2d 179, 183 (Ind. Ct. App. 2010). "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort . . . ." *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 261-63 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). "Ratification is a question of fact." *Maxitrol,* 924 N.E.2d at 183. Plaintiffs allege that the NCAA knew or was "willfully ignorant, or purposefully refrained from seeking information" about Rembao's conduct. *Id.* at 184. Specifically, Plaintiffs allege numerous leaders of the NCAA and its Board are also high-level athletic department administrators at member institutions. SAC ¶ 31. Plaintiffs further allege widespread knowledge of Rembao's misconduct throughout NCAA member institutions, including those with which he had no connection, *id*. ¶¶ 185, 257, and a sweeping investigation at one member institution and a third party complaint at

---

[22] *See Doe v. Lafayette School Corp.*, 846 N.E.2d 691, 702 (Ind. Ct. App.), abrogated on other grounds by *State Farm Mut. Auto. Ins. v. Jakupko*, 856 N.E.2d 778 (Ind. Ct. App. 2006); *Hansen v. Bd. of Trustees For Hamilton Se. Sch. Corp.*, No. 05-670, 2007 WL 3091580, at *7 (S.D. Ind. Oct. 19, 2007), aff'd sub nom, *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599 (7th Cir. 2008); *Konkle v. Henson*, 672 N.E.2d 450, 457 (Ind. Ct. App. 1996).

another, *id.* ¶¶ 188-90, 365-71. These allegations show the NCAA—through its administrative leaders who simultaneously worked in the athletic departments at member schools—knew or should have known about Rembao's conduct. These allegations, taken together in the light most favorable to Plaintiffs, suffice to raise a *plausible* inference that the NCAA knew or should have known about Rembao's conduct. Plaintiffs also plausibly allege that the NCAA knew about Rembao's conduct under the rule of imputed knowledge, which "imputes [an] agent's knowledge to the principal, even if the principal does not actually know what the agent knows." *Southport*, 734 N.E.2d at 274. There is (and can be) no dispute that the University of Texas knew of the accusations against Rembao. Because UT-Austin is an agent of the NCAA, *see Kemether v. Pennsylvania Interscholastic Athletic Ass'n*, 15 F. Supp. 2d 740, 763 (E.D. Pa. 1998) (unincorporated athletic association and its member schools had an agency relationship), Plaintiffs have adequately alleged that the NCAA had knowledge of Rembao's conduct.

Plaintiffs also allege that the NCAA benefited from its failure to investigate, discipline, or ultimately discharge, Rembao. *Maxitrol,* 924 N.E.2d at 183 ("An employer who has knowledge of an employee's course of conduct but does not reprimand or discipline the employee may be found to have ratified that conduct."). Continued employment of a tortious employee may constitute a "benefit" for purposes of ratification. *Id. See, e.g.*, *C.R. v. Tenet Healthcare Corp.,* 169 Cal. App. 4th 1094, 1112 (2009) ("sufficient allegations defendant ratified Mr. Gaspar's alleged sexual misconduct" where "managing agents and supervisors knew Mr. Gaspar was sexually abusing patients" but still allowed him to be alone with female patients and "hid" the information "so he could [continue to] work for it").

## V.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss. Should the Court grant the motion in any respect, Plaintiffs request leave to amend the complaint.

Dated: December 11, 2020                    Respectfully submitted,


                                            */s/ Elizabeth A. Fegan_____*
                                            ELIZABETH A. FEGAN (admitted *pro hac vice*)
                                            beth@feganscott.com
                                            FEGAN SCOTT, LLC
                                            150 S. Wacker Dr., 24th Floor
                                            Chicago, IL 60606
                                            Telephone: (312) 741-1019
                                            Facsimile: (312) 264-0100

                                            LYNN A. ELLENBERGER (admitted *pro hac vice*)
                                            lynn@feganscott.com
                                            FEGAN SCOTT, LLC
                                            500 Grant St., Suite 2900
                                            Pittsburgh, PA 15219
                                            Telephone: (412) 346-4104
                                            Facsimile: (412) 785-2400

                                            JONATHAN D. SELBIN (admitted *pro hac vice*)
                                            jdselbin@lchb.com
                                            ANNIKA K. MARTIN (admitted *pro hac vice*)
                                            akmartin@lchb.com
                                            RHEA GHOSH (admitted *pro hac vice*)
                                            rghosh@lchb.com
                                            LIEFF CABRASER HEIMANN & BERNSTEIN
                                            250 Hudson Street, 8th Floor
                                            New York, NY 10013
                                            Telephone: (212) 355-9500
                                            Facsimile: (212) 355-9592

                                            Lynn A. Toops, No. 26386-49
                                            ltoops@cohenandmalad.com
                                            COHEN & MALAD, LLP
                                            One Indiana Square, Suite 1400
                                            Indianapolis, IN 46204
                                            Telephone: (317) 636-6481
                                            Facsimile: (317) 636-2593

                                            *Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that on December 11, 2020, a copy of the foregoing filed by CM/ECF and served

on all counsel of record through the CM/ECF system.

*/s/ Elizabeth A. Fegan*____