UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ERIN ALDRICH, | ) | |
| LONDA BEVINS, | ) | |
| JESSICA JOHNSON, | ) | |
| BEATA CORCORAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02310-JRS-MG |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, | ) | |
| BOARD OF GOVERNORS OF THE | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION TO DISMISS AND MOTION FOR
ORAL ARGUMENT**

Unfortunately, this case is not unusual.  This case is about college sports and alleged sexual abuse.  Former NCAA athletes Erin Aldrich, Jessica Johnson, and Londa Bevins ("Aldrich Plaintiffs") report that during their college years, they were targeted, groomed, and abused by their track coach, John Rembao.  These women saw in Mr. Rembao, a well-respected and famous track coach who assisted the United States Olympic Team, a chance to chase their dreams.  He was influential.  He was powerful.  And from 1996 to 2000, the Aldrich Plaintiffs claim that he abused that trust and performed sexual acts on them.

1

Over twenty years later, the Aldrich Plaintiffs and current Princeton rower Beata Corcoran (together with the Aldrich Plaintiffs, the "Plaintiffs") filed this action against Mr. Rembao, the NCAA, and the NCAA's Board of Governors. The claims against Mr. Rembao are not before the Court: the case at bar concerns only the NCAA and the Board of Governors ("Defendants").[1] Plaintiffs allege that Defendants failed to create regulatory safeguards to protect student-athletes from predatory coaches. Plaintiffs' Second Amended Complaint ("SAC"), (ECF No. 116), is over 520 paragraphs long and it brings fourteen claims against Defendants, ranging from negligence and breach of contract to vicarious liability. Defendants have moved to dismiss, (ECF No. 123), and have requested an oral argument to explain their motion, (ECF No. 125).

In assessing a motion to dismiss, the Court accepts all well-pled allegations as true and reads all inferences in a light most favorable to Plaintiffs. *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014); *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). For the following reasons, Defendants' Motion to Dismiss, (ECF No. 123), is **granted**. Furthermore, Defendants' Motion for Oral Argument is **denied** as moot. (ECF No. 125.)

---

[1] The Northern District of California is overseeing the proceedings against Mr. Rembao. *Aldrich v. Rembao*, 5:20-CV-01733-EJD (N.D. Cal. 2020).

# I. BACKGROUND

The named Plaintiffs can be split into two groups.  First there are the Aldrich Plaintiffs: Ms. Aldrich; Ms. Johnson; and Ms. Bevins.  The Aldrich Plaintiffs allege that Mr. Rembao sexually abused them when they were student-athletes at the University of Arizona and the University of Texas.  Second, there is Ms. Corcoran, a current student-athlete at Princeton University.  Ms. Corcoran alleges that she faces an increased risk of sexual abuse in the future, given Defendants' alleged inaction. The Northern District of California ("Northern District") previously outlined the allegations of abuse and the Court repeats those facts as necessary throughout this opinion. *Aldrich v. NCAA*, 484 F. Supp. 3d 779, 784–88 (N.D. Cal. 2020).

The NCAA is an unincorporated association based in Indianapolis, Indiana.  (SAC ¶ 28.)  They act as the governing body for college sports.  (*Id.*)  The Association is made up of over a thousand different colleges and universities, who are referred to as "member institutions." (*Id.* at ¶ 82.)  NCAA's member institutions are organized into three levels: Division I, Division II, and Division III.  (*Id.*)

The NCAA's highest governing body is the NCAA Board of Governors.  (*Id.* at ¶ 30.)  The Board oversees association-wide issues and is responsible for ensuring that each division of the NCAA "operates consistently with the basic purposes, fundamental policies and general principles of the Association." (*Id.*)  The Board can set policies for the NCAA, as can the individual divisions.  (*Id.* at ¶ 32.)

3

## II. PROCEDURAL HISTORY

The Aldrich Plaintiffs originally filed this case in the Northern District of California, against Mr. Rembao and Defendants. (Compl., ECF No. 1.) That court dismissed the claims against Defendants for lack of personal jurisdiction and transferred those claims here under 28 U.S.C. § 1406. *Aldrich*, 484 F. Supp. 3d at 796. After the transfer, Plaintiffs filed the SAC, (SAC, ECF No. 116), and Defendants moved to dismiss and/or strike the SAC under Federal Rules 12(b)(1) and 12(b)(6). (Defs.' Mot., ECF 123.) Defendants also requested oral argument for their Motion. (Mot. for Oral Argument, ECF No. 125.) Plaintiffs filed a response to the Motion, (Pls.' Br., ECF No. 128), and Defendants filed a Reply. (Defs.' Reply, ECF No. 129.)

On September 8, 2021, the Court ordered the parties to file a joint jurisdictional statement (or competing jurisdictional statements if they could not agree) explaining why the Court has jurisdiction under the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d)(2). The parties filed a joint jurisdictional statement on September 14, 2021, explaining how this Court has subject matter jurisdiction.[2] (Joint Jurisdictional Statement, ECF No. 150.)

---

[2] The Court is grateful to the parties for jointly addressing this issue on an abbreviated timetable.

### III. STANDARD OF REVIEW

Defendants object to the SAC under Rule 12(b)(1) and 12(b)(6). Objections to standing under Rule 12(b)(1) can be phrased as either facial challenges or factual challenges. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "[A] facial challenge argues that the plaintiff has not sufficiently *alleged* a basis of subject matter jurisdiction." *Id.* (quoting *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009)) (emphasis in original). In reviewing a facial challenge, the court must accept all well-pled factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Id.* Here, Defendants raise a facial challenge to the SAC. (Defs.' Br. 14, ECF No. 124.)

To survive a motion to dismiss under Rule 12(b)(6), a "complaint must allege sufficient factual matter to state a claim to relief that is plausible on its face." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (quoting *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013) (per curiam)). The Court accepts all well-pled facts in the SAC as true and ignores the legal conclusions and threadbare recitals of the elements. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court also reads all facts and reasonable inferences in the light most favorable to the nonmoving party. *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018).

As laid out by the parties to the satisfaction of the Court, (Joint Jurisdictional Statement, ECF No. 150), the Court has jurisdiction under the CAFA. 28 U.S.C. §

1332(d)(2).  Plaintiffs have sufficiently pleaded that the class has more than 100 members and that a member of the class is a diverse citizen of Defendants.  Plaintiffs have also provided a good faith estimate of the amount in controversy and have plausibly explained how that amount exceeds $5,000,000.  *See Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 617 (7th Cir. 2012) (citing *Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 763–64 (7th Cir. 2011)) (illustrating CAFA's requirements and noting that a good-faith estimate with explanation satisfies the amount in controversy requirement).  (SAC ¶ 17, ECF No. 116; Joint Jurisdictional Statement, ECF No. 150.)

## III. DISCUSSION

Defendants raise several arguments against the SAC.  Three of the objections—standing, timeliness, and proper defendant entity—are global and apply to the entire SAC.  The remaining objections are all failure to state a claim arguments under Rule 12(b)(6), each one targeting a different claim brought by Plaintiffs.  The Court begins with the global arguments, and then proceeds to the 12(b)(6) arguments.

### A. Standing

Defendants argue that all four Plaintiffs lack standing to pursue injunctive relief, and that Ms. Corcoran lacks standing, period.  *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)) ("A plaintiff bears the burden of showing that she has

standing for each form of relief sought.")  Plaintiffs have only defended Ms. Corcoran's standing for injunctive relief; they have made no arguments regarding the other named Plaintiffs or regarding Ms. Corcoran's standing for damages; namely, Counts 1–7.  (Pls.' Br. 13–19; Defs.' Reply 5.)   Failure to respond results in waiver, thereby conceding that she lacks standing to seek damages.  *See Alito v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (waiver applies where a litigant does not respond to alleged deficiencies in a motion to dismiss).[3]   Thus, the Court dismisses Ms. Corcoran's claims as they relate to Counts 1–7 and turns to the only real standing dispute: whether Ms. Corcoran has standing for injunctive relief.

Article III standing requires prospective plaintiffs to satisfy a three-part test laid down by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Namely, plaintiffs are required to have "suffered an injury in fact" that is concrete, particularized, and actual or imminent, and not merely "conjectural" or "hypothetical".  *Id.*  There must also be a causal link between the injury and the conduct alleged, and it must be "likely, as opposed to merely speculative" that the injury will be remedied by a judicial decision.  *Id.*  To show an injury in fact based on

---

[3] Even if standing for damages had not been waived, the Court would not find standing here.  While standing for injunctive relief and standing for damages are distinct arguments, *see e.g.*, *Simic v. City of Chicago*, 851 F.3d 734, 737–40 (7th Cir. 2017) (addressing both analyses), standing for damages based on an increased risk of harm must still demonstrate a "sufficient likelihood" of future harm. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021) (no damages standing where plaintiffs "did not demonstrate a sufficient likelihood" that they would be harmed in the future.)  Thus, even if Ms. Corcoran had preserved a standing argument for damages, it would fail for the same reason her injunctive standing arguments do.

7

an increased risk of future harm, there must be "certainly impending future harm." *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 567 U.S. 398, 422 (2013)). Put another way, there must be "a substantial risk that the harm will occur" and the risk cannot be too speculative. *Prosser v. Becerra*, 2 F.4th 708, 714, 715 (7th Cir. 2021) (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2251, 2565 (2019)).

Ms. Corcoran does not allege she has been sexually assaulted or otherwise injured by her Princeton rowing coaches. (SAC ¶ 24). In lieu of a physical injury, she alleges she has been injured by the increased risk of sexual assault she faces as a student athlete. (*Id.* at ¶ 26.) Here, the risk of sexual abuse does not meet that high bar for standing. Ms. Corcoran's injury is too hypothetical and speculative. Defendants cite *Plotkin v. Ryan* and the Court finds that case illuminative. 239 F.3d 882 (7th Cir. 2001). In *Plotkin*, Illinois Secretary of State's Office was accused of accepting bribes in exchange for commercial drivers' licenses. *Id.* at 883. The plaintiff brought a § 1983 claim against the former Secretary of State and argued that he suffered injury "in the form of an increased risk of accidents because of unqualified drivers [with] illegally obtained commercial drivers' licenses." *Id.* at 886. The Seventh Circuit was not persuaded. The panel held that the risk was "too speculative and generalized" to show an injury-in-fact. *Id.*

Here, Ms. Corcoran's case is similar to *Plotkin*; Ms. Corcoran cites a speculative risk based on the lack of NCAA regulations, much in the same way that *Plotkin* cited

8

a speculative risk of increased accidents due to the lack of driving regulation. Plaintiffs argue that the NCAA has admitted that there is a risk of sexual abuse by coaches, (SAC ¶¶ 53–57), but that still does not get to the problem here: the risk is too speculative and does not approach the "certainly impending" or "substantial risk" standard.

In their brief, Plaintiffs cite several cases that speak to the high level of risk needed to properly allege standing under an increased risk of injury theory. (Pls.' Br. 14-15, ECF No. 128 (citing *Powell v. Illinois*, No. 18-6675, 2019 WL 4750265, at *8 (N.D. Ill. Sept. 30, 2019); *Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788, 812-13 (M.D. Tenn. 2016)).) However, these examples best serve to illustrate exactly how high the bar is for Plaintiffs. Ms. Corcoran's allegations simply cannot clear this high of a bar. She has not alleged she faces the sorts of "acute" risks the plaintiffs in *University of Tennessee* faced as members of a specific local institution that had a lengthy history of covering up sexual abuse, nor the localized and specific risks the plaintiffs in *Powell* faced as residents of a specific neighborhood with ongoing gun violence mere blocks away. Rather, Ms. Corcoran's alleged increased risks are far too generalized, broad and remote to qualify as an injury in fact. These increased risks would stretch the "imminent injury" requirement beyond its purpose. After all, the purpose of the imminence of injury standard is to "ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*, 504 U.S. at 565 n.2.

Ms. Corcoran alternatively argues that she has standing based on her breach of contract claims. Plaintiffs say that the Court should do as the Northern District of Illinois did in *Dinerstein v. Google* and find standing when a complaint sufficiently alleges a breach of contract. 484 F. Supp. 3d 561, 571 (N.D. Ill. 2020) (Pls.' Br. 19.) This is a novel argument that is still percolating in Seventh Circuit courts.

Defendants argue that this theory cannot hold because Plaintiffs have not argued the causation and redressability prongs of Article III standing. The Court tends to agree. While it is possible that Ms. Corcoran could have standing based on breach of contract, she has not convinced the Court that her breach of contract can satisfy those prongs. Indeed, the cases she cites only dispute the concrete injury aspect of standing; the parties in those cases did not contest the other elements of standing like Defendants do here. *See Dinerstein,* 484 F. Supp. 3d 561, No. 1:19-cv-04311 (N.D. Ill. 2020) (Def. Google LLC's Memo. at 5–6, ECF No. 46); *Dinerstein,* 484 F. Supp. 3d 561, No. 1:19-cv-04311 (N.D. Il. 2020) (Def. Univ. of Chi. Memo. at 4–8, ECF No. 44); *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018). (*See* Defs.' Br. 16 (addressing traceability and redressability)). Ms. Corcoran has not carried her burden of showing standing.

For these reasons, the Court holds that Ms. Corcoran does not have standing to seek injunctive relief in this case. Since no other Plaintiff has such standing, the Court thus dismisses Count 14 from the SAC and strikes the request for injunctive

relief from the SAC.  (SAC § VIII.C.)  The Court also dismisses all of Ms. Corcoran's claims for want of standing.

## B. Timeliness

The Court must now wrestle with the statute of limitations.  Normally, statute of limitations arguments are not appropriate for motions to dismiss.  *See Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.,* 782 F.3d 922, 928 (7th Cir. 2015).  A statute of limitations defense is appropriate "only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Id.* (quoting *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014)).  As long as there is a plausible theory that would defeat a statute-of-limitations defense, "questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.* (citing *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 80 (7th Cir. 1992)).  At this stage, Plaintiffs receive the benefit of imagination, so long as the hypotheses are consistent with the SAC.  *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007)).

The applicable statute of limitations rules come from state substantive law.  *See Hollander v. Brown*, 457 F.3d 688, 691–92, 694 (7th Cir. 2006) (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751–53 (1980)).  Thus, the Court looks to Indiana law for

11

the statute of limitations, its exceptions, and its rules on equitable relief.  *See id.* at 694.

The statute of limitations in Indiana are as follows: for contracts in writing, ten years, Ind. Code Ann. § 34-11-2-11; and for contracts not in writing, six years, Ind. Code Ann. § 34-11-2-7.  Indiana courts view statutes of limitations favorably, finding that such rules "rest upon sound policy and tend to the peace and welfare of society.'" *Shideler v. Dwyer*, 417 N.E.2d 281, 283 (Ind. 1981) (citing *Horvath v. Davidson*, 264 N.E.2d 328 (Ind. Ct. App. 1970)).

If the statute of limitations has run, a plaintiff may still have an actionable claim if an equitable doctrine intervenes.  Fraudulent concealment and equitable estoppel are two such doctrines that can stop a statute of limitations defense.  *See, e.g.*, *Hughes v. Glaese*, 6659 N.E.2d 516, 519 (Ind. 1995) (explaining fraudulent concealment); § 39.9. Equitable estoppel, 22A Ind. Prac., Civil Trial Practice § 39.9 (2d ed.) (noting the differences).

In response to Defendants argument that the statute of limitations has run for the Aldrich Plaintiffs, (Defs.' Br. 6–13, ECF No. 124), the Aldrich Plaintiffs raise two counterarguments.  On the one hand, Ms. Aldrich counters that under the discovery rule and the law of the case doctrine, her cause of action accrued in 2019 and is therefore timely.  (Pls.' Br. 5–9, ECF No. 128.)  Ms. Bevins and Ms. Johnson, on the

other hand, argue that fraudulent concealment or equitable estoppel toll their statute of limitations.  The Court addresses these arguments one at a time below.

### 1. Ms. Aldrich's Timeliness

Ms. Aldrich's first argument involves the discovery rule, but the parties disagree about what that rule requires.  Defendants believe that, under *Doe v. Shults-Lewis Child & Family Services, Inc.*, 718 N.E.2d 738, 747 n.3 (Ind. 1999), if Ms. Aldrich remembered the sexual violence inflicted by Mr. Rembao, then the statute of limitations ran at the time of the abuse.  (Defs.' Br. 7-8; Defs.' Reply 2-3.)  *Shults-Lewis* was a case involving childhood sexual abuse.  There, the Indiana Supreme Court dismissed the claim of an adult woman who remembered her childhood sexual abuse, holding that "[w]here the plaintiff actually retains memories of the event, there is nothing to cause a delay in the commencement of a cause of action. There was nothing to prevent the plaintiff from bringing her claim when her legal disability ended at age eighteen."  *Id.*  The Seventh Circuit applied this rule in another childhood sexual abuse case, *Doe v. Howe Military School*, where two plaintiffs remembered being sexually abused by schoolteachers as children.  27 F.3d 981 (7th Cir. 2000).  The Seventh Circuit held that their claims accrued upon the abuse occurring, as "nothing prevented them from asserting their claims during the [time] after they reached majority."  227 F.3d 981, 989 (7th Cir. 2000).

13

Ms. Aldrich does not attempt to distinguish *Shults-Lewis*.  Instead, she offers a competing rule: that Indiana's statute of limitations does not run until "the time that damage is or could be ascertained."  (Pls.' Br. 7.)  Plaintiffs point to *Hildebrand v. Hildebrand* to support this argument.  736 F. Supp. 1512 (S.D. Ind. 1990).

The Court finds that the ascertainable damage rule best applies here, and that *Shults-Lewis* is distinguishable, although the result here would be the same under either rule.  First, the ascertainable damage rule has been cited much more frequently in Indiana courts.  *See, e.g.*, *Robertson v. State*, 141 N.E.3d 1224, 1227 (Ind. 2020) (quoting *Cooper Indus., LLC v. City of S. Bend*, 889 N.E.2d 1274, 1280 (Ind. 2009) ("[i]t is not necessary under this rule that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred"); *Riddle v. Khan*, 168 N.E.3d 1017 (Ind. Ct. App. 2021) (1983 claim); *see also Ruckelshaus v. Cowan*, 963 F.3d 641 (7th Cir. 2020) (legal malpractice cases).  Even Defendants cite the "ascertainable" language.  (Defs.' Reply 3 (citing *LaCava v. LaCava*, 907 N.E.2d 154, 162 (Ind. Ct. App. 2009)).)

Second, the Court is unable to find any Indiana cases which apply *Shults-Lewis*'s memory retention rule outside the context of childhood sexual abuse.  Whereas the ascertainable damage rule appears to apply across tort law, *Shults-Lewis* appears to be limited to this subset of cases.

14

Third, reading *Shults-Lewis* as narrow makes sense in light of the ascertainable damage rule.  In *Shults-Lewis*—and in *Howe Military*—the plaintiffs were sexually abused as children.  Child sex abuse is *per se* ascertainable; all adults know that when adults perform sexual acts on children, it is injurious.  In those cases, the plaintiffs remembered the sexual acts.  Thus, when they turned eighteen, because of this universal understanding, damage was ascertainable to them.  Because of this *per se* understanding, the ascertainable damage rule explains *Shults-Lewis*'s holding.

The Court's opinion is also corroborated by the black letter rule in Indiana: that a cause of action accrues "when the plaintiff knows, or in the exercise of ordinary diligence could have discovered, that it has been injured from tortious conduct." *City of Marion v. London Witte Grp., LLC*, 169 N.E. 3d 382, 390 (Ind. 2021) (citing *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992)).  Looking to see if damage is ascertainable falls perfectly in line with seeing if a plaintiff knows, or *could have discovered through ordinary diligence*, whether the plaintiff suffered an injury from a tortious cause.

In sum, the Court declines to apply the child sexual abuse rule from *Shults-Lewis* to adult sexual abuse cases.  Instead, the Court applies the ascertainable damage rule.  Thus, the Court turns to see if there is a plausible claim to relief—i.e., is there

15

a plausible claim that there was no ascertainable damage to Ms. Aldrich until, at minimum, 2010.[4]

Here, reading the facts in the light most favorable to Plaintiff, Ms. Aldrich does not state a plausible claim that she could not have ascertained damage until 2010. Mr. Rembao began recruiting Ms. Aldrich when she was a sophomore or junior in high school. (SAC ¶ 167.) He would send Ms. Aldrich gifts and make nightly phone calls to her once she committed to Mr. Rembao's school, the University of Arizona. (SAC ¶¶ 170–71.) When Ms. Aldrich was invited to compete for Team USA in Australia in 1996, Ms. Aldrich's family paid to send Ms. Aldrich and Mr. Rembao to Australia for the competition. (SAC ¶ 177.) While on the airplane to Australia in August 1996, Mr. Rembao covered Ms. Aldrich with a blanket, fondled her, and penetrated her vaginally with his fingers. (SAC ¶¶ 178–80.) Ms. Aldrich, in her words, "submitted" to the touching. (SAC ¶ 179.) From there, the sexual attacks continued. Between 1996 and 1997, Mr. Rembao would perform oral sex on Ms. Aldrich in his office, at his home, in his car, on road trips, and at competitions. (SAC ¶ 183.) Ms. Aldrich's roommate caught Mr. Rembao in Ms. Aldrich's dorm in the spring of 1997 and reported it to the University. (SAC ¶¶ 189–91.) This incident led to Mr. Rembao's departure from the University of Arizona. (SAC ¶ 191.) While Ms. Aldrich says that she did not recognize that she had been abused until 2019, (SAC ¶

---

[4] The longest statute of limitations in this case is ten years. Ind. Code Ann. § 34-11-2-11 (contracts in writing; ten years)

205), given these facts, damage should have been ascertainable to Ms. Aldrich even before 2000.  The incident on the airplane is the most alarming: while Ms. Aldrich may have trusted Mr. Rembao, the nature of that incident, the relationship between them, her isolation on an airplane outside the United States, away from her parents or any other support figures, should have made damage ascertainable with at least some ordinary diligence.  Certainly, the wrong reported by the roommate and subsequent departure of Mr. Rembao would indicate to a reasonable person that he had engaged in misconduct with Ms. Aldrich.  In light of these incidents, Ms. Aldrich does not have a plausible claim that she could not, at the least, have ascertained *some* damage or injury by 2010.

The Court is sympathetic to Ms. Aldrich's plight, finding the abuse she suffered to be deplorable.  But the law in Indiana is to determine when a plaintiff could ascertain some damage.  Given the facts here, a reasonable person would have understood that they were injured by another.  *See Doe v. United Methodist Church*, 673 N.E.2d 839, 842-44 (Ind. Ct. App. 1996) (statute of limitations ran where the plaintiff did not recognize the sexual acts as abuse, but did recognize that they were wrong morally, socially, and maybe even legally).  Thus, Ms. Aldrich's discovery rule arguments do not present a plausible claim which obviates the statute of limitations.

But, Ms. Aldrich argues that Arizona law is the law of the case.  Arizona has a statute of limitations exception, known as the "unsound mind" exception, which declares that a cause of action does not accrue until one "understand[s] his legal

rights or liabilities." *Doe v. Roe*, 955 P.2d 951, 964 (Ariz. 1998) (en banc); *see* A.R.S. § 12-502. Ms. Aldrich maintains that Arizona law applies because the Northern District of California applied it to the Defendants' earlier motion to dismiss. *See Aldrich*, 484 F. Supp. 3d at 797–99. Ms. Aldrich argues that this prior Order sets Arizona law as the law of the case, and thus, this Court should apply the unsound mind rule, or at least be persuaded by it. Defendants argue that Arizona law cannot be the law of the case because the Northern District did not decide this issue. (Defs.' Reply 2, ECF No. 129.)

Law of the case doctrine "is a rule of practice, based on sound policy [which holds] that, when an issue is once litigated and decided, that should be the end of the matter." *Creek v. Vill. Of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998) (quoting *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir. 1982)). "An actual decision of an issue is required to establish the law of the case." *Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020).

Law of the case doctrine does not apply here. The Northern District of California did not decide whether Ms. Aldrich's *claims against the NCAA and its Board* were timely. The transferor court only looked to Ms. Aldrich's claims against Mr. Rembao. *Aldrich*, 484 F. Supp. 3d at 797–99. The question of timeliness regarding the NCAA claims has not been litigated and decided. *Gilbert v. Ill. State Bd. Of Educ.*, 591 F.3d 896, 903 (7th Cir. 2010) (citing *FMS, Inc. v. Volvo Const. Equipment N.A., Inc.*, 557 F.3d 758, 762-63 (7th Cir. 2009)) ("the law-of-the-case doctrine does not come into

18

play when the transferor judge never decided the precise issue that is before the successor judge") *Creek*, 144 F.3d at 445.  Moreover, the Northern District could not have decided that issue,  as that court lacked personal jurisdiction over the NCAA. *Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103, 1104 (N.D. Ill. 2015) (citing *be2 LLC v. Ivanov*, 642 F.3d 555, 557 (7th Cir. 2011)) (noting that if a court lacks *in personam* jurisdiction, they cannot reach Rule 12(b)(6) issues).  Just because one claim against one defendant involved looking to Arizona law does not mean that Arizona law applies to all claims and defendants in the case.  *See Chicago Joe's Tea Room, LLC v. Vill. Of Broadview*, 894 F.3d 807, 818 (7th Cir. 2018) (law of the case only applies where the "*precise issue*" was decided before hand); *Gilbert*, 591 F.3d at 903 (same); *Stewart v. Beach*, 701 F.3d 1322, 1328 n.6 (10th Cir. 2012) (holding that law of the case cannot apply to a defendant who was not before the court in the prior case). Since the issue has not been decided in this case, law of the case doctrine does not apply here.

Since there is no plausible claim that would defeat the statute of limitations defense, the Court finds Ms. Aldrich's action untimely and dismisses her claims.

Even if *Shults-Lewis* applied, the result here would be the same.  Under *Shults-Lewis*, "[w]here the plaintiff actually retains memories of the event, there is nothing to cause a delay in the commencement of a cause of action."  718 N.E.2d at 747 n.3. The SAC avers that Ms. Aldrich repressed "the majority" of her memories regarding Mr. Rembao's sexual acts *after* she left the University of Arizona in January 1998.

(SAC ¶¶ 198, 345.)  The SAC does not say that Ms. Aldrich repressed her memory before then.  Defendants point out that, based on this wording, from August 1996 to January 1998, Ms. Aldrich retained her memories of Mr. Rembao's actions.  (Defs.' Br. 7.)  Ms. Aldrich only offers one sentence in response to this argument, saying that it is a non sequitur.  (Pls.' Br. 8–9.)  She cites no authority and no portions of the SAC to dispute Defendants reading.

The plain import of that paragraph in the SAC is that for a seventeen-month time period, Ms. Aldrich knew the sexual acts occurred and retained *all* memories of the violence.  Since Ms. Aldrich retained memories of the violence, the *Shults-Lewis* rule would squarely bar her claims, as nothing prevented Ms. Aldrich from filing a claim when she had such memories.[5]

Ms. Aldrich argues that, under *Fager v. Hundt* and *LaCava v. LaCava*, a case should survive a motion to dismiss where the plaintiff has a partially repressed memory.  *Fager*, 610 N.E.2d 246, 252 (Ind. 1993); *LaCava*, 907 N.E.2d 154, 165 (Ind. Ct. App. 2009).  Even if this was the rule, Ms. Aldrich's allegations do not plead a plausible timely claim.  All of Mr. Rembao's sexual actions occurred between August 1996 and January 1998.  (SAC ¶¶ 177–98.)  Ms. Aldrich alleges no sexual acts after January 1998.  (SAC ¶¶ 198–207.)  As stated above, Ms. Aldrich has not cited any

---

[5] The Court recognizes that this language from the Indiana Supreme Court oversimplifies the difficulty in making allegations of sexual abuse.  The Court repeats this language because it is operative and does not mean to imply that Ms. Aldrich could easily, without pressure, stress, or fear, file a claim closely Mr. Rembao harmed her.

part of the SAC which alleges that she repressed her memories *during* that 1996–98 window.  Ms. Aldrich only alleges that she repressed those memories after the fact. Thus, since she retained memories of those tortious acts at the time, her claims accrued then under *Shults-Lewis*.  Still, the Court has not relied on this standard here.

### 2. Ms. Johnson and Ms. Bevin's Timeliness

Ms. Johnson and Ms. Bevins do not repeat Ms. Aldrich's arguments.  Instead, they argue that their claims are timely under the doctrines of equitable estoppel, equitable tolling, and fraudulent concealment.  They say these doctrines apply for two reasons. First, they apply because the NCAA knew about "the prevalence of coaches" who used their power over students to commit sexual violence but did not notify student-athletes of this pattern.  Second, Plaintiffs say these doctrines apply because UT-Austin performed a "sham" investigation into Mr. Rembao and led Plaintiffs to believe that their claims were meritless.  The Court finds that neither reason warrants equitable relief here.

#### i. Fraudulent Concealment

Fraudulent concealment estops a statute of limitations defense "whenever the defendant, by his own actions, prevents the plaintiff from obtaining the knowledge necessary to pursue a claim." *Shults-Lewis*, 718 N.E.2d at 744.  Here, Plaintiffs argue that the NCAA passively concealed the prevalence of abusive coaches.  (Pls.' Br. 10,

21

ECF No. 128 (The NCAA "was on notice," but "chose to ignore the issue").  "Passive
fraudulent concealment requires (1) a relationship between the parties such that the
defendant has a duty to disclose the alleged wrongful act to the plaintiff and (2) a
breach of that duty."  *Lyons v. Richmond Cmty. Sch. Corp.*, 19 N.E.3d 254, 260–61
(Ind. 2014) (citing *Guy v. Schuldt*, 138 N.E.2d 891, 895 (1956)).  Such a relationship
could be a confidential or fiduciary relationship.  *Gittings v. Deal*, 109 N.E.3d 963,
973 (Ind. 2018).

Starting with the first theory: that Defendants committed fraudulent concealment
by not disclosing that there was a high number of coaches committing sexual abuse.
Passive concealment hinges on what kind of relationship is present between the
NCAA and Plaintiffs and whether such a relationship creates a duty to disclose.
*Lyons*, 19 N.E.3d at 260.

"A confidential or fiduciary relationship exists when confidence is reposed by one
party in another with resulting superiority and influence exercised by the
other."  *Butler v. Symmergy Clinic, PC*, 158 N.E.3d 407, 414 (Ind. Ct. App. 2020)
(quoting *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 281 (Ind. Ct. App. 2005)).  At
bottom, these relationships require an unusually high degree of care, like "attorney
and client, guardian and ward, principal and agent, pastor and parishioner, husband
and wife, and . . . parent and child.  *Leever v. Leever*, 919 N.E.2d 118, 123 (Ind. Ct.
App. 2009); *Fiduciary Relationship*, *Black's Law Dictionary* (11th ed. 2019).  Whether
a fiduciary relationship exists is a question of fact in Indiana.  *Kapoor v. Dybwad*, 49

22

N.E.3d 108, 129 (Ind. Ct. App. 2015) (quoting *Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind. Ct. App. 1998)).

Here, Ms. Johnson and Ms. Bevins allege that there was a fiduciary relationship "founded upon trust and confidence between the NCAA and its student-athletes." (SAC ¶ 434.)  Ms. Johnson and Ms. Bevins argue that this relationship was formed when the NCAA "actively promoted itself as providing a safe and nurturing environment for its student-athletes." (*Id.*)  They believed that the NCAA would both require member institutions to keep their coaches from committing sexual abuse and that the NCAA would inform the public of any allegations or concerns relating to sexual abuse by coaches.  (SAC ¶¶ 88–89, 435–36.)

The NCAA, obviously, disagrees.  It argues that there are insufficient facts to show a relationship of confidence.  And the Court agrees.  The Court is not convinced there are sufficient facts to plead a fiduciary relationship between the two.  There is certainly trust between Plaintiffs and the NCAA, but "trust is not enough." *Zimmer Inc. v. Beamalloy Reconstructive Med. Prods., LLC*, No. 1:16-cv-355-TLS, 2017 WL 3315135, at *6 (N.D. Ind. Aug. 2, 2017).   Here, Ms. Johnson and Ms. Bevins do not plead a close, confidential relationship with the NCAA.  *See Olcott Int'l. & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1073 (Ind. Ct. App. 2003) (no fiduciary duty where parties lacked a "close-knit" intertwined business relationship).  Ms. Johnson and Ms. Bevins have cited no cases in which a similar relationship imposed a fiduciary duty, and the Court is unable to find any.  Moreover, their only cited case

23

is distinguishable. In *Reginald Martin*, the plaintiffs were brokers contracted to sell insurance for the defendant company and were in the midst of a contract extension negotiation with the defendant. *Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, 388 F. Supp. 2d 919 (S.D. Ind. 2005). As part of negotiations, the company shared confidential information with the brokers. *Id.* at 928. Here, Ms. Johnson and Ms. Bevins allege only that they unilaterally trusted the NCAA to create positive and safe environments. There is no sharing of confidential information here like there was in *Reginald Martin*, making this case distinguishable. In sum, there is insufficient factual allegations to plead fiduciary duty.

Yet, Ms. Johnson and Ms. Bevins also claim that the UT-Austin investigation fraudulently concealed their causes of action. (Pls.' Br. 10–12, ECF No. 128.) But fraudulent concealment only applies where a *defendant* engages in concealing a cause of action. *See Lyons*, 19 N.E.3d at 260 ("Fraudulent concealment is an equitable doctrine that operates to estop a *defendant* from asserting the statute of limitations as a bar to a claim whenever the *defendant* . . . has either, by deception or by violation of duty, concealed from the plaintiff material facts . . . ." (emphasis added)). Here, the alleged concealment was done by UT-Austin, not by the NCAA. Plaintiffs argue that UT-Austin was an agent or representative of the NCAA, but that argument lacks SAC support. (Pls.' Br. 12, ECF No. 128.) Here, the SAC does not allege any connection between UT-Austin and the NCAA. (SAC ¶¶365–79, ECF No. 116.) The SAC does not point to any relationship between the two entities and does not outline

any facts showing that UT-Austin was benefiting the NCAA or was subject to the NCAA's control. *See* Restatement (Third) of Agency § 1.01 (defining agency). Thus, the SAC does not plead a plausible defense to the statute of limitations.

### ii. Equitable Estoppel

Ms. Bevins and Ms. Johnson also urge that their statute of limitations should be tolled under equitable estoppel. Equitable estoppel is distinct from fraudulent concealment even though they are often used interchangeably. *See Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 56 N.E.3d 38, 44–45 (Ind. Ct. App. 2016). Like fraudulent concealment, silence only tolls the statute of limitations where there is a duty to speak. *See, e.g.*, *Town of New Chi. v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010).

Ms. Bevins and Ms. Johnson argue that the same two factual scenarios above— the concealing of other sexual abuse instances and the UT-Austin investigation— warrant equitable tolling. Defendants fiercely attack the UT-Austin angle, and the Court agrees with Defendants. For the same reasons above regarding agency, the Court cannot toll the statute of limitations based on the conduct of UT-Austin.

Regarding the prevalence of sexual abuse theory, Defendants argue that there is no duty for Defendants to inform student-athletes of other sexual abuse cases. (Defs.' Reply 3, ECF No. 129.) The Court agrees. Consistent with the fiduciary analysis listed above, there is no duty giving rise to a duty to disclose. Indeed, wholly lacking

25

are any pleaded facts indicating a plausible fiduciary relationship between the parties.  Thus, equitable tolling does not apply because the silent party here did not have a duty to speak.  *Town of New Chi.*, 939 N.E.2d at 653.

But, Ms. Johnson and Ms. Bevins cite *Langston v. Mid-American Intercollegiate Athletics Association* to support their position that the NCAA's silence creates equitable estoppel.  448 F. Supp. 3d 938, 950 (N.D. Ill. 2020).  *Langston* is distinguishable for at least two reasons.  First, *Langston* dealt with Kansas law, not Indiana law.  Second, the defendants in *Langston* did not even dispute whether the NCAA had a duty to disclose information about concussions.  NCAA Mem., *Langston*, No. 1:17-cv-04978, 448 F. Supp. 938 (N.D. Ill. 2020) (contesting only the contract claims, not the negligence claim).

Ms. Bevins and Ms. Johnson pose one further theory to skirt the statute of limitations, arguing that this Court should create a novel exception in equity for "victims of sexual abuse in instances where the abuser is in a recognized position of power over their victims, like an NCAA coach over a student-athlete." (SAC ¶ 384.) Plaintiffs say that this exception would toll the limitations period "until the victim[s] can identify the conduct for what it was: sexual abuse." (SAC ¶ 384; Pls.' Br. 12.)  The Court need not create such an exception now, because that rule would not save Ms. Johnson's and Ms. Bevin's claims.  Ms. Johnson filed a formal complaint against Mr. Rembao in June 2000, and Ms. Bevins served as a witness in that investigation. (SAC ¶¶ 320, 365.)   Thus, Ms. Johnson and Ms. Bevins recognized that they were

26

victimized—or in the words of the SAC, abused—back in 2000.  Thus, their proposed exception would not save their claims.  In conclusion, the Court finds no plausible timely claim for Ms. Johnson and Ms. Bevins and therefore dismisses the claims brought by them.

### C. Proper Defendant

Defendants argue that the Board of Governors ("Board") is not an entity capable of being sued.  (Defs.' Br. 17.)  A defendant must have the legal capacity to be sued. Fed. R. Civ. P. 17(b).  For entities that are not individuals or corporations, capacity to sue or be sued is a matter of state law.  Fed. R. Civ. P. 17(b)(3).  Plaintiffs concede that Indiana does not have a statute allowing for suits against a board of directors of unincorporated association.  (Pls.' Br. 19.)  They have not located any Indiana cases recognizing a comparable board either.  Instead, Plaintiffs cite a case from New Jersey that found a hospital's Medical Executive Committee capable of being sued. *Nahas v. Shore Med. Ctr.*, No. 13-6537, 2018 WL 1981474, at *1 (D.N.J. Apr. 27, 2018).  Plaintiffs point to *Nahas* and say that New Jersey has a similar statutory scheme to Indiana.  (Pls.' Br. 19–20.)  But in *Nahas,* the court noted that New Jersey had a statute which set a standard for evaluating capacity.  That standard is what made the entity in that case suable.  Plaintiffs have not located a similar statute or standard in Indiana.  In any event, while the Board of Governors may have some comparable characteristics to groups recognized in New Jersey, *see Nahas*, 2018 WL 1981474, at *9 (listing qualities of entities with capacity), Rule 17(b) requires the

Court to look to Indiana state law.  Not only have Plaintiffs failed to cite any persuasive Indiana authority that the Board is a suable entity in Indiana, but contrary authority exists.  *See Manassa v. NCAA*, No. 1:20-cv-03172-RLY-MJD (S.D. Ind. Sept. 13, 2021), ECF No. 42 (holding that the NCAA Board of Governors is not a suable entity under Indiana law).  Accordingly, the Court declines to find the Board to be a suable entity.

Thus, the Court hereby dismisses all claims against the NCAA Board of Governors with prejudice.  Even if the Court was to find the Board to be a suable entity, Plaintiffs claims would still fail for the other shortcomings illustrated in this Order: Ms. Corcoran lacks standing to bring any claims and the Aldrich Plaintiffs do not have timely claims to bring.

## IV. CONLUSION

For the foregoing reasons, Defendants Motion to Dismiss (ECF No. 123) is **granted.**  Moreover, Defendants Motion for Oral Argument (ECF No. 125) is **denied** as moot.  The Clerk is directed to enter Judgment consistent with this Order.

**SO ORDERED.**

Date: 9/30/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to registered counsel of record:

28